**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
*Norfolk Division*

| | |
|---|---|
| **SFF CONSERVATION INITIATIVE, INC.,** | Civil Action No. 2:26-cv-00738 |
| **and LISA M. CLARKSON**, individually and on behalf of all others similarly situated,<br>Plaintiffs, | **CLASS ACTION COMPLAINT FOR:** |
| v. | 1) **42 U.S.C. § 1983 (Procedural & Substantive Due Process, Equal Protection, Takings);**<br>2) **Clean Water Act Citizen Suit, 33 U.S.C. § 1365;** |
| **CITY OF VIRGINIA BEACH;** | 3) **Inverse Condemnation, Va. Const. Art. I, § 11;** |
| **VIRGINIA BEACH DEVELOPMENT AUTHORITY;** | 4) **Declaratory Judgment, 28 U.S.C. §§2201-2202;**<br>5) **Supplemental State-Law Claims; and** |
| **ROBERT M. DYER;** | 6) **EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| **ROSEMARY A. WILSON;** | |
| **PATRICK A. DUHANEY;** | **JURY TRIAL DEMANDED** |
| **MARK D. STILES;** | |
| **THE DRAGAS COMPANIES, INC.;** | |
| **and JOHN DOES 1-50,** | |
| Defendants. | |

<u>**CLASS ACTION COMPLAINT, APPLICATION FOR**</u>
<u>**TEMPORARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION**</u>

Putative Class Plaintiffs SFF Conservation Initiative, Inc. ("SFF") and Lisa M. Clarkson ("Clarkson"), individually and on behalf of all persons similarly situated, by counsel, allege as follows:

## I. NATURE OF ACTION AND EMERGENCY RELIEF SOUGHT

1.     This is an emergency action to prevent the imminent and irreversible disposition of a 350-acre public asset.  The Council held a public hearing on July 7, 2026, and has scheduled a vote on July 14, 2026, to approve the transfer of the publicly owned Virginia Beach National Golf Club to a predetermined developer, The Dragas Companies, Inc. ("Dragas"), for construction of approximately 659 residential units below the City of Virginia Beach's ("City") "Green Line" growth boundary, in the Southern Rivers Watershed, on poorly drained hydric soils served only by private wells and on-site septic systems, and within a watershed for which the City is in admitted, ongoing violation of the Clean Water Act.

2.     Once the Virginia Beach Development Authority (the "Authority" or "VBDA") conveys the land and site work begins, the injury cannot be undone.  Plaintiffs seek a temporary restraining order and preliminary injunction freezing the conveyance and physical alteration of the property until the concealed dealings described below are disclosed and a lawful public process occurs.  The property also contains two active bald eagle nests, confirmed on the public record at the Virginia Beach City Council meeting on July 7, 2026.  No Defendant holds or has sought the federal authorization that must precede any disturbance of those nests, and the site work the transaction contemplates cannot lawfully begin without it.

3.     The transaction was not the product of a transparent, competitive procurement process.  As detailed in Part VI, City officials negotiated with Dragas in secret for more than seventeen months before any public solicitation issued and nearly two years before the public was told a sale was under consideration.  Those negotiations involved the Mayor and Vice Mayor personally.  The City and Dragas executed a Mutual Non-Disclosure Agreement that barred disclosure to the City's own boards and commissions, the very bodies charged with overseeing the

property and its environmental consequences, other potential bidders, and the general public. Dragas then submitted a fraudulent proposal, executing an Anti-collusion Form falsely certifying the absence of the insider access it had enjoyed, and the City accepted that certification knowing it was false.

4. This transaction is the latest act of a documented, multi-year pattern in which the City, the Authority, and a circle of favored developers and insiders have converted the public's land-use, environmental-permitting, and property-disposition powers into instruments of private gain, summarized in Part VIII. That pattern establishes three facts essential to the relief sought. First, the regulatory checkpoints that should protect this parcel have been deliberately disabled. Second, the officials who would implement the transfer have repeatedly misrepresented material facts to tax-paying citizens of Virginia Beach, to the City's own oversight boards, to a sitting Council member, and to a federal court. Third, the ordinary channels of enforcement are structurally unavailable, because the local Commonwealth's Attorney is disqualified by a documented financial conflict and a post-vote state suit cannot arrest the conveyance before the harm becomes permanent. This Court is the only forum that can preserve the status quo.

5. Plaintiffs bring claims under 42 U.S.C. § 1983 for deprivations of procedural due process, substantive due process, equal protection, and the Takings Clause; under 42 U.S.C. §§ 1985 and 1986 for conspiracy to obstruct justice, to deprive property owners of equal protection, and for the knowing failure to prevent those wrongs; under the Clean Water Act citizen-suit provision, 33 U.S.C. § 1365; under Article I, § 11 of the Constitution of Virginia for inverse condemnation; under 28 U.S.C. §§ 2201-2202 for declaratory relief; and under supplemental Virginia law, including the business conspiracy statute (Va. Code §§ 18.2-499, 18.2-500), the Antitrust Act (Va. Code § 59.1-9.5), and the Computer Crimes Act (Va. Code § 18.2-152.3).

Plaintiffs reserve the right to assert claims under 18 U.S.C. §§ 1961-1968 (RICO) upon completion of discovery sufficient to plead the predicate acts with particularity.

6. Plaintiffs further seek declaratory and injunctive relief under the Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668-668d, and the Migratory Bird Treaty Act, 16 U.S.C. §§ 703-712 and, in the alternative to the extent federally listed species are confirmed on the property, under the citizen-suit provision of the Endangered Species Act, 16 U.S.C § 1540(g), to protect the two active bald eagle nests on the Virginia Beach National property.

7. Plaintiffs seek, by the accompanying emergency motion under Federal Rule of Civil Procedure 65, a temporary restraining order and preliminary injunction that will halt any further disposition, lease, or encumbrance of City-owned real property, including the Virginia Beach National Golf Club and an adjacent parcel described herein; bar any alteration, modification, transfer, tree removal, or land-disturbing activity on the Virginia Beach National property, including within 660 feet of either documented bald eagle nest, absent compliance with the Bald and Golden Eagle Protection Act; enjoin the July 14, 2026 vote until the concealed communications are disclosed and a genuine public process occurs; enjoin further development in the Southern Rivers Watershed until the City achieves Clean Water Act compliance as set forth in Part IX; and preserve all documents, records, and audit logs relevant to the conduct alleged.

8. As ultimate relief, Plaintiffs seek judicial dissolution of the Authority, the return of all Authority-held public property to the City under court supervision, an audit of City building permits issued in violation of the City's ordinances, and referral of the evidence assembled here to the United States Attorney, the Attorney General of Virginia, and the Virginia State Police.

9. The City is named on the § 1983, Clean Water Act, and supplemental state-law claims. Municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978),

is established by the City Council's own legislative acts, the longstanding administrative custom of bypassing statutory predicates, and the ratification of subordinate conduct by final policymakers. The violations alleged were not the work of a single employee but the coordinated product of multiple City departments, including planning, zoning, information technology, the treasury, the City Attorney's Office, and economic development.

## II. JURISDICTION AND VENUE

10.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331, civil-rights jurisdiction under 28 U.S.C. § 1343(a)(3), and Clean Water Act citizen-suit jurisdiction under 33 U.S.C. § 1365(a). The Court has supplemental jurisdiction over the Virginia claims under 28 U.S.C. § 1367(a) and jurisdiction to enter declaratory relief under 28 U.S.C. §§ 2201-2202. The City of Virginia Beach falls within the Eastern District of Virginia therefore, venue is proper in this District and the Norfolk Division under 28 U.S.C. § 1391(b). Defendants reside and transact their affairs in the Eastern District of Virginia and the property at issue is located in the Eastern District of Virginia. Each Defendant is subject to personal jurisdiction as a Virginia entity, a resident, or under Va. Code § 8.01-328.1.

11.     Count VI seeks declaratory and injunctive relief arising under the laws of the United States, including the Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668-668d, and the Migratory Bird Treaty Act, 16 U.S.C. §§ 703-712, within the Court's jurisdiction under 28 U.S.C. § 1331 and §§ 2201-2202; to the extent Count VI proceeds in the alternative under the Endangered Species Act, jurisdiction also lies under 16 U.S.C. § 1540(c) and (g).

12.     Plaintiffs satisfied the Clean Water Act's pre-suit notice requirement. On March 12, 2026, Plaintiffs served a sixty-day Notice of Intent to Sue under 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R. Part 135 upon the Administrator of the U.S. Environmental Protection Agency, the

EPA Region 3 Regional Administrator, the Director of the Virginia Department of Environmental Quality ("DEQ"), the Chair of the State Water Control Board (the "Board"), and the City; the Notice was delivered on March 19, 2026. *Exhibit A*. More than sixty days have elapsed.

13. The Act's citizen-suit bar applies only where the Administrator or the State "has commenced and is diligently prosecuting a civil or criminal action in a court," 33 U.S.C. § 1365(b)(1)(B); administrative proceedings by DEQ under 9VAC25-830-260, including compliance reviews and special orders, are not judicial actions and do not trigger the bar. Although the Board holds "exclusive authority" to enforce the Chesapeake Bay Preservation Act against a locality under Va. Code § 62.1-44.15:70, that state-law authority does not restrict this federal citizen suit, and no EPA, DEQ, or Board judicial action against the City has commenced. The violations alleged are ongoing and continuing.

14. Contemporaneously with this filing, Plaintiffs are serving written notice under the Endangered Species Act's citizen-suit provision, 16 U.S.C. § 1540(g)(2), upon the Secretary of the Interior, the Director of the U.S. Fish and Wildlife Service, and each Defendant named in Count VI. Because the noticed July 14, 2026 vote and the conveyance and site work that would promptly follow pose and emergency presenting a significant risk to the well-being of wildlife on the property, the Act permits an action respecting such an emergency to be brought immediately after notification. 16 U.S.C. § 1540(g)(2)(C). The eagle-specific relief sought in Count VI does not depend on the Endangered Species Act and is subject to no pre-suit notice requirement.

15. Plaintiffs are filing the accompanying Emergency Motion concurrently with this Complaint and are providing notice to each Defendant by the most expeditious means reasonably available, consistent with Rule 65(b)(1).

**A. Plaintiffs**

16.     Plaintiff SFF Conservation Initiative, Inc. is a Virginia § 501(c)(3) nonstock corporation with its principal office at 3808 North Landing Road, Virginia Beach, whose mission is the protection of the agricultural lands, wetlands, groundwater, and watersheds of the Commonwealth, and whose members own, use, and enjoy property and waters injured by the conduct alleged.  SFF sues on its own behalf and on behalf of its members.

17.     Plaintiff Lisa M. Clarkson is a resident, taxpayer, and property owner of the City and the Executive Director of SFF.  She owns real property within the Southern Rivers Watershed and the Chesapeake Bay Preservation Area that lies hydrologically downstream of both the West Neck drainage parcels described in Part VIII and the Virginia Beach National parcels described in Part VI.  An adjacent parcel, set aside for drainage from her subdivision and continuously tax-exempt since 1964, was stripped of its exemption in 2018, billed at a fabricated "buildable" value, and forced into the hands of a developer-purchaser.  She has suffered recurrent flooding, diminution in property value, and threats to her well water as a direct result.

18.     Clarkson and numerous SFF members are served exclusively by private drinking-water wells drawing on the shallow aquifer and by on-site septic systems.  Virginia Beach lies within the Eastern Virginia Groundwater Management Area, and the General Assembly has recognized the threat that commercial and industrial use poses to resident wells, protecting residential wells within five miles of permitted commercial or industrial withdrawals, Va. Code § 62.1-258.1.  The intensification of impervious use immediately upstream of these wells threatens contamination that no post-hoc damages award could repair, and confers a direct, particularized

interest in the disposition of the Virginia Beach National property independent of any recreational use.  Clarkson sues individually and as a class representative.

**B. Named Defendants**

19.    Defendant City of Virginia Beach is a Virginia municipal corporation and a "person" subject to liability under 42 U.S.C. § 1983 and the Clean Water Act, 33 U.S.C. § 1362(5).

20.    Defendant Virginia Beach Development Authority is a political subdivision created under Chapter 643 of the 1964 Acts of Assembly, governed by an eleven-member board appointed by the City Council.  It holds, conveys, leases, and finances real property, including the Virginia Beach National Golf Club, and administers the cigarette-tax-funded Economic Development Investment Program ("EDIP") and the Tourism Development Financing Program.  It published no annual report between FY2018 and FY2023, a five-year gap that facilitated concealment of the conduct alleged.

21.    Defendant Robert M. Dyer is the Mayor of the City of Virginia Beach and chairs the Virginia Beach City Council.  He participated personally in the confidential Dragas negotiations, including a September 23-24, 2024 text-message exchange arranging a private meeting structured to remain below the three-member threshold that triggers Virginia's open-meeting requirements, Va. Code § 2.2-3701.  He is sued individually for damages and officially for injunctive relief.

22.    Defendant Rosemary A. Wilson is the Vice Mayor and Council liaison to the Authority.  She participated personally in the confidential Dragas negotiations and, in November 2025, told the press that interest in selling the property arose from a developer approach received "in September," a statement the documentary record shows was false by more than a year.  She is sued individually and officially.

23. Defendant Patrick A. Duhaney is the City Manager. He directs the City's land-use apparatus, personally attended a September 6, 2024 meeting with a second developer group pursuing the property, directed staff in the Dragas negotiations, and, after the limitations period for prosecuting malfeasance reported in 2021 had elapsed, rehired the Zoning Administrator who had performed the reclassifications described in Part VIII. He received real property by deed from a builder engaged in development on unlawfully reclassified land. *Exhibit B*. He is sued individually and officially.

24. Defendant Mark D. Stiles is the City Attorney. His Office negotiated and, upon information and belief, approved the August 7, 2024 Non-Disclosure Agreement concealing the negotiations from the City's own boards; made, through a Deputy City Attorney, the drainage-easement "placeholder" admission described in Part VI; produced records to a sitting Council member on October 25, 2024 while advising him to "refrain from publicizing" them; and declined to correct or refer the reclassification and tax-lien conduct after receiving written notice from Clarkson in 2021. He is sued individually and officially.

25. Defendant The Dragas Companies, Inc., together with its operating affiliates, is a Virginia-based residential developer that conducted more than seventeen months of confidential negotiations for the property before any other competing business had an equal opportunity to compete. Dragas personally solicited at least three sitting Council members, including the Mayor and Vice Mayor, by text message. Dragas is named on the supplemental Virginia claims and is a necessary party to the injunctive relief sought.

**C. Doe Defendants**

26. John Does 1 through 50 are additional participants whose true names are not yet known or not yet confirmed and who are described with particularity elsewhere in this Complaint,

including the current and former City Treasurer, the Deputy Treasurer for Real Estate, and Treasurer's Office personnel who directed the removal of tax-exempt status and the assessment and mailing of fabricated liens; the information-technology personnel who executed the database alterations; the Planning Director and the Zoning Administrator who effected the reclassifications and issued permits without environmental review; the Commonwealth's Attorney for the City, sued in his official capacity only for the declaratory relief in Count XIV; the regional financial institution that served as the financial hub of the conduct alleged; the corporate recipient of the September 16, 2025 single-applicant carveout; additional Council members and Authority board members who participated in the conduct alleged; and additional City employees, developers, title and auction participants, and professional advisers. Plaintiffs will substitute their true names by amendment upon confirmation through discovery.

### IV. CLASS ACTION ALLEGATIONS

27. Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of a single Class: all persons and entities that own real property in the City of Virginia Beach which is adjacent to, downstream of, or within the drainage catchment of land whose drainage or open-space function the City de-recognized, removed from its official records, or conveyed or permitted for private development through the conduct alleged herein, and that have thereby suffered, or are imminently threatened with, recurrent flooding, loss of natural drainage capacity, diminution in property value, or contamination of well water.

28. For purposes of the Rule 23(b)(2) class, the Class also includes all current taxpayers and registered voters of the City, who share a common interest in the integrity of the City's

disposition of public land and the lawful administration of its land-use and environmental programs.  Defendants and their officers, employees, and agents are excluded.

29. Joinder is impracticable; the conduct that is alleged, affected land throughout the Southern Rivers Watershed and, upon information and belief, the Class includes several hundred property owners in addition to the taxpayers and voters within the Rule 23(b)(2) class.

30. Common questions predominate, including whether the City lawfully removed drainage and open-space land from its records without notice or hearing; whether the City's practice of affording favored developers off-process access to public land is an official policy or custom under *Monell*; whether the City's acceptance of site plans depicting jurisdictional wetlands and drainage as buildable land is policy or custom; whether the City's failure to subtract wetlands, water bodies, and drainage from each parcel before calculating minimum lot area is an unlawful taking; whether the unauthorized fill of wetlands and drainage is an ongoing Clean Water Act violation; and the measure of class-wide relief.

31. Clarkson's claims are typical, arising from the same course of conduct that injured the Class, and Plaintiffs and their experienced counsel will fairly and adequately protect the Class. Certification is appropriate under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, and, in the alternative, under Rule 23(b)(3) because common questions predominate and a class action is superior.

## V. THE PROTECTED SETTING AND THE REGULATORY FRAMEWORK BYPASSED

32. Approximately 67 percent of the City lies south of the "Green Line" growth boundary within the Southern Rivers Watershed, draining to Back Bay, the North Landing River, and ultimately Currituck and Albemarle Sounds.  The area is characterized by hydric soils, a seasonal high-water table, extensive nontidal wetlands, and reliance on private wells and on-site

septic, and lies within the Interfacility Traffic Area ("ITA") protecting Naval Air Station Oceana and Naval Auxiliary Landing Field ("NALF") Fentress.

33. The City's own ordinances cap residential density below the Green Line at one dwelling unit per fifteen acres, and the 2005 ITA Overlay reduced density to that level in response to the federal Base Realignment and Closure conditions that preserved NAS Oceana. Virginia Beach, VA, Mun. Code Sec. 402(b) and Sec. 1803. The land below the Green Line was placed beyond intensive development because its soils and hydrology cannot safely support it without endangering the residents, who build there, and everyone downstream.

34. The City holds Virginia Pollution Discharge Elimination System ("VPDES") Municipal Separate Storm Sewer ("MS4") Phase I Permit No. VA0088676, effective January 26, 2024, authorizing stormwater discharges across approximately 67 percent of the City's land area. The City's Zoning Ordinance excludes wetlands, water bodies, and special-restriction floodplains from minimum-lot-area, density, and lot-coverage calculations. The Chesapeake Bay Preservation Act, Va. Code § 62.1-44.15:27(A), mandates regulation of any land-disturbing activity of 2,500 square feet or more within a designated Preservation Area, and the City's Wetlands Zoning Ordinance, Va. Code §§ 28.2-1302 *et seq.* and City Code Appendix A, §§ 1400-1418, vests the City's Wetlands Board with permitting authority over every tidal wetland alteration.

35. Virginia Beach is a statutory "Tidewater Virginia" locality, Va. Code § 62.1-44.15:68, and is therefore subject to the mandatory Chesapeake Bay Preservation Area ("CBPA") designation requirement of Va. Code § 62.1-44.15:74(A), under which the City "shall use the criteria developed by the Board to determine the extent of the Chesapeake Bay Preservation Area within [its] jurisdiction." The CBPA Board's criteria define the Resource Protection Area by physical features, namely tidal wetlands, tidal shores, contiguous nontidal wetlands, and water

bodies with perennial flow, not by whether those features drain to the Chesapeake Bay. 9VAC25-830-80.

36. Beginning in 2018, however, without notice or legislative authorization, the City administered two different regimes: it applied the full Bay Act ordinance (Appendix F, Ordinance No. 3825) to its northern, Bay-draining watersheds while applying a weaker Southern Watersheds Management Ordinance (Appendix G, Ordinance No. 2115, adopted in 1992 and never substantively amended) to the southern two-thirds of the City, including the Southern Rivers Watershed in which the Virginia Beach National parcels lie.

37. Appendix G predates the Virginia Erosion and Stormwater Management Act and omits the mandatory 2,500-square-foot threshold, the water-quality criteria, and the wetland-verification checkpoint the Bay Act requires. As a Dillon Rule locality, the City has no authority to substitute a lesser program of its own design for a mandatory statutory obligation. *Board of Supervisors v. DeGroff Enters.*, 214 Va. 235, 237 (1973). By under-designating the Preservation Area across two-thirds of its territory, the City removed the 2,500-square-foot trigger and, with it, the wetland-verification checkpoint that is the last safeguard against unlawful wetland destruction.

38. Four separate regulatory authorities have jurisdiction over wetlands in Virginia, and the City's local Wetlands Board is only one of them. First, the local Wetlands Board, with Virginia Marine Resources Commission oversight, regulates tidal wetlands under Va. Code §§ 28.2-1300 *et seq*. Second, the U.S. Army Corps of Engineers regulates the discharge of dredged or fill material into waters of the United States under Section 404 of the Clean Water Act. Third, DEQ regulates impacts to all state-waters wetlands, including isolated and non-federal wetlands, under the Virginia Water Protection Permit program, Va. Code § 62.1-44.15:20. Fourth, the Chesapeake Bay Preservation Act requires nontidal wetlands connected by surface flow and contiguous to tidal

wetlands or perennial-flow water bodies to be delineated and protected as Resource Protection Areas, 9VAC25-830-80.

39. When the City ceased recognizing wetlands outside its local Board's narrow tidal jurisdiction in 2018, it did not render those wetlands unregulated; it simply stopped performing the verification that Chesapeake Bay Preservation Area Ordinance § 106(A)(6) makes a condition precedent to any grading or land-disturbing authorization, namely proof of Section 404 and Section 401 coverage before the first shovel of dirt turns. The General Assembly and the City's own ordinances make the City, the front-line enforcement checkpoint; when the City, authorizes land disturbance without that verification, it is not a bystander to the resulting Section 301(a) violation but the proximate cause of it.

40. Virginia Beach National Golf Club is a publicly owned, approximately 350-acre golf and recreation complex. The City owns the land; the Authority leases the golf-course grounds and contracts with a private operator under a management agreement expiring December 31, 2026. On October 13, 2023, the City Auditor found that the Authority lacked written procedures governing finances and capital maintenance, had no process to track capital needs running into millions of dollars, including stormwater ponds in "degraded" or "serious" condition in 7 of 11 cases, and had ignored a procurement-policy recommendation the Auditor first made in 2018.

41. The property is also occupied bald eagle nesting habitat. Two active bald eagle nests are located on the Virginia Beach National property. Their presence was raised on the public record at the July 7, 2026 public hearing before the City Council and has been reported by multiple regional media outlets, and residents have reported the nests to the Center for Conservation Biology, which administers Virginia's annual bald eagle nest survey and the VaEagles Nest Locator in coordination with the Virginia Department of Wildlife Resources.

42.     Federal law protects those nests independently of the wetlands and stormwater regimes described above.  The Bald and Golden Eagle Protection Act prohibits, absent a permit from the U.S. Fish and Wildlife Service, the "take" of any bald eagle, "alive or dead, or any part, nest, or egg thereof," 16 U.S.C. § 668(a); "take" includes to "molest or disturb," id. § 668c, and "disturb" includes any act that agitates or bothers a bald eagle to a degree likely to cause injury, a decrease in productivity, or nest abandonment, 50 C.F.R. § 22.6.

43.     The Migratory Bird Treaty Act independently prohibits the taking of bald eagles, their nests, and their eggs.  16 U.S.C. § 703(a); 50 C.F.R. § 10.13.  When the bald eagle was removed from the federal lists of endangered and threatened wildlife effective August 8, 2007, 72 Fed. Reg. 37,346 (July 9, 2007), the Fish and Wildlife Service designated these statutes as the species' continuing federal protection and issued the National Bald Eagle Management Guidelines (May 2007), which prescribe protective buffers of up to 660 feet between active nests and construction activity and counsel against clearing, land disturbance, and exterior construction during the nesting season.

44.     Upon information and belief, neither the City, the Authority, nor Dragas holds, has applied for, or has disclosed any intention to seek an eagle incidental-take or nest-take permit under 50 C.F.R. §§ 22.80 or 22.85; none has commissioned an eagle survey of the property; and the RFP, the staff presentations to Council, and the Dragas proposal are silent as to the bald eagles.

45.     When residents raised the nests at a community meeting hosted by Dragas at the Virginia Beach Central Library days before the public hearing, Dragas's President and Chief Executive Officer responded, "That's the first I've heard of that." *Exhibit C*.

46.     The proposed redevelopment, approximately 659 residential units, a redesign of eight golf holes, a new clubhouse and practice facilities, and the associated clearing, grading,

demolition, and utility work, cannot be accomplished without tree removal and land disturbance in proximity to, and upon information and belief within 660 feet of, one or both nests. Bald eagles in southeastern Virginia occupy their nest territories for much of the year, and the nesting season in Virginia extends from mid-December into mid-July, so the nests may be occupied at the time of the noticed July 14, 2026 vote and of any conveyance or site mobilization that follows it.

47. Records produced in response to a Virginia Freedom of Information Act request by then-Council Member Christopher Taylor (the "Taylor FOIA Production") establish that confidential negotiations with Dragas began no later than April 2024. On April 19, 2024, Deputy City Manager Amanda Jarratt requested aerial imagery of the property for a meeting with Helen Dragas; on April 22, 2024, Jarratt and a colleague met Dragas and her attorney in person. *Exhibit D.*

48. On April 23, staff summarized the meeting: Dragas was "interested in building a for-sale home and condo community on the land adjacent to VB National," had requested stormwater and maintenance cost estimates, and was "familiar with the AICUZ [Air Installations Compatible Use Zones] zoning and would not build on the parcels that cross into the zoning." *Exhibit E.* The residential component was thus part of the transaction from the first substantive contact. On April 24, Jarratt offered to send Dragas the not-yet-final internal audit before it had been shared with the public or the full Authority board. *Exhibit F.*

49. On July 16, 2024, a Dragas vice president sent City staff a draft "Exclusivity Non-Disclosure Agreement" seeking exclusive negotiating rights that would have locked out all other buyers. *Exhibit G.* Two days later, staff forwarded the draft to City Attorney Stiles, writing that Dragas "is eager to reconvene on how her company might be able to develop some additional residential unconstrained by AICUZ, but wants to keep their discussions confidential with a period

of exclusivity," and that "this is a really interesting project that might check down several boxes for us if we play our cards right." *Exhibit H*. This contemporaneous email shows City staff functioning as advocates for the Dragas proposal rather than as neutral public servants.

50. On August 7, 2024, the City and Dragas executed a Mutual Non-Disclosure Agreement. *Exhibit I*. The Agreement barred disclosure of confidential information, including conceptual plans, financial reports, and wetlands and drainage data, to "any third party, including any member or members of any appointed committees or commissions of the city." That clause excluded the Authority board, the Planning Commission, the Wetlands Board, and the Chesapeake Bay Preservation Area Board, the very bodies responsible for the property and its environmental consequences.

51. Upon information and belief, the City Attorney's Office executed the Agreement without any Council vote or recorded authorization. Virginia is a *Dillon Rule* state where local governments have only the powers expressly granted to them by the General Assembly and those necessarily implied from the expressly granted authority, and no statute confers upon the City Manager's Office or the City Attorney's Office authority to bind the City to conceal from its own appointed boards information those boards require to discharge their statutory duties. The Agreement is *ultra vires*[1] and void *ab initio*.

52. On August 8, 2024, staff identified the unconstrained residential footprint outside the ITA overlay as "about 42 acres," the footprint that would later yield the 659 units. *Exhibit J*. Dragas then received the City's complete due-diligence file more than a year before any solicitation issued. *Exhibit K*. On August 29, 2024, a Deputy City Attorney provided Dragas the boundary

---

[1] Unauthorized; beyond the scope of power allowed or granted by a corporate charter or by law. Ex. "the officer was liable for the firm's ultra vires actions." Also termed extra vires. Cf. Black's Law Dictionary (12th ed. 2024), *ultra vires*.

survey, title report, and easement information, explaining that drainage easements serving adjacent properties existed only as a "placeholder in the event the property is conveyed to a private party." *Exhibit L*. This is a contemporaneous admission that, more than thirteen months before any public solicitation, the City Attorney's Office was already planning for private conveyance and structuring easements accordingly.

53. The City was not dealing with Dragas alone. On September 6, 2024, a second, independent developer group, pursuing the same property and whose meeting the City Manager personally attended, recapped that it too had been told most of the land lay within the ITA and that "a major challenge for this property will be the requirement to obtain a Council supermajority vote." *Exhibit M*. This confirms that the supermajority requirement was being privately strategized, before any competitive process even began.

54. On September 23, 2024, Helen Dragas personally text-messaged a Council member, asking to meet "regarding a large, exciting project we've been exploring in Virginia Beach." *Exhibit N*. The same week she separately text-messaged Vice Mayor and the Mayor, where the Mayor responded, "Glad to do it, by law can[not] do more than two of us at a time," and the group arranged to meet at the Mayor's Office. *Exhibit O*. These contemporaneous texts are direct evidence that at least three sitting Council members, including the Mayor and Vice Mayor, were individually and privately solicited and briefed by the developer more than a year before the public was told a sale was under consideration, structured in groups of two to remain below the three-member threshold that triggers Virginia's open-meeting requirements pursuant to Va. Code § 2.2-3701.

55. On October 25, 2024, City Attorney Stiles produced the foregoing records to Council Member Taylor in response to his FOIA request while advising him, on the basis of the

Dragas non-disclosure agreement, to "refrain from publicizing the specific details of any of the proposals at this time." *Exhibit P*. The City Attorney thus used a private developer's confidentiality agreement to discourage a sitting Council member from sharing public records with the public he was elected to serve.

56. The City's Request for Proposals (RFP #ED-25-04), issued approximately October 2025, roughly seventeen months after Dragas's first meeting with staff, required every respondent to communicate only through a single designated contact and to execute an Anti-collusion Form certifying that no arrangement in restraint of free competitive bidding existed and that "no person acting for, or employed by, the City of Virginia Beach has an interest in, or is concerned with, this proposal." *Exhibit Q*.

57. In November 2025, Vice Mayor Wilson and a City spokesperson told the press that the idea to seek buyers, arose only after receiving a developer approach "in September" 2025; the documentary record shows both statements false by more than a year. Dragas submitted a proposal and, upon information and belief, executed the Anti-collusion Form by the November 21, 2025 deadline, after seventeen months of direct engagement with staff and with the Mayor and Vice Mayor personally. The certification was false when made and known to be false, and the City's acceptance of it shows that the City knowingly participated in the false certification.

58. On June 16, 2026, staff presented the Dragas proposal to Council: approximately $17.94 million, a $1.82 million Authority contribution, and approximately 659 residential units. Staff represented that a "public input session" had been conducted; upon information and belief, that session was limited to prospective respondents and excluded the public. Councilwoman Barbara Henley questioned whether the site, with its "very poorly drained soil," was "really the

right place to put 659 housing units," and noted the absence of any traffic or City-services analysis. Only after that objection did Council schedule an actual public hearing, for July 7, 2026.

59. The proposed density is irreconcilable with the land's location and applicable standards. The parcels lie south of the Green Line, where rural zoning contemplates one unit per fifteen acres; the proposal would place approximately 659 units on approximately 42 acres, roughly fifteen units per acre, without any traffic, fiscal-impact, Chesapeake Bay Water Quality Impact Assessment, Section 404 determination, or Virginia Department of Health septic analysis for a property the City's own audit found to contain eleven stormwater ponds, seven in "degraded" or "serious" condition. *Exhibit R*.

60. The parcels drain to the North Landing River, the watershed for which the City has designated its mandatory phosphorus load-reduction calculations "TBD" (to be determined), has achieved zero reductions from stormwater facilities for fourteen consecutive years, and remains in admitted, ongoing violation of its MS4 permit. Converting the open space to 659 units of impervious surface and stormwater discharge would inflict the environmental and groundwater injury that no damages award could repair.

61. Promptly after the June 16 presentation, Plaintiffs confirmed that Dragas had, for the second time since 2021, sought and obtained access to City Planning Department plans for a separate, adjacent parcel of City-owned land never subject to any public process. Plaintiffs first discovered and halted substantially identical conduct by Dragas in 2021.[2] The recurrence is direct evidence that off-process facilitation of favored developers' access to public land is a settled municipal custom. Once a deed is recorded or site work begins, no money judgment can restore the public's lost opportunity for notice, hearing, and competitive process.

---

[2] Comments filed on Accela, Virginia Beach Department of Planning, 2021-DSC-013803 and 2021-DSC-013904 related to GPIN 1484448460000. Parcel 8, Plat Showing Parcels 1-13.

62. The City's own FY25 MS4 Annual Report and Total Phosphorus TMDL Action Plan, signed under penalty of perjury on September 30, 2025 under 40 C.F.R. § 122.22(d), admit material non-compliance with Permit No. VA0088676. For the North Landing River-Middle subwatershed, into which the Virginia Beach National and West Neck parcels drain, the City has achieved only approximately 231 of the 775 pounds per year of phosphorus reduction required, roughly 30 percent of its obligation, and has achieved zero reductions from that watershed's stormwater facilities for fourteen consecutive years.

63. The City's own figures show that converting pervious agricultural land to impervious development increases per-acre phosphorus loading roughly 3.5-fold, even as the Permit requires full Chesapeake Bay TMDL compliance by June 30, 2028. Intensifying development in this subwatershed is flatly incompatible with the City's binding federal and state water-quality obligations.

64. Between July 1, 2024 and June 30, 2025, the City discharged or allowed the discharge of raw sewage and petroleum products into waters of the United States, including Broad Bay, the Eastern Lynnhaven River, London Bridge Creek, Lake Holly, Lake Wesley, Owl Creek, and the Upper North Landing River. The City's own Annual Report documents no fewer than twelve separate sewage discharge events, including a single force-main failure that released approximately 20,000 gallons into London Bridge Creek, and a discharge of approximately 4,200 gallons of jet fuel.

65. Many receiving waters are already impaired under CWA § 303(d) and subject to bacteria TMDLs, so each discharge is a discharge to an impaired water contrary to the load reductions the Permit requires. These discharges were not authorized by the Permit and constitute

separate, ongoing violations of CWA § 301(a), 33 U.S.C. § 1311(a), and Permit Parts I.B.2.e and I.B.2.f.

66. The City has committed numerous programmatic violations. It failed to eliminate illicit discharges within the Permit's thirty-day timeframe, including a heating-oil contamination event that persisted for approximately fifteen months (*Permit Part I.B.2.e.6*); it has not updated its MS4 Program Plan since 2020 (*Permit Part I.A.6*); approximately 191 privately maintained stormwater facilities, roughly twelve percent, have not been inspected within the mandatory five-year period (*Permit Part I.B.2.h.2.a.2*); and required phosphorus load-reduction calculations for the North Landing River Watershed remain designated "TBD" and unreported (*Permit Parts I.D.2 and I.E*).

67. Through its Department of Economic Development, the City has recruited industrial and commercial operations into its MS4 service area without ensuring they obtain the VPDES industrial stormwater permits federal and state law require, in violation of CWA § 301(a). (*Permit Parts I.B.2.g* and *I.A.3*, and 40 C.F.R. § 122.26(b)(14)). The City's industrial and high-risk facility list has been reduced rather than expanded. Each deficiency remains uncorrected.

68. The City does not apply to its own capital projects, public works, road and drainage construction, utility installations, and municipal facilities the same wetland-delineation, Wetlands Board permitting, Section 404 and Section 401 verification, and VESMP[3] plan-review requirements it imposes, or purports to impose, on private applicants. City crews place fill[4] in

---

[3] "Virginia Erosion and Stormwater Management Program" or "VESMP" means a program established by a VESMP authority for the effective control of soil erosion and sediment deposition and the management of the quality and quantity of runoff resulting from land-disturbing activities to prevent the unreasonable degradation of properties, stream channels, waters, and other natural resources. The program shall include such items as local ordinances, rules, requirements for permits and land-disturbance approvals, policies and guidelines, technical materials, and requirements for plan review, inspection, and enforcement consistent with the requirements of this article. Va. Code § 62.1-44.15:24

[4] Fill material placed in waters of the United States where the material has the effect of replacing any portion of ta water with dry land, changing the bottom elevation or any portion. Any pollutant that replaces portions of surface

jurisdictional wetlands and discharge construction-phase sediment to the MS4 without Wetlands Board permits under City Code Appendix A, §§ 1400-1418, without evidence of Section 404 or Section 401 coverage under Chesapeake Bay Preservation Area Ordinance § 106(A)(6), and without the plan review the City would demand of any private landowner proposing identical work. No provision of law authorizes this exemption.

69.     Virginia Code § 62.1-44.15:34 expressly subjects governmental land-disturbing activities to the VESMP; 9VAC25-875-560 requires the operator of a regulated land-disturbing activity, public or private, to obtain VESMP approval; and 33 U.S.C. § 1362(5) defines the "person" bound by CWA §§ 301(a) and 404 to include a "municipality … or political subdivision of a State."  When a City crew, places fill in a jurisdictional wetland without a Section 404 permit, the City is the discharger and the violator.  Each such project that has proceeded without the required delineation, permit, and verification is a separate, continuing violation of the Permit (*Parts I.B.2.a*, *I.B.2.b*, and *I.A.3*) and of CWA § 301(a).

70.     On March 4, 2025, two jet-fuel pipeline breaches occurred south of the Green Line: a release at Two Farms Lane[5] of approximately 4,200 gallons that reached the Upper North Landing River, and a release of approximately 70 gallons at the City-owned facility at 4001 Dam Neck Road.[6]  As of the date of this Complaint, the City has neither notified nor tested the residential wells downstream, including wells serving SFF members.  These unauthorized discharges of petroleum violate CWA § 301(a) and CWA § 311, 33 U.S.C. § 1321, and trigger response obligations under the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.*  The pipeline is regulated as a hazardous-liquid pipeline under 49 C.F.R. Part 195.  Upon information and belief, both

---

water for any purpose, by placement of any pollutant or material including rock, sand, earth, and man-made materials and debris.  9VAC25-210-10
[5] 2,500 feet west of VB National parcels, directly below the Green Line
[6] 1,500 feet west of VB National parcels, directly below the Green Line

breaches occurred where construction took place after the corridor's easement and setback data had been removed from the City's geographic information and zoning systems, as described in Part VIII, so that no party had contemporaneous notice of the pipeline's location. On March 12, 2026, Plaintiffs served the sixty-day Notice documenting these violations. *Exhibit A*.

### VIII. BACKGROUND: THE PATTERN OF MUNICIPAL AND AUTHORITY SELF-DEALING

71. The Virginia Beach National transaction did not arise in a vacuum. It is the latest act of a documented, multi-year pattern that the following allegations establish to prove the official policy or custom the 42 U.S.C. § 1983 claims require, the combination the 42 U.S.C. § 1985 and Virginia statutory claims require, the disabling of the checkpoints that should protect this parcel, and the basis for dissolution of the Authority.

72. The Authority is an unelected body appointed by, and serving at the pleasure of, the same City Council whose campaigns are funded by the development, hospitality, and financial interests that are the beneficiaries of the Authority's dispositions. Its eleven members answer to no electorate, and its seats are populated by campaign contributors to the appointing Council members, as the public campaign-finance record reflects. Familial relationships compound the absence of accountability.

73. Upon information and belief, members of the Authority board and sitting Council members share close, undisclosed family relationships, including a parent-child relationship, that are not placed on the record as Va. Code § 15.2-2289 requires; the precise relationships will be confirmed through discovery.

74. An Authority so composed, unelected, populated by contributors, and interlocked by family with the Council that appoints it, cannot provide the arm's-length stewardship the public's land requires.

75. The Authority cannot be trusted to convey, lease, or encumber public property. Every major disposition in the record follows a single template: a public asset or public subsidy is transferred to a favored private party for private gain, while the liabilities, risks, and environmental burdens are retained by the public. In short, the City is engaging in its own version of "insider trading."[7]

76. The Authority has ignored its own auditor for five years, published no annual report for five years, and employed a director who pleaded guilty to embezzling public funds.[8] A body with this record is structurally incapable of the fiduciary stewardship that the disposition of public land demands. It should be enjoined from any further conveyance, lease, or encumbrance of public property and, ultimately, dissolved, with all Authority-held property returned to the City under court supervision.

77. The 2018 administrative reclassifications and tax-lien mechanism supplied the raw material for the illegal development this action seeks to arrest. Beginning in approximately 2018, City employees administratively reclassified parcels in the Agricultural District and in jurisdictional wetlands as "residential" in the City's official computer systems, by keystroke, without any ordinance, Planning Commission review, public hearing, or written notice to affected owners, in violation of Va. Code §§ 15.2-2204 and 15.2-2285; the reclassifications are void *ab initio*.

78. When Clarkson requested the change log, the City responded that it does "not keep track."[9] In the same period the responsible officials ceased recognizing non-tidal jurisdictional

---

[7] The Cavalier wire advanced public money to a private closing in violation of policy; the brewery and Corporate Landing conveyances rewarded a conflicted insider; Atlantic Park transferred public land for a dollar a year while shifting more than $300 million in exposure onto the taxpayers; and the Virginia Beach National transaction was negotiated off-process for seventeen months and concealed from the Authority's own oversight boards.

[8] WAVY 10. Ex-Virginia Beach economic director pleads guilty to felony embezzlement charges. (Aug. 4, 2021)

[9] F010022-041021 requesting all changes to the zoning map specifically the online GIS mapping data dates of change, individual who changed the zoning, on whose authorization and why the changes were made – "No Records Exist."

wetlands and raised the Preservation Area review threshold, deregulating 7,500 square feet of land disturbance per project across the most flood-vulnerable two-thirds of the City.

79. The mechanism by which protected land was made available for private development ran through the Treasurer's tax records. Beginning in 2018, the City removed the tax-exempt status from parcels that had long been carried as drainage and open-space land, without notice, hearing, or any change-in-use determination, and routed the resulting assessments through its judicial tax-sale process to pre-determined developer-purchasers, converting land that had served as natural drainage into nominally buildable lots. *Exhibit S*. Plaintiffs do not challenge the City's power to levy taxes; they allege only that the assessment system was manipulated to strip protection from drainage land and deliver it to developers, and their reliance on that mechanism in this Complaint is limited to that purpose. *Hibbs v. Winn*, 542 U.S. 88 (2004).

80. The mechanism is documented in three adjoining parcels in the West Neck area off Indian River Road, which lie below the Virginia Beach National site, within the Southern Rivers Watershed, and outside the City's MS4 service area.

81. Of the three, one was a buildable parcel, and the other two functioned as drainage continuously carried as tax-exempt drainage and open-space land since 1964. On April 5, 2018, a preferred builder solicited the City Attorney requesting a "tax suit to be instituted" against the property. *Exhibit T*. On approximately June 6, 2018, the City Treasurer removed all tax-exemptions citywide without ordinance, hearing, or change-in-use determination, and placed hundreds of parcels on the taxable roll at a fabricated "buildable" value.[10]

---

F010011-040721 requesting a list of all "by right" residential building plans issued in the agricultural district without being presented to the Planning Commission or City Council – "No Records Exist." F010010-040721 requesting zoning determination letters to and responses from the zoning administrator regarding "by right" residential structures in the agricultural district – "No Records Exist."

[10] With a first batch run on June 6, 2018 (*Exhibit S*, p. 4), the City Treasurer's office sent out tax notices on tax-exempt parcels citywide, assessing 10-years of taxes on buildable value to induce the transfer of lands to a list of specific builders.

82.  In March 2019, the Treasurer's Office denied a qualifying heir the statutory right of redemption, completing the forced sale, and the buyer then subdivided and built within the very drainage the two parcels had provided, on land with no City water or sewer and dependent on private wells and on-site septic in hydric soils. *Exhibit U*.

83.  The West Neck parcels are not an isolated instance but the template for what the City now proposes on a far larger scale.  The same de-recognition of drainage, and the same conversion of natural conveyance into buildable lots, underlie the 659-unit Virginia Beach National proposal, the industrial rezoning within the Interfacility Traffic Area, and the imagineVB 2040 Comprehensive Plan, each of which would intensify impervious development on land below the Green Line whose drainage the City has dismantled parcel by parcel and outside the MS4 service area that might otherwise convey the runoff.  *Exhibit V*.

84.  Because the City removed this drainage from its records and conveyed it to private parties without ever studying the cumulative hydrological consequences, none of these approvals may lawfully proceed until the Southern Rivers Watershed is comprehensively studied, its jurisdictional wetlands, waters, and drainage features are remapped and restored to the record, and the drainage capacity the City appropriated is replaced.

85.  Until that study is complete and the drainage restored, the Virginia Beach National conveyance, the industrial rezoning, and the Comprehensive Plan cannot be approved consistent with the City's own ordinances, the Clean Water Act, and the Constitution of Virginia.

## IX. GROUNDS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

86.  Plaintiffs are entitled to a temporary restraining order and preliminary injunction under Federal Rule of Civil Procedure 65 because plaintiffs are likely to suffer irreparable harm without the injunction, the balance of equities and hardships are in plaintiffs' favor, and an

injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008); *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342 (4th Cir. 2009).

**A. Likelihood of Success on the Merits**

87. Plaintiffs are likely to succeed on multiple independent claims that do not depend on any future vote. The City is in admitted, ongoing violation of the Clean Water Act and its MS4 permit, as its own perjury-certified reports establish, and Plaintiffs have satisfied the Act's sixty-day notice requirement.

88. The August 7, 2024 Non-Disclosure Agreement is *ultra vires* and void *ab initio* under the Dillon Rule. *Board of Supervisors v. DeGroff Enters.*, 214 Va. 235 (1973). The seventeen-month concealed negotiation, coupled with the materially false Anti-collusion Form the City knowingly accepted, establishes a restraint of competition under the Virginia Antitrust Act and deprivations of procedural due process and equal protection in the disposition process. Each rests on conduct that has already occurred.

89. Plaintiffs are likewise entitled to relief on Count VI: two documented bald eagle nests stand on the property, federal law forbids their disturbance absent a Fish and Wildlife Service permit, and no Defendant holds or has sought one; a transaction that cannot lawfully be consummated without a federal permit, that no party has requested, cannot proceed to closing and site work in its absence.

**B. Irreparable Harm and the Absence of an Adequate Remedy at Law**

90. The harm is the paradigm of irreparable injury. Real property is unique, and the 350-acre public asset, once conveyed and developed, cannot be restored. The threatened injury is environmental, including the destruction of wetlands and natural drainage capacity, increased stormwater discharge, and contamination of downstream private wells, and such injury "can

seldom be adequately remedied by money damages and is often permanent." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987).

91. Virginia law channels a challenge to a land-use decision into a Circuit Court suit filed within thirty days after the decision, but that remedy supplies no mechanism to arrest the recording of a deed or the commencement of site work in the interim, and the federal claims are not subject to any state-exhaustion requirement. *Patsy v. Board of Regents*, 457 U.S. 496 (1982).

92. The point of no return is the conveyance, not the vote. The disturbance or destruction of an active bald eagle nest is likewise irreparable in the most literal sense; no award of damages can restore an abandoned nest territory, and the federal permitting and buffer review that must precede such disturbance, once bypassed by conveyance and mobilization, cannot be retro-fitted.

**C. Balance of Equities and the Public Interest**

93. These factors merge when the government is enjoined. *Nken v. Holder*, 556 U.S. 418 (2009). A brief freeze of the status quo imposes no cognizable hardship, because the management agreement does not expire until December 31, 2026, and Defendants have no legitimate interest in consummating a transaction tainted by concealment and a false certification. An injunction requiring only that the City obey its own laws before parting with public property, serves the public interest.

**D. Scope of Relief: Citywide and Southern Rivers Watershed Compliance**

94. The relief Plaintiffs seek is directed at the conveyance and physical alteration of public property and at the City's continuing environmental non-compliance, not at the Council's legislative deliberations. Plaintiffs respectfully request that the Court enjoin the City from authorizing, permitting, or undertaking any further land-disturbing development, citywide and

specifically within the Southern Rivers Watershed, until the City has brought its stormwater, wetlands, and Chesapeake Bay Preservation Area programs into compliance with the Clean Water Act and its MS4 permit.

95. The need for watershed-wide relief follows from the nature of the violation. The City abandoned the mandatory land-disturbance threshold, allowing four-times the impact on a parcel-by-parcel basis permitting residential structures to be built within drainage easements and natural conveyances within and outside the City's MS4.[11] The wetlands, ditches, and drainage features that historically served the area below the Green Line as natural stormwater infrastructure were de-recognized and conveyed to private parties for development, appropriating for private benefit the public drainage function on which neighboring and downstream owners outside the MS4 depend.

96. Because the City effected that appropriation parcel by parcel, the entire Southern Rivers Watershed must be remapped and the jurisdictional wetlands, waters, and drainage features restored to the record before any upzoning or further intensification may lawfully proceed. The City's failure to enforce its own Zoning Ordinance, which requires that wetlands, water bodies, and drainage areas be subtracted from each parcel before the minimum lot area is determined,[12]

---

[11] City 'policy' since 2018 applies the 10,000 sq. ft. land-disturbance threshold to the Southern Rivers Watershed, falsely certifying in every MS4 Annual Report that: "The City ordinances require that land-disturbing activities equal to or exceeding an area of 2,500 square feet comply with the erosion and sediment control requirements, including the development and implementation of an erosion and sediment control plan. This requirement is more stringent than the 10,000-square-feet threshold required by the State for areas outside of the Chesapeake Bay Preservation Area." MS4 annual report. FY20, p. 12; FY21, p. 12; FY22, p. 11; FY23, p. 10; FY24, p. 11; FY25, p. 6. An audit of Planning Department records will show all lots where permits were issued in violation since 2018.

[12] City Zoning Ordinance of the City of Virginia Beach, Sec. 200, minimum lot area states: (b) The following shall not be included in determining the allowable dwelling unit or lodging unit density, lot coverage, floor area ratio and minimum lot area requirements: (1) The floodway portion of any floodplain; (2) Any body of water except as mentioned above; (3) Any manmade drainage areas such as borrow pits and the easements over them constructed primarily for purposes other than storage and retention of stormwater; (4) Wetlands; and (5) Any part of a public or private utility easement whose total width is more than twenty (20) feet.
(c) Floodplains subject to special restrictions pursuant to section 4.10 of the Floodplain Ordinance (Appendix K) not be included in determining minimum lot area requirements.

has, on a citywide basis, increased developable density to impervious cover never anticipated in the most flood-prone watershed shifting the resulting flood burden onto neighboring and downstream property. That practice is both an uncompensated taking and damaging of private drainage, under Article I, Section 11 of the Constitution of Virginia and the creation and maintenance of a public nuisance.

97. The City must itself come into compliance with the environmental and building requirements it is charged with enforcing before any further development is permitted, and the Court's supervision should continue until full compliance is achieved. A municipality that manufactures development entitlements by keystroke, exempts its own projects from the wetlands and stormwater law it enforces against private owners, and permits construction in drainage easements and on unsuitable soils has made itself a risk to the health, welfare, and safety of its own residents, elevating private development profit over the safety of the public at large.

98. The Court should therefore order that all public land conveyed or held in furtherance of the conduct alleged be returned to the public, and that an audit be performed to identify every parcel granted a City-issued building permit in violation of the City's ordinances, so that the resulting hazards may be identified and abated under judicial supervision.

## X. CAUSES OF ACTION

### COUNT I
**Procedural Due Process**
**(42 U.S.C. § 1983)**
*(Against the City, the Authority, Duhaney, Stiles, Dyer, Wilson, and Doe Defendants)*

99. Plaintiffs incorporate by reference each preceding paragraph as thought fully set forth herein. Plaintiffs and the Class held constitutionally protected property interests in their zoning designations, and the recognition of the wetlands and drainage servitudes on their land.

Defendants deprived them of those interests without notice or an opportunity to be heard. *Jones v. Flowers*, 547 U.S. 220 (2006).

100.    These deprivations result from official policy and custom within the meaning of *Monell*, including the City Council's legislative acts, the longstanding administrative custom of bypassing statutory predicates, and the ratification of subordinate conduct by final policymakers. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).  The violations were not the act of a single employee but the coordinated efforts of multiple City departments, establishing a custom so persistent and widespread as to carry the force of law.  *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978).

<u>**COUNT II**</u>
**Substantive Due Process**
**(42 U.S.C. § 1983)**
*(Against the City, the Authority, Duhaney, Stiles, Dyer, Wilson, and Doe Defendants)*

101.    Plaintiffs incorporate each preceding paragraph.  Defendants' conduct, including converting protected land by keystroke, manufacturing liens not lawfully owed, concealing a seventeen-month negotiation from the City's own oversight boards, and staging a "public input session" limited to developers, was arbitrary, irrational, and conscience-shocking.  *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).  Defendants' intensification of land below the Green Line without the soils, hydrology, groundwater, and water-quality analyses Virginia law requires, in an area, the City's own records describe as unsuitable for community development,[13] and whose natural drainage the City dismantled in 2018, reflects a conscious disregard of residents' health and safety and creates and maintains a public nuisance.

---

[13] Interfacility Traffic Area and Vicinity Master Plan (2017). p. 14, "community development is not well suited for this soil type due to issues with the seasonal high water table."

**COUNT III**
**Equal Protection**
**(42 U.S.C. § 1983)**
*(Against the City, the Authority, Duhaney, Stiles, Dyer, Wilson, and Doe Defendants)*

102.    Plaintiffs incorporate each preceding paragraph. Defendants intentionally treated Plaintiffs and the Class differently from others similarly situated and without rational basis. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). Dragas received seventeen months of exclusive confidential engagement while competing respondents received approximately six weeks to answer an RFP shaped by those months, and out-of-district Council members used their city-wide votes to impose intensive development on the district below the Green Line while disregarding that district's residents and downstream owners. There is no rational basis for this differential treatment and the blatant disregard for the community, where the City cannot extend public services.

**COUNT IV**
**Takings and Damaging**
**(42 U.S.C. § 1983 (Fifth and Fourteenth Amendments))**
*(Against the City and the Authority)*

103.    Plaintiffs incorporate each preceding paragraph. The City's affirmative acts, including de-recognizing wetlands and permitting fill of parcels that functioned as natural stormwater storage, caused recurrent physical invasion of Plaintiffs' property by stormwater. *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012). Plaintiffs need not exhaust state remedies. *Knick v. Township of Scott*, 588 U.S. 180 (2019).

**COUNT V**
**Clean Water Act Citizen Suit**
**(33 U.S.C. § 1365)**
*(Against the City and Doe Defendants (Pipeline Operators))*

104.    Plaintiffs incorporate each preceding paragraph. The City is in ongoing violation of CWA § 301(a), 33 U.S.C. § 1311(a); CWA § 402(p), 33 U.S.C. § 1342(p); CWA § 404, 33 U.S.C.

§ 1344; and Permit No. VA0088676, including, without limitation, (a) unauthorized sewage discharges to impaired waters (*Permit Parts I.B.2.e, I.B.2.f*); (b) unauthorized petroleum and jet-fuel discharges (*Permit Part I.B.2.f;* CWA § 311; 40 C.F.R. Parts 110, 117, 302); (c) failure to eliminate illicit discharges within thirty days (*Permit Part I.B.2.e.6*); (d) failure to update the MS4 Program Plan since 2020 (*Permit Part I.A.6*); (e) failure to inspect approximately 191 private stormwater facilities (*Permit Part I.B.2.h.2.a.2)*; (f) failure to complete TMDL reporting (Permit Parts I.D.2, I.E); (g) facilitation of unpermitted industrial discharges (*Permit Parts I.B.2.g, I.A.3;* 40 C.F.R. § 122.26(b)(14)); (h) systemic failure to recognize wetlands and enforce the Wetlands Zoning Ordinance and Preservation Area Ordinance § 106(A)(6) (*Permit Parts I.B.2.a, I.A.3, I.B.1*); (i) failure to apply the mandatory 2,500-square-foot threshold by under-designating the Preservation Area (Va. Code §§ 62.1-44.15:27(A), :68, :74(A); 9VAC25-830-80, -90; *Permit Part I.B.2.a.1*); and (j) unlawful self-exemption of City capital projects (Va. Code § 62.1-44.15:34; 9VAC25-875-560; *Permit Parts I.B.2.a, I.B.2.b*).

105. Each violation is ongoing; each day of each violation, and each discharge from a City MS4 outfall within the Southern Rivers Watershed since the later of January 26, 2024 or September 17, 2024, is a separate offense. Plaintiffs are entitled to declaratory and injunctive relief, a court-supervised compliance schedule, a Supplemental Environmental Project, civil penalties of up to $64,618 per day per violation under 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, and fees. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000).

**COUNT VI**
**Unlawful Take and Disturbance of Nesting Bald Eagles – Declaratory and Injunctive Relief**
**(Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668-668d; Migratory Bird Treaty Act, 16 U.S.C. §§ 703-712; 50 C.F.R. Part 22; 28 U.S.C. §§ 2201-2202; in the alternative, Endangered Species Act, 16 U.S.C. §§ 1538(a)(1)(B), 1540(g))**
*(Against the City, the Authority, Dragas, and Doe Defendants)*

106. Plaintiffs incorporate each preceding paragraph. Two active bald eagle nests are located on the Virginia Beach National property, a fact confirmed on the public record at the July 7, 2026 public hearing and reported by multiple regional media outlets. Absent a permit issued by the U.S. Fish and Wildlife Service under 50 C.F.R. §§ 22.80 or 22.85, federal law prohibits any act that would "take," "molest," or "disturb" those eagles or their nests, 16 U.S.C. §§ 668(a), 668c; 50 C.F.R. § 22.6; 16 U.S.C. § 703(a), and the Service's National Bald Eagle Management Guidelines prescribe buffers of up to 660 feet between active nests and construction.[14]

107. Upon information and belief, no Defendant holds or has applied for any such permit, commissioned an eagle survey, or incorporated any avoidance or minimization measure into the proposed transaction; Dragas's President and Chief Executive Officer was asked about the nests at a public meeting, answered that this was "the first I've heard of that."

108. The conveyance of the property and the redesign and construction of approximately 659 residential units, with attendant tree removal, grading, and demolition, will disturb and take the resident eagles and their nests within the meaning of both statutes unless and until the required federal review and permitting occur. Furthermore, the Bald and Golden Eagle Protection Act carries severe civil and criminal penalties.[15]

---

[14] 50 C.F.R. § 22.280(b) requirements for activities within 660 feet of a bald eagle nest.
[15] 16 U.S.C. §668(a) criminal penalties first offense fined not more than $5,000 or imprisoned not more than one year or both; second and subsequent not more than $10,000 or imprisoned not more than two years, or both. 16 U.S.C. §668(b) civil penalties not more than $5,000 for each such violation.

109. An actual and justiciable controversy exists under 28 U.S.C. § 2201 as to whether the property may be conveyed, altered, modified, or transferred, and whether site work may commence, absent the federal authorization described above. Plaintiffs seek a declaration that it may not, and injunctive relief, ancillary to that declaration and to the equitable relief sought on Counts I through V, barring any alteration, modification, transfer, tree removal, demolition, or land-disturbing activity on the property, and specifically within 660 feet of either nest, unless and until a qualified eagle survey has been completed and furnished to the Court, the U.S. Fish and Wildlife Service, and the Virginia Department of Wildlife Resources, and any permit required under 16 U.S.C. § 668 and 50 C.F.R. §§ 22.80 or 22.85 has issued. Because the relief sought in this Count is declaratory and equitable only, because the land remains in public ownership, and because no Defendant can claim hardship from being required to comply with federal law before consummating the transaction, the equities favor relief.

110. In the alternative, and to the extent site surveys confirm the presence on or adjacent to the property of any species listed under the Endangered Species Act, including the northern long-eared bat (Myotis septentrionalis), listed as endangered, 87 Fed. Reg. 73,488 (Nov. 30, 2022), whose range includes the City, the conduct alleged would effect a prohibited "take" under 16 U.S.C. § 1538(a)(1)(B) and 50 C.F.R. § 17.3, and Plaintiffs assert a citizen-suit claim under 16 U.S.C. § 1540(g).

111. Plaintiffs are serving the notice required by 16 U.S.C. § 1540(g)(2) contemporaneously with this filing and invoke the emergency provision of § 1540(g)(2)(C); to the extent any waiting period nonetheless applies, Plaintiffs will amend upon its expiration. Plaintiffs acknowledge that the bald eagle itself was removed from the lists of endangered and threatened wildlife effective August 8, 2007, 72 Fed. Reg. 37,346 (July 9, 2007); the eagle-specific relief

sought in this Count therefore rests on the Bald and Golden Eagle Protection Act and the Migratory

Bird Treaty Act, the statutes designated as the eagle's continuing federal protection upon delisting.

## COUNT VII
**Inverse Condemnation**
**(Va. Const. Art. I, § 11 (Supplemental))**
*(Against the City)*

112.    Plaintiffs incorporate each preceding paragraph.  The City's de-recognition of

wetlands appropriated the drainage function of historical wetlands for the benefit of new

development and damaged Plaintiffs' property through recurrent flooding.  Virginia's takings

clause expressly reaches property "damaged," not merely "taken."  *Livingston v. Va. Dep't of

Transp.*, 284 Va. 140 (2012).

## COUNT VIII
**Conspiracy to Obstruct Justice in State Courts**
**(42 U.S.C. § 1985(2), First Clause)**
*(Against Doe Defendants)*

113.    Plaintiffs incorporate each preceding paragraph.  Defendants conspired to impede

the due course of justice in Virginia Beach Circuit Court judicial tax-sale proceedings by

generating liens through fraudulent RACS edits, routing the resulting sales to conflicted court

officers, concealing campaign-donor relationships, serving process at addresses known to be

decades out of date, and obtaining default judgments against absent heirs.[16]

## COUNT IX
**Conspiracy to Obstruct Federal-Court Proceedings**
**(42 U.S.C. § 1985(2), Second Clause)**
*(Against the City, Dyer, Wilson, Stiles, and Does 1-50)*

114.    Plaintiffs incorporate by reference each preceding paragraph.  Where the

obstruction is directed at federal-court proceedings, no class-based animus is required.  *Kush v.

Rutledge*, 460 U.S. 719 (1983).  Defendants conspired to impede, hinder, obstruct, and defeat the

---

[16] *Exhibits S-U.*

due course of justice in the Holloway federal-court litigation through the misrepresentation conduct judicially found on July 8, 2025 to have "materially misled both plaintiffs and the court." *Exhibit W*.

**COUNT X**
**Neglect to Prevent**
**(42 U.S.C. § 1986)**
*(Against Stiles and Doe Defendants)*

115.    Plaintiffs incorporate each preceding paragraph.    Defendant Stiles, having knowledge of the § 1985 wrongs and the power to prevent them by advising that the conduct was unlawful, neglected to do so, and is liable for the resulting damages.

**COUNT XI**
**Virginia Statutory Business Conspiracy**
**(Va. Code §§ 18.2-499, 18.2-500 (Supplemental))**
*(Against the Authority, Stiles, Duhaney, Dyer, Wilson, Dragas, and Doe Defendants)*

116.    Plaintiffs incorporate each preceding paragraph.  Defendants combined to willfully and maliciously injure Plaintiffs in their business and property.  The individual Defendants acted outside the scope of their lawful authority and for the benefit of private parties, and Dragas, a legally distinct corporate person, independently supplies the plurality the statute requires.  *Fox v. Deese*, 234 Va. 412 (1987).  Plaintiffs are entitled to threefold damages, costs, and fees under Va. Code § 18.2-500.

**COUNT XII**
**Virginia Antitrust Act**
**(Va. Code §§ 59.1-9.5, 59.1-9.12 (Supplemental))**
*(Against the Authority, Stiles, Duhaney, Dyer, Wilson, Dragas, and Doe Defendants)*

117.    Plaintiffs incorporate each preceding paragraph.    Defendants combined to predetermine the disposition of the Virginia Beach National property for more than seventeen months before competing developers had an equal opportunity to compete, while Dragas certified the contrary on the Anti-collusion Form, in violation of Va. Code § 59.1-9.5.  The parallel,

independently documented pursuit of the same property by a second developer group confirms that the restraint was a deliberate choice, not an absence of qualified bidders.[17]  Plaintiffs are entitled to injunctive relief, disgorgement, and treble damages under Va. Code § 59.1-9.12.

**COUNT XIII**
**Virginia Computer Crimes Act**
**(Va. Code §§ 18.2-152.3, 18.2-152.12 (Supplemental))**
*(Against Doe Defendants)*

118.    Plaintiffs incorporate each preceding paragraph.  Defendants used the City's computer systems without authority, or exceeded their authority, to alter zoning, land-use, wetlands, tax-exemption, and pipeline-easement data for the affected parcels, in violation of Va. Code § 18.2-152.3.  *Exhibit X.*

**COUNT XIV**
**Declaratory Judgment: Disqualification of the Commonwealth's Attorney**
**(28 U.S.C. §§ 2201-2202)**
*(Against John Doe (Commonwealth's Attorney), in his official capacity)*

119.    Plaintiffs incorporate each preceding paragraph.  An actual controversy exists as to whether the Commonwealth's Attorney has an irreconcilable structural conflict and whether administrative remedies through his office are available.  Plaintiffs seek a declaration that the conflict warrants referral to the Attorney General or the appointment of a special prosecutor under Va. Code § 19.2-155.

**COUNT XV**
**Declaratory Judgment: ITA Amendment Inconsistent with State Law AICUZ**
**Obligations**
**(28 U.S.C. §§ 2201-2202; Va. Code §§ 15.2-2204, 15.2-2223, 15.2-2284, 15.2-2285)**
*(Against the City)*

120.    Plaintiffs incorporate each preceding paragraph.  Before a comprehensive-plan amendment of this magnitude, Virginia law requires "careful and comprehensive surveys and

---

[17] WAVY 10.  Public hearing held about the potential sale of VB National Golf Club. "A RFP took place after in the fall of 2025 for 45 days.  A total of nine groups submitted proposals." (July 8, 2026)

studies," Va. Code §§ 15.2-2223 and 15.2-2224, strategies to combat recurrent flooding and sea-level rise, Va. Code § 15.2-2223.3, and Preservation Area policies on septic-soil suitability, groundwater, and a Water Quality Impact Assessment, 9VAC25-830-140 and -170.

121. Yet, none appears in the record for the imagineVB 2040 Comprehensive Plan, and the City has never completed the Southern Rivers Watershed Master Drainage Study. A single-parcel or interdependent amendment adopted without the statutory predicate is void *ab initio* (*Board of County Supervisors of Prince William County v. Oak Valley Homeowners Ass'n*, 2026 WL 873963 (Va. Ct. App. Mar. 31, 2026)).

122. A locality must give actual "reasonable consideration" to every factor of Va. Code § 15.2-2284. (*Hartley v. Board of Supervisors of Brunswick County*, 80 Va. App. 1 (2024)). Plaintiffs seek a declaration that any rezoning or master-plan amendment authorizing industrial use within the ITA, adopted while the Navy's F-35C environmental review remains open and without a locality-level compatibility review, violates the City's binding state-law obligations and is void.

**<u>COUNT XVI</u>**
**Declaratory Judgment: Non-Disclosure Agreement Ultra Vires and Void**
**(28 U.S.C. §§ 2201–2202; Dillon Rule)**
*(Against the City and the Authority)*

123. Plaintiffs incorporate each preceding paragraph. No statute confers upon the City Manager's Office or the City Attorney's Office the authority to bind the City to conceal from its own appointed boards the information those boards require to discharge their statutory duties. Plaintiffs seek a declaration that the August 7, 2024 Non-Disclosure Agreement is *ultra vires* and void *ab initio*, and that any official action taken in reliance upon it is voidable.

**COUNT XVII**
**Fraudulent Concealment and Fraud on Land Records**
**(Virginia Common Law)**
*(Against the City, the Authority, and Doe Defendants)*

124. Plaintiffs incorporate each preceding paragraph. Defendants knowingly altered public land records, including pipeline easements, tax-exemption codes, and floodplain designations, concealing material facts affecting property value and safety that adjacent owners and purchasers were entitled to rely upon. Plaintiffs are entitled to compensatory and punitive damages and to equitable relief including restoration of accurate records.

**COUNT XVIII**
**Unjust Enrichment**
**(Virginia Common Law)**
*(Against the Authority, Dragas, and Doe Defendants)*

125. Plaintiffs incorporate each preceding paragraph. Each Defendant in this Count was enriched by sale proceeds, commissions, development profits, grant funds, or below-value land conveyances derived from the conduct alleged, at the expense of the Class. It would be unjust to retain the enrichment, and Plaintiffs are entitled to disgorgement.

**COUNT XIX**
**Declaratory Judgment: Individual Liability for Defense Costs**
**(25 U.S.C. §§ 2201-2202; Va. Code § 15.2-1521)**
*(Against all Individual Defendants)*

126. Plaintiffs incorporate each preceding paragraph. Virginia's discretionary authority to defend officers under Va. Code § 15.2-1521 does not extend to actual fraud, malice, or willful misconduct. Plaintiffs seek a declaration that no individual Defendant found liable for the intentional, *ultra vires*, or willful misconduct alleged is entitled to have defense costs, settlement, or judgment paid from public or taxpayer funds.

# XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court:

A. CERTIFY the Class under Rule 23(a) and 23(b)(2), and alternatively under Rule 23(b)(3), and appoint Plaintiffs and their counsel to represent the Class;

B. ENTER a temporary restraining order and preliminary and permanent injunction (i) barring the City, the Authority, the City Manager, all named Defendants in their official capacities, and Dragas from executing, recording, performing, or taking any step to consummate any deed, lease, or other instrument conveying or encumbering the Virginia Beach National property or the adjacent parcel described herein, and from any land-disturbing activity thereon, until all communications with Dragas from April 2024 forward are publicly disclosed, a genuine public process has occurred, and the Court has determined that any disposition complies with law; (ii) to the limited extent necessary, enjoining the July 7, 2026 vote until that disclosure and process are complete; and (iii) barring any further disposition of City-owned real property absent thirty days' public notice, a noticed hearing, and compliance with Va. Code § 15.2-1800;

C. ENJOIN the City from authorizing, permitting, or undertaking any further land-disturbing development, citywide and specifically within the Southern Rivers Watershed, until the City has brought its stormwater, wetlands, and Chesapeake Bay Preservation Area programs into full compliance with the Clean Water Act and Permit No. VA0088676, has remapped the Southern Rivers Watershed and restored the jurisdictional wetlands, waters, and drainage features to the record, and has

come into compliance with the building and land-disturbance requirements it enforces against private owners, all under the continuing supervision of the Court until full compliance is achieved;

D.  ENJOIN the City, the Authority, Dragas, and all persons acting in concert with them from any alteration, modification, transfer, tree removal, demolition, construction, or land-disturbing activity on the Virginia Beach National property, and specifically within 660 feet of either documented bald eagle nest, unless and until (i) a qualified bald eagle survey of the property has been completed and furnished to the Court, the U.S. Fish and Wildlife Service, and the Virginia Department of Wildlife Resources, and (ii) any permit required under 16 U.S.C. § 668 and 50 C.F.R. §§ 22.80 or 22.85 has been obtained (Count VI);

E.  ORDER that all public land conveyed or held in furtherance of the conduct alleged be returned to the public, and that a court-supervised audit identify every parcel granted a City-issued building permit in violation of the City's ordinances so that resulting hazards may be abated;

F.  ORDER the judicial dissolution of the Virginia Beach Development Authority, with all Authority-held property and obligations transferred to the City under court supervision and a receiver or monitor appointed to oversee the wind-down;

G.  ORDER the City and the Authority to preserve all documents, communications, electronic records, and audit logs concerning the disposition of City-owned property and all communications with Dragas from April 2024 forward, and to file within fourteen days a sworn inventory of every parcel under consideration for sale, lease, or development;

H.  REFER the evidence described herein to the United States Attorney for the Eastern District of Virginia, the Attorney General of Virginia, and the Virginia State Police for investigation and such action as each deems appropriate;

I.  DECLARE the City in violation of the Clean Water Act and its Permit, order a court-supervised compliance schedule and a Supplemental Environmental Project, and impose civil penalties payable to the United States Treasury (Count V);

J.  DECLARE the August 7, 2024 Non-Disclosure Agreement *ultra vires* and *void ab initio* and order disclosure of its full contents to the Authority board, the Planning Commission, the Wetlands Board, and the Chesapeake Bay Preservation Area Board (Count XVI); and DECLARE voidable any contract resulting from RFP #ED-25-04;

K.  AWARD compensatory and, against the individual Defendants, punitive damages under 42 U.S.C. §§ 1983 and 1988; just compensation under Counts IV and VII; treble damages and fees under Va. Code §§ 18.2-500 and 59.1-9.12; disgorgement on Count XVIII; and compensatory and punitive damages on Count XVII;

L.  DECLARE that no individual Defendant found liable for intentional, *ultra vires*, or willful misconduct may have defense costs, settlement, or judgment paid from public funds (Count XIX);

M.  AWARD attorneys' and expert fees, costs, and pre- and post-judgment interest; and GRANT such other relief as is just and proper.

## XII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury on all issues so triable.

## XIII. RESERVATION OF CLAIMS

Plaintiffs reserve the right to assert claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, upon completion of discovery sufficient to plead the predicate acts with the particularity this Circuit requires. The pattern described in Parts VI and VIII, including mail and wire fraud, honest-services fraud, federal-program bribery, and the alteration of official records, constitutes, upon information and belief, a pattern of racketeering activity conducted through an enterprise within 18 U.S.C. § 1962. All Defendants are on notice that Plaintiffs anticipate moving to amend to add such claims and to substitute the true names of the Doe Defendants.

Dated: July 13, 2026

Respectfully submitted,


_____/s/_____
Suzanne Seidel Richmond (VSB No. 75888)
SS Richmond Law
3808 North Landing Road
Virginia Beach, Virginia 23456
Telephone: 757-301-8822
Email: suzanne@ssrichmondlaw.com
*Counsel for Plaintiffs and the Putative Class*