Plaintiffs' 60-Day Notice of Intent to Sue under the Clean Water Act
(Mar. 12, 2026) and proof of service (Mar. 19, 2026)

**Exhibit A**



March 12, 2026

*Via Certified Mail, Return Receipt Requested*

Patrick A. Duhaney, City Manager
City of Virginia Beach Municipal Center
2401 Courthouse Drive, Bldg. 1
Virginia Beach, Virginia 23456

Interim Director
Virginia Department of Environmental Quality
1111 E. Main Street, Suite 1400
Richmond, Virginia 23219

Lee Zeldin, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Chairman, State Water Control Board
c/o Virginia Department of Environmental Quality
111 E. Main Street, Suite 1400
P.O. Box 1105
Richmond, Virginia 23218

RE: **NOTICE OF INTENT TO FILE CITIZEN SUIT UNDER SECTION 505 OF THE CLEAN WATER ACT, 33 U.S.C. § 1365, AGAINST THE CITY OF VIRGINIA BEACH, VIRGINIA FOR VIOLATIONS OF THE CLEAN WATER ACT AND VPDES PERMIT NO. VA0088676**

## I. NOTICE OF INTENT

NOTICE IS HEREBY GIVEN pursuant to Section 505(b)(1)(A) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(b)(1)(A), and 40 C.F.R. Part 135, that the below-named Notifier intends to commence a civil action against the City of Virginia Beach ("City" or "Defendant") for violations of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, and Virginia Pollutant Discharge Elimination System Permit No. VA0088676 ("Permit").

The City owns and operates the Municipal Separate Storm Sewer System ("MS4") serving over 300 square miles of coastal Virginia. The City holds Permit No. VA0088676, effective January 26, 2024, authorizing stormwater discharges to seventeen 6th-order hydrologic units within the Chesapeake Bay watershed, the Southern Rivers watershed, the Atlantic Ocean, and other receiving waters. The Permit expressly covers the Chowan River & Dismal Swamp and Small Coastal basins – including Back Bay, the North Landing River, the Northwest River, the

Pocaty River, West Neck Creek, and Ashville Bridge Creek – constituting approximately 67 percent of the City's – land area.

This action is necessary because the City has demonstrated a pattern and practice of violating the Clean Water Act and its Permit through: (1) repeated unauthorized discharges of raw sewage and hazardous substances to waters of the United States; (2) systematic failure to regulate industrial stormwater discharges while actively recruiting polluting industries to locate within the City; (3) willful and systemic failure to recognize, delineate, and protect wetlands and to enforce the City's own Wetlands Zoning Ordinance across all land-disturbing activities; (4) abandonment of the mandatory 2,500-square-foot land-disturbance regulatory threshold across the majority of the City's jurisdiction; and, (5) unlawful self-exemption of the City's own capital projects and public works from the local, state, and federal requirements the City is obligated to enforce against private parties.

The City's violations sacrifice the environmental health and welfare of its residents and future generations in favor of reckless private development profits and municipal convenience. The long-term environmental damage caused by these violations will burden this coastal community for decades.

## II. NOTIFIER

Lisa Clarkson
SFF Conservation Initiative, Inc.
3808 North Landing Road
Virginia Beach, Virginia 23456
Phone: 757-450-3329

Notifier is a resident and taxpayer of the City of Virginia Beach who owns real property within the Southern Rivers Watershed and within the Chesapeake Bay Preservation Area. Notifier uses and enjoys the waters of Back Bay, the North Landing River, the Lynnhaven River, and their tributaries for recreational, aesthetic, and economic purposes, and is directly and adversely affected by the violations described herein. Notifier brings this Notice on her own behalf and on behalf of SFF Conservation Initiative, Inc., a Virginia nonstock corporation whose members use and enjoy the waters of the City of Virginia Beach and are directly injured by the degradation of those waters.

## III. ALLEGED VIOLATOR

City of Virginia Beach,
2401 Courthouse Drive,
Virginia Beach, VA 23456

The City is the owner and operator of the Municipal Separate Storm Sewer System serving an area exceeding 300 square miles in southeastern Virginia. The City holds Permit No. VA0088676, issued pursuant to the Virginia Stormwater Management Act and the Clean Water Act, effective January 26, 2024, and expiring January 25, 2029. The City is a statutory "Tidewater Virginia" locality under Va. Code § 62.1-44.15:68 and is therefore subject to the mandatory Chesapeake Bay Preservation Area designation requirements of Va. Code § 62.1-44.15:74(A). The City is also a VESMP authority under Va. Code § 62.1-44.15:27 and operates a local Wetlands

Board under Va. Code § 28.2-1303 and Appendix A, §§ 1400–1418 of the Virginia Beach City Code.

## IV. STATEMENT OF APPLICABLE LAW

### A. The Clean Water Act and the MS4 Permit

The Permit authorizes discharge of stormwater from "all existing and new municipal separate stormwater point source discharges to surface waters" from the City's MS4. Permit, Part I.A.1.a. The Permit's authorized discharge area expressly includes seventeen 6th-order hydrologic units spanning four river basins. The Southern Rivers Watershed – encompassing Back Bay (AS20), North Landing River (AS13, AS16, AS17), Northwest River (AS10, AS11), Pocaty River (AS15), West Neck Creek (AS14), Chesapeake Canal (AS12), Shipps Bay–North Bay (AS19), and Ashville Bridge Creek (AS18) – is entirely within the Permit's authorized discharge area. Permit, Cover Page; Receiving Waters and Watersheds.

The Permit requires the City to "implement a local erosion and sediment control program consistent with the Virginia Erosion and Sediment Control Law § 62.1-44.15:51 . . . and a stormwater management program consistent with the Virginia Stormwater Management Act § 62.1-44.15:24 . . . and Virginia Stormwater Management Program Regulation 9VAC25-870 *et seq.*" Permit, Part I.B.2.a. This obligation applies to the City's entire MS4, without geographic limitation.

The Permit requires the City to "maintain and utilize its legal authority authorized by the Commonwealth of Virginia to control discharges to and from the MS4" – including the authority to "control the contribution of pollutants to the MS4" and "require compliance with conditions in ordinances." Permit, Part I.A.3.a, d. The City must "review and update its ordinances . . . as necessary to continue providing adequate legal authority to control discharges to and from the MS4." *Id.*

The Permit requires the City to maintain an MS4 Program Plan that specifically references "any ordinance more stringent than" the Virginia Stormwater Management Program Regulation, the Virginia Erosion and Sediment Control Regulations, "and the Chesapeake Bay Preservation Act (§ 62.1-44.15:67 *et seq.*) and Chesapeake Bay Preservation Area Designation and Management Regulations (9VAC25-830 *et seq.*)." Permit, Part I.A.6.

### B. Virginia Law – Mandatory Duties in a Dillon Rule State

Virginia is a Dillon Rule state. The City of Virginia Beach possesses only those powers expressly conferred by the General Assembly, those necessarily or fairly implied from express grants, and those essential and indispensable to the locality's declared objects and purposes. *Board of Supervisors v. DeGroff Enters.*, 214 Va. 235, 237 (1973). A locality cannot exercise power the General Assembly has not conferred, and ambiguities are resolved against the locality's claim of authority. Conversely, **a Dillon Rule locality does not have discretionary authority to ignore a mandatory statutory obligation.** Where the General Assembly has used the word "shall," the locality must comply; it may not substitute a lesser program of its own design.

The City's stormwater regulatory authority derives exclusively from Va. Code § 62.1-44.15:27(A), which mandates that a locality operating a regulated MS4 "shall be required to adopt

and administer a Virginia Erosion and Stormwater Management Program ("VESMP") . . . that regulates any land-disturbing activity that (i) disturbs 10,000 square feet or more or (ii) disturbs 2,500 square feet or more in an area of a locality designated as a Chesapeake Bay Preservation Area ("CBPA") ." The statute is a package deal: the City's authority to regulate stormwater at all comes from this section, and the City cannot pick and choose which portions of the mandatory floor to adopt.

The City is a statutory "Tidewater Virginia" locality. Va. Code § 62.1-44.15:68. It is therefore subject to the mandatory CBPA-designation requirement of § 62.1-44.15:74(A): the City "shall use the criteria developed by the Board to determine the extent of the Chesapeake Bay Preservation Area within [its] jurisdiction [...]." "Shall" is not discretionary. The General Assembly's enumeration of the City of Virginia Beach in the Tidewater-Virginia list is an express legislative determination that the City's entire jurisdiction – not merely its Bay-draining watersheds – is subject to the CBPA designation process.

The Board's designation criteria at 9VAC25-830-80 define the Resource Protection Area by physical features – tidal wetlands, tidal shores, contiguous nontidal wetlands, and water bodies with perennial flow – not by the downstream destination of those features' drainage. The criteria at 9VAC25-830-80(A) require RPA designation wherever features exist that "provide for the removal, reduction or assimilation of sediments, nutrients and potentially harmful or toxic substances in runoff entering the bay and its tributaries, and minimize the adverse effects of human activities on state waters and aquatic resources." The conjunctive "and" makes the "state waters" clause independently operative. Every water body in the Southern Rivers Watershed is a "state water."

The Board's RMA criteria at 9VAC25-830-90 require a Resource Management Area "contiguous to the entire inland boundary of the Resource Protection Area" and expressly "do not . . . discourage or preclude" jurisdiction-wide RMA designation. 9VAC25-830-90(C)(5). Where the City has designated an RPA, the RMA must follow as a matter of regulatory compulsion. Where the City has declined to designate an RPA despite the physical presence of qualifying features, the City has failed to comply with mandatory criteria it has no Dillon Rule authority to disregard.

### C. The City as the First Line of Defense for Wetlands

The General Assembly has placed the City of Virginia Beach – not DEQ, not the Corps of Engineers, not the Virginia Marine Resources Commission – at the front line of wetlands protection in Tidewater. The City is the entity that reviews site plans, issues land-disturbing permits, issues building permits, and authorizes certificates of occupancy. No bulldozer moves, no fill is placed, and no structure rises without the City's prior authorization. The City is, by statutory design, the first and most effective checkpoint at which unlawful wetlands destruction can be stopped before it occurs.

This gatekeeping role is not voluntary. It is mandated across overlapping layers of law, each of which the City has adopted and is bound to enforce:

- **Va. Code §§ 28.2-1302 *et seq.* and City Code App. A, §§ 1400–1418 (Wetlands Zoning Ordinance)** – establish the City's Wetlands Board and prohibit any person from using or developing tidal wetlands within the City without a permit from the

Wetlands Board. The City – through its own Board – is the permitting authority for every tidal wetland alteration within its borders, regardless of whether that wetland also falls under Corps of Engineers § 404 jurisdiction or VMRC jurisdiction under Va. Code §§ 28.2-1300 *et seq.*

- **CBPA Ordinance § 106(A)(6) (City Code App. F)** – requires that "[p]rior to the authorization and initiation of grading or other on-site activities, evidence of all wetland permits required by Sections 1400 through 1418 of the Zoning Ordinance . . . and Sections 401 and 404 of the Clean Water Act (33 U.S.C. Sections 1341 and 1344) shall be obtained and evidence of such submitted by the applicant to the City." This is a condition precedent to every land-disturbing authorization in the CBPA. The City's own ordinance makes the City the verifier of federal and state wetland compliance before the first shovel of dirt turns.

- **Va. Code § 62.1-44.15:27(A) and 9VAC25-875-70** – establish the 2,500-square-foot land-disturbance threshold in CBPA-designated areas. Every project disturbing 2,500 square feet or more in a properly designated CBPA must pass through the City's VESMP review – which in turn triggers the § 106(A)(6) wetland-permit verification. When the City under-designates the CBPA or fails to apply the 2,500-square-foot threshold, it removes the trigger that brings wetland verification into play.

- **Permit Part I.A.3** – obligates the City to "maintain and utilize its legal authority . . . to control discharges to and from the MS4," including the authority to "require compliance with conditions in ordinances." The Wetlands Zoning Ordinance and CBPA Ordinance § 106(A)(6) are precisely such ordinances. The Permit requires the City to enforce them – it does not permit the City to treat them as optional paperwork.

- **Permit Part I.B.2.a** – requires the City's erosion-and-sediment-control and stormwater programs to be "consistent with" the governing state statutes and regulations. A program that authorizes land disturbance in wetlands without first requiring Wetlands Board approval and evidence of § 404/§ 401 coverage is not "consistent with" a statutory regime that makes those approvals mandatory.

The fact that DEQ administers the Virginia Water Protection Permit program under Va. Code § 62.1-44.15:20, and that the Corps of Engineers administers CWA § 404, **does not relieve the City of its independent duty** to verify that those authorizations exist before issuing its own land-disturbing approvals. The General Assembly and the City's own ordinances have deliberately structured the City as the choke point. When the City waves a project through without checking, the downstream agencies never see it – because the disturbance, the fill, and the discharge have already happened by the time any other regulator has reason to look. **The City is responsible for enforcement of all alterations to any and all wetlands within its borders, regardless of which agency – DEQ, VMRC, or the Corps – holds concurrent permitting jurisdiction over that wetland.**

## V. VIOLATIONS

### A. Unauthorized Discharges of Raw Sewage to Waters of the United States – CWA § 301(a), 33 U.S.C. § 1311(a); Permit Part I.B.2.e; Permit Part I.B.2.f

Between July 1, 2024 and June 30, 2025, the City discharged or caused or allowed the discharge of raw, untreated sewage from its municipal infrastructure into and through the MS4 to waters of the United States, including but not limited to Broad Bay, the Eastern Lynnhaven River, London Bridge Creek, Lake Holly, Lake Wesley, Owl Creek, and the Oceanfront drainage basin. These waters are home to residents who swim, fish, boat, and recreate in reliance on the City's duty to protect water quality. The City's own Annual Report documents no fewer than twelve separate sewage discharge events reaching surface waters during a single reporting year, including a single force main failure that released approximately 20,000 gallons of raw sewage into London Bridge Creek.

These discharges were not authorized by the Permit. The Permit expressly prohibits illicit discharges to the MS4 and does not authorize sewage discharges. Each discharge constitutes a separate violation of CWA § 301(a) and the Permit. Many of the receiving waters are already impaired for bacteria under CWA § 303(d) and subject to bacteria TMDLs, making these sewage discharges particularly damaging and directly contrary to water quality restoration efforts upon which public health depends.

The recurring nature of these discharges, including multiple grinder pump malfunctions and force main failures, demonstrates a systemic failure of infrastructure maintenance that places private convenience and municipal cost savings above the health and safety of the public and the ecological integrity of coastal waters that define this community.

### B. Unauthorized Discharge of Petroleum and Hazardous Substances – CWA § 301(a), 33 U.S.C. § 1311(a); Permit Part I.B.2.f; 40 C.F.R. Parts 110, 117, 302

During the same period, petroleum products including diesel fuel and jet fuel were discharged into and through the MS4 to waters of the United States, including a discharge of approximately 4,300 gallons of jet fuel near the Upper North Landing River. These discharges were not authorized by the Permit and constitute violations of CWA § 301(a).

### C. Failure to Eliminate Illicit Discharges Within Required Timeframe – Permit Part I.B.2.e.6

The Permit requires the elimination of illicit discharges within thirty days of discovery, or where elimination within thirty days is not possible, an expeditious schedule. The City failed to eliminate illicit discharges within the required timeframe, including but not limited to a heating oil contamination event that persisted for approximately fifteen months before resolution. This delay is neither expeditious nor consistent with the Permit's mandate to protect surface waters from ongoing contamination.

### D. Failure to Update the MS4 Program Plan – Permit Part I.A.6

The Permit requires the City to maintain, implement, and enforce an MS4 Program Plan and to update the Plan annually. The City's own Annual Report admits that the MS4 Program

Plan was last updated in 2020 and has not been revised to incorporate the requirements of the 2024 Permit. This five-year failure to update a foundational compliance document renders the City's entire stormwater program outdated and inadequate, in continuing violation of the Permit. The Program Plan also fails to reference the City's CBPA ordinance as re-enacted by Ord. No. 3825 (August 19, 2025) and fails to document the geographic extent of CBPA coverage as required by Permit Part I.A.6.

### E. Failure to Inspect Privately Maintained Stormwater Management Facilities – Permit Part I.B.2.h.2.a.2

The Permit requires inspection of all privately maintained stormwater management facilities with maintenance agreements no less than once every five years. The City's Annual Report acknowledges that twelve percent of such facilities – approximately 191 facilities – have not been inspected within the required period. Each uninspected facility represents an unverified pollution control device that may be failing, malfunctioning, or wholly ineffective, allowing untreated stormwater pollutants to flow into waters relied upon by the public.

### F. Failure to Complete Required TMDL Reporting – Permit Part I.D.2; Permit Part I.E

The Permit requires the City to calculate and report pollutant load reductions achieved under local TMDL action plans. The City's Annual Report contains multiple entries designated "TBD" – to be determined – for required phosphorus load reduction calculations in the North Landing River Watershed. Incomplete reporting prevents the public, the DEQ, and EPA from evaluating whether the City is making adequate progress toward restoring impaired waters. Reporting is not an aspiration; it is a legal obligation.

### G. Facilitation of Unpermitted Industrial Discharges to the MS4 – CWA § 301(a), 33 U.S.C. § 1311(a); Permit Part I.B.2.g; Permit Part I.A.3; 40 C.F.R. § 122.26(b)(14)

The City of Virginia Beach, through its Department of Economic Development, has actively recruited, incentivized, and facilitated the establishment of industrial and commercial operations within the City's MS4 service area without ensuring that such operations obtain the VPDES industrial stormwater permits required by federal and state law before commencing discharge.

The City has a legal duty under the Permit to identify and control pollutants in stormwater discharges from industrial and high-risk facilities, to maintain lists of such facilities, to inspect facilities, require control measures, coordinate with the DEQ regarding violations, and refer unpermitted dischargers to the DEQ. The City has a further duty under the Permit to maintain and utilize its legal authority to prohibit illicit discharges and control the contribution of pollutants to the MS4.

Instead, the City has pursued an economic development strategy that prioritizes the attraction of private industry without corresponding environmental compliance. The City issues building permits, certificates of occupancy, and business licenses to industrial facilities without verifying VPDES permit status. The City's own Annual Report reveals that its industrial and high-risk facility list has been reduced rather than expanded, reflecting a posture of decreasing rather than increasing vigilance.

The result is that industrial pollutants – including but not limited to heavy metals, petroleum compounds, solvents, and process chemicals – are discharged to the MS4 and ultimately to waters of the United States without the treatment, monitoring, and reporting that industrial stormwater permits require. The public bears the burden of this pollution in diminished water quality, impaired recreational use, degraded fisheries, and long-term contamination that will persist for generations, while private industrial operators enjoy the profits of non-compliance facilitated by their host municipality.

This is not merely a regulatory gap. It is a conscious choice to subordinate the public's right to clean water to the private pursuit of profit, enabled by a City government that has elected to look the other way. **This represents a fundamental conflict of interest: the City profits from industrial development through tax revenue and economic activity while externalizing the environmental costs onto residents and receiving waters.**

**H. Systemic Failure to Recognize Wetlands and to Enforce the Wetlands Zoning Ordinance Across All Land-Disturbing Activities – CWA § 301(a), 33 U.S.C. § 1311(a); CWA § 404, 33 U.S.C. § 1344; Va. Code § 28.2-1302 et seq.; Va. Code § 62.1-44.15:27(A); Va. Code § 62.1-44.15:74(A); 9VAC25-830-80; City Code App. A, §§ 1400–1418; CBPA Ordinance § 106(A)(6); Permit Part I.B.2.a; Permit Part I.A.3; Permit Part I.B.1**

Virginia Beach is a coastal city. Its identity, its economy, its quality of life, and its ecological heritage are inextricable from the health of its waterways, marshes, tidal creeks, and wetlands. Wetlands are among the most productive ecosystems on earth. They filter pollutants, absorb floodwaters, recharge groundwater, buffer storms, and sustain the fisheries and wildlife upon which this community depends. In a city facing rising seas, intensifying storms, and increasing development pressure, wetlands are not a luxury. They are a necessity.

Yet the City does not meaningfully recognize, protect, or account for wetlands in its land-disturbance permitting program, and it has abandoned the front-line enforcement role that the General Assembly assigned to it. Upon information and belief:

(1) The City's land development review and permitting process does not require wetland delineation as a condition of plan submission; does not verify compliance with CWA § 404, CWA § 401, or the Virginia Water Protection Permit program under Va. Code §§ 62.1-44.15:20 *et seq.*; and does not condition local land-disturbing permits upon proof of federal and state wetland authorizations – despite CBPA Ordinance § 106(A)(6) expressly requiring that "evidence of all wetland permits required by Sections 1400 through 1418 of the Zoning Ordinance . . . and Sections 401 and 404 of the Clean Water Act . . . shall be obtained" prior to authorization of grading or on-site activities.

(2) The City does not refer land-disturbing applications involving tidal wetlands or vegetated wetlands to the City's own Wetlands Board for the permit required by City Code App. A, §§ 1400–1418 and Va. Code §§ 28.2-1302 *et seq.* Projects that unambiguously encroach on tidal wetlands are processed through Development Services as routine site plans, and the Wetlands Board – the City's own statutory instrument for wetlands protection – is bypassed.

(3) The City approves development on lands containing jurisdictional wetlands as though those wetlands do not exist. Site plans are accepted that show existing wetland features as "upland" or simply omit them. No City reviewer is tasked with field-verifying wetland boundaries, cross-checking against the National Wetlands Inventory, or flagging discrepancies between submitted plans and observable hydric soils, hydrophytic vegetation, and tidal influence visible on the ground.

(4) **This failure exists in all land-disturbing activities, because the City no longer requires strict adherence to the 2,500-square-foot regulatory threshold.** Va. Code § 62.1-44.15:27(A) mandates that the City's VESMP regulate every land-disturbing activity of 2,500 square feet or more "in an area of a locality designated as a Chesapeake Bay Preservation Area." That threshold is the trigger: when a 2,500-square-foot project enters the VESMP process, CBPA Ordinance § 106(A)(6) requires the wetland-permit verification described above. By under-designating the CBPA (see Violation I, below), and by processing sub-10,000-square-foot projects outside the CBPA with no wetland screening at all, the City has removed the trigger that brings wetland enforcement into play for the vast majority of land-disturbing activities in the vast majority of the City's territory. A 9,000-square-foot fill in a tidal marsh along the North Landing River never crosses a City reviewer's desk for wetlands compliance – because the City has structured its program so that it doesn't have to look.

The City represents to the DEQ and to the public that it requires permits for the development of raw lands and implements erosion and sediment controls and post-construction stormwater management in accordance with its Permit. This representation is fundamentally misleading when the City simultaneously allows the destruction of wetlands – nature's most effective stormwater management system – without verification that such destruction is lawfully authorized and without accounting for the lost water quality functions that wetlands provide.

When a developer fills a wetland to construct a parking lot, a warehouse, or a subdivision, the natural capacity of that land to filter nitrogen, phosphorus, sediment, and bacteria is eliminated. The constructed BMPs required by the City's stormwater program – detention ponds, bioretention cells, manufactured treatment devices – are engineered substitutes that replicate only a fraction of the water quality functions that the destroyed wetland performed at no public cost. The City's TMDL Action Plans do not account for this loss. The City's pollutant load calculations do not reflect the increased loading that results from wetland destruction. The City's stormwater program, in effect, ignores the most consequential land use change occurring within its borders.

It bears emphasis: **the City is the first line of defense against the destruction of historical wetlands in Tidewater.** Whether a given wetland falls under the § 404 jurisdiction of the Corps of Engineers, the Virginia Water Protection jurisdiction of DEQ under Va. Code § 62.1-44.15:20, or the tidal-wetlands jurisdiction of VMRC under Va. Code §§ 28.2-1300 *et seq.* – or all three simultaneously – is irrelevant to the City's independent obligation. Every one of those agencies reviews applications; none of them reviews bulldozers. The City does. City Code App. A, §§ 1400–1418 vests the City's own Wetlands Board with permitting authority over tidal wetlands. CBPA Ordinance § 106(A)(6) makes proof of federal and state wetland permits a condition precedent to City authorization. Permit Part I.A.3 makes enforcement of those ordinances a condition of the City's own Clean Water Act permit. The City cannot lawfully issue a land-disturbing permit, a grading permit, or a building permit for activity in or adjacent to a

wetland until the wetland has been delineated and the required permits are in hand. When the City does so anyway, it is not merely a bystander to the resulting § 301(a) violation – **it is the proximate cause of it.**

This failure is not merely an oversight. In a coastal community that is already experiencing the consequences of environmental degradation – flooding, water quality impairment, habitat loss, and the steady erosion of the natural systems that sustain human life along the coast – the refusal to protect wetlands is a choice with generational consequences. It is a choice that favors the short-term profits of developers and the tax revenues of the municipality over the long-term health, safety, and environmental heritage of the residents who call Virginia Beach home and of their children who will inherit what remains.

The City's failure to recognize wetlands and to enforce its Wetlands Zoning Ordinance violates the Permit's requirement to implement an effective construction site runoff and post-construction stormwater management program (Permit Part I.B.2.a); violates the Permit's requirement to maintain legal authority to control pollutant contributions to the MS4 and to "require compliance with conditions in ordinances" (Permit Part I.A.3); violates the Permit's requirement to plan for water quality protection (Permit Part I.B.1); and violates the Clean Water Act's fundamental prohibition against the discharge of pollutants – including fill material, sediment, and stormwater – to waters of the United States without authorization (CWA § 301(a), 33 U.S.C. § 1311(a); CWA § 404, 33 U.S.C. § 1344). Each fill of a jurisdictional wetland authorized by the City without verification of § 404 coverage constitutes a separate violation of § 301(a) for which the City bears direct responsibility.

**I. Failure to Apply the Mandatory 2,500-Square-Foot Land-Disturbance Threshold Throughout the MS4 Service Area by Under-Designating the Chesapeake Bay Preservation Area – CWA § 301(a), 33 U.S.C. § 1311(a); CWA § 402(p), 33 U.S.C. § 1342(p); Va. Code § 62.1-44.15:27(A); Va. Code § 62.1-44.15:68; Va. Code § 62.1-44.15:74(A); 9VAC25-830-80; 9VAC25-830-90; 9VAC25-875-70; Permit Part I.B.2.a.1; Permit Part I.A.3; Permit Part I.A.6**

Upon information and belief, the City's CBPA designation under Appendix F of the Virginia Beach City Code (Ord. No. 3825, adopted August 19, 2025) does not extend to the Southern Rivers Watershed, and the City's VESMP ordinance under Appendix D (Ord. No. 3784, adopted September 17, 2024) applies the 2,500-square-foot land-disturbance threshold only within the CBPA-designated area. The result is that approximately 67 percent of the City's land area – including the most flood-vulnerable terrain in the City, containing over 90 percent of City land area with elevations below three feet – is regulated at a 10,000-square-foot threshold rather than the 2,500-square-foot threshold that the CBPA designation criteria would require if properly applied.

The Southern Rivers Watershed contains extensive tidal wetlands, tidal shores, and water bodies with perennial flow along Back Bay, the North Landing River, the Pocaty River, the Northwest River, and their tributaries. Under the Board's mandatory criteria at 9VAC25-830-80, these physical features are required to be included in the Resource Protection Area. The City does not have Dillon Rule authority to disregard a mandatory designation criterion established by the State Water Control Board. The General Assembly's enumeration of Virginia Beach in the Tidewater-Virginia list at Va. Code § 62.1-44.15:68 is an express legislative determination that

the City's entire jurisdiction is subject to the CBPA designation process – not merely the portion that drains north to the Chesapeake Bay.

The City's Appendix G – the Southern Rivers Watershed Management Ordinance, adopted in 1992 (Ord. No. 2115, March 24, 1992) and never substantively amended in 33 years – does not cure this gap. Appendix G predates the Virginia Erosion and Stormwater Management Act (2016/2024), the Virginia Stormwater Management Handbook v1.0 (2024), and the Virginia Runoff Reduction Method v4.1 (2024). It does not incorporate the water-quantity technical criteria of 9VAC25-875-600 (channel protection, flood protection) or the water-quality criteria of 9VAC25-875-580 (phosphorus-load limit). Its land-disturbance trigger, buffer width, and performance criteria have not been updated since 1992 – predating not only VESMA but the 2012/2013 CBPA regulation amendments, the 2014 VSMP revision, and the 2024 VESM consolidation. Under Dillon Rule, Appendix G cannot serve as a lawful substitute for CBPA compliance. The General Assembly mandated CBPA designation under § 62.1-44.15:74(A); it did not authorize localities to create alternative programs that achieve lesser protections. A locality's police-power ordinance cannot override or diminish a specific statutory obligation.

This under-designation constitutes a violation of the Permit in at least three independent respects:

(a) Permit Part I.B.2.a.1 – Failure to implement a stormwater management program consistent with the VSMA throughout the MS4. The Permit requires the City to implement a stormwater program consistent with § 62.1-44.15:24 *et seq.* The VSMA (through § 62.1-44.15:27(A)) requires the program to regulate land-disturbing activities of 2,500 square feet or more in CBPA-designated areas. The City, by failing to designate the CBPA in the Southern Rivers Watershed in accordance with the Board's mandatory criteria at 9VAC25-830-80 and -90, has artificially excluded 67 percent of its MS4 service area from the 2,500-square-foot tier – rendering its stormwater program inconsistent with the statute the Permit requires it to implement.

(b) Permit Part I.A.3 – Failure to maintain adequate legal authority to control pollutant contributions to the MS4. The City's ordinances do not provide legal authority to require erosion and sediment control, stormwater management plan review, or VRRM/VSMH-compliant water-quality and water-quantity design for land-disturbing activities between 2,500 and 9,999 square feet in the Southern Rivers Watershed. This is a gap in legal authority within the MS4 service area that the City was required to "review and update" but has not remedied.

(c) Permit Part I.A.6 – Failure to maintain an MS4 Program Plan accurately documenting compliance with the CBPA. The Permit requires "specific reference" to "the Chesapeake Bay Preservation Act (§§ 62.1-44.15:67 *et seq.*)." If the City's CBPA designation under-designates the Southern Rivers Watershed contrary to the Board's criteria, the Program Plan incorporates a non-compliant CBPA ordinance and is therefore itself non-compliant.

Each discharge of stormwater from a City MS4 outfall within the Southern Rivers Watershed – to Back Bay, the North Landing River, the Northwest River, the Pocaty River, West Neck Creek, or their tributaries – on each day since the later of January 26, 2024 (permit effective date) or September 17, 2024 (adoption of new Appendix D) has been and continues to be a

discharge not in compliance with the terms and conditions of Permit No. VA0088676 and therefore in violation of CWA § 301(a), 33 U.S.C. § 1311(a), and the Virginia Stormwater Management Act.

This violation and Violation H are two faces of the same failure. **By under-designating the CBPA, the City removes the 2,500-square-foot trigger; by removing the trigger, the City removes the CBPA Ordinance § 106(A)(6) wetland-verification checkpoint; and by removing the checkpoint, the City removes itself as the first line of defense against unlawful wetland destruction across two-thirds of Tidewater's largest city.** A regulatory structure that was designed by the General Assembly to interlock – CBPA designation driving the 2,500-square-foot threshold, the threshold driving VESMP review, and VESMP review driving wetland-permit verification – has been dismantled by pulling the first pin.

> **J. Unlawful Self-Exemption of City Projects from Local, State, and Federal Law – CWA § 301(a), 33 U.S.C. § 1311(a); CWA § 404, 33 U.S.C. § 1344; Va. Code § 62.1-44.15:27(A); Va. Code § 62.1-44.15:34; Va. Code § 28.2-1302; 9VAC25-875-560; CBPA Ordinance § 106(A)(6); City Code App. A, §§ 1400–1418; Permit Part I.B.2.a; Permit Part I.B.2.b; Permit Part I.A.3**

Upon information and belief, the City of Virginia Beach does not apply to its own capital projects, public works, road construction, drainage projects, utility installations, park improvements, and municipal facilities the same wetland-delineation, wetland-permit-verification, erosion-and-sediment-control, and stormwater-management requirements that the City is obligated – and that the City purports – to apply to private applicants. City projects disturb wetlands, place fill in waters of the United States, and discharge construction-phase sediment to the MS4 without Wetlands Board permits under City Code App. A, §§ 1400–1418, without evidence of CWA § 404 or § 401 coverage under CBPA Ordinance § 106(A)(6), and without the VESMP plan review that the City would demand of any private landowner proposing identical work.

No provision of local, state, or federal law exempts a municipality from the environmental requirements it administers. To the contrary:

- **Va. Code § 62.1-44.15:34** – expressly subjects "state agency and federal entity land-disturbing activities" to the Virginia Erosion and Stormwater Management Program. A fortiori, a locality that is itself the VESMP authority is subject to its own program. The VESMP statute contains no municipal carve-out; nor could it, because the City's VESMP authority derives from the same § 62.1-44.15:27(A) that sets the 2,500-square-foot floor. Under Dillon Rule, the City has no power to create an exemption the General Assembly did not grant.

- **9VAC25-875-560** – requires the operator of a regulated land-disturbing activity to obtain VESMP authority approval of an erosion and sediment control plan and a stormwater management plan. The regulation does not distinguish between public and private operators. When the City is the operator, the City must obtain approval from the City-as-VESMP-authority – a requirement that exists precisely to ensure that municipal projects receive the same technical scrutiny as private ones, documented in the same files and reportable in the same Annual Report.

- **Va. Code § 28.2-1302 and City Code App. A, § 1403** – prohibit "any person" from using or developing any wetland within the City without a permit from the Wetlands Board. "Person" under Va. Code § 28.2-1300 includes "any . . . governmental body, including a federal or state entity and any officer or governing or managing body of any of them." The City's own Wetlands Zoning Ordinance binds the City's own Public Works and Public Utilities departments. A municipal drainage ditch through a tidal marsh requires a Wetlands Board permit just as surely as a private bulkhead does.

- **CBPA Ordinance § 106(A)(6)** – requires evidence of wetland permits "prior to the authorization and initiation of grading or other on-site activities." The ordinance does not say "except grading by the City." When City crews grade a site in the CBPA without § 404 and Wetlands Board coverage in the project file, the City violates its own ordinance – and through that ordinance, the Permit condition (Part I.A.3) that requires the City to "require compliance with conditions in ordinances."

- **Permit Part I.B.2.b (Municipal Operations)** – requires the City to implement pollution-prevention and good-housekeeping measures for municipal operations – including compliance with "all applicable federal and state regulations" for City maintenance facilities, fleet operations, and construction activities. The Permit's Municipal Operations section exists precisely because municipal activities are a known source of MS4 pollutant loading that cannot be left to self-regulation.

- **CWA § 301(a), 33 U.S.C. § 1311(a), and CWA § 404, 33 U.S.C. § 1344** – prohibit the discharge of any pollutant – including dredged or fill material – by "any person" without a permit. 33 U.S.C. § 1362(5) defines "person" to include "a State, municipality, commission, or political subdivision of a State." The City is not above the Clean Water Act. When a City crew places fill in a jurisdictional wetland without a § 404 permit, the City – not some abstract third party – is the discharger, and the City is the violator.

The conflict of interest here is more acute than in Violation G. In Violation G, the City looks the other way while private industry pollutes. Here, **the City is the polluter** – and has appointed itself the regulator that decides whether to look. The General Assembly did not authorize a municipality to sit in judgment of itself and rule in its own favor. Nor did EPA. Nor did the Permit. Every City land-disturbing project in the MS4 service area that has proceeded without the wetland delineation, Wetlands Board permit, § 404/§ 401 verification, and VESMP plan approval that would be demanded of a private applicant is a separate and continuing violation of the Permit and of CWA § 301(a).

## VI. DAYS OF VIOLATION

Each unauthorized discharge of sewage, petroleum, fill material, or other pollutants to waters of the United States constitutes a separate day of violation of CWA § 301(a) and the Permit. The programmatic violations identified herein – failure to update the MS4 Program Plan, failure to inspect stormwater management facilities, failure to implement effective industrial discharge and wetlands protection programs, failure to apply the 2,500-square-foot land-disturbance threshold throughout the MS4 service area, failure to complete required TMDL reporting, and self-exemption of City projects from applicable requirements – are continuing violations, each day of

which constitutes a separate violation. For Violation I specifically, each discharge of stormwater from a City MS4 outfall within the Southern Rivers Watershed on each day since January 26, 2024 is a separate day of violation. Notifier reserves the right to establish the precise number of violation days through discovery and at trial.

## VII. WATERS AFFECTED

The violations described herein affect, among others: Broad Bay; the Eastern and Western Lynnhaven River; London Bridge Creek; Lake Holly; Lake Wesley; Owl Creek; the Upper North Landing River; Back Bay; the North Landing River; the Northwest River; the Pocaty River; West Neck Creek; Ashville Bridge Creek; the Chesapeake Bay and its tributaries; the Albemarle Sound and its tributaries; the Atlantic Ocean; and wetlands, tidal creeks, and coastal waters throughout the City's MS4 service area. Many of these waters are impaired under CWA § 303(d) for bacteria, nutrients, or other pollutants. The residents of Virginia Beach depend upon these waters for recreation, sustenance, property value, quality of life, and ecological heritage.

## VIII. REQUEST FOR STATE ENFORCEMENT ACTION; DILIGENT PROSECUTION BAR

### A. Request to the State Water Control Board and DEQ

Notifier acknowledges that Va. Code § 62.1-44.15:70 vests the State Water Control Board with "exclusive authority to institute or intervene in legal and administrative actions to ensure compliance by local governing bodies with this article and with any criteria or regulations adopted hereunder" – that is, with the Chesapeake Bay Preservation Act under state law. DEQ, acting under the authority of the SWCB, may conduct compliance reviews under 9VAC25-830-260, establish corrective action schedules, and issue special orders imposing civil penalties for noncompliance with the state CBPA program.

**Notifier hereby formally requests that DEQ, acting under the authority of the SWCB, immediately initiate enforcement proceedings against the City of Virginia Beach** pursuant to Va. Code § 62.1-44.15:70 and 9VAC25-830-260 and -270 for: (1) the City's failure to designate the Chesapeake Bay Preservation Area in accordance with the Board's mandatory criteria at 9VAC25-830-80 and -90, specifically the under-designation of the Southern Rivers Watershed; (2) the City's failure to enforce CBPA Ordinance § 106(A)(6) wetland-permit-verification requirements in its land-disturbance permitting program; and (3) the City's failure to apply the CBPA program to its own projects. Notifier further requests that DEQ conduct an immediate comprehensive compliance review of the City's CBPA program and VESMP program and issue a corrective action plan or special order requiring the City to bring its practices into compliance with state law.

### B. Federal Claims Are Independent; Diligent Prosecution Bar

The SWCB's "exclusive authority" under Va. Code § 62.1-44.15:70 applies to enforcement of the Chesapeake Bay Preservation Act under state law. It does not bar, and cannot bar, citizen suits to enforce the federal Clean Water Act. The Supremacy Clause of the United States Constitution (Article VI, Clause 2) establishes that federal law is "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." The

CWA's citizen suit provision, 33 U.S.C. § 1365, is a federal remedy that cannot be restricted or eliminated by state law, even in a Dillon Rule state. The Dillon Rule governs the allocation of power among state and local governments within Virginia; it does not, and cannot, limit the authority of the federal government or federal courts to enforce federal law.

Virginia's VPDES permit program is administered pursuant to EPA's delegation of NPDES permitting authority to the Commonwealth under 33 U.S.C. § 1342(b). Permit No. VA0088676 is issued under the joint authority of state law (Va. Code §§ 62.1-44.15 *et seq.* and 9VAC25-890) and federal law (33 U.S.C. § 1342(p) and 40 C.F.R. § 122.26). Violations of the VPDES MS4 Permit are simultaneously violations of the federal NPDES program. An MS4 permit is an "effluent standard or limitation" within the meaning of 33 U.S.C. § 1365(a)(1), and violations of that permit are actionable in federal court regardless of whether the state has taken enforcement action.

CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B), bars citizen suits only if "the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State." Administrative proceedings by DEQ under 9VAC25-830-260 – including compliance reviews, corrective action schedules, and even the issuance of special orders – do not constitute "diligent prosecution" within the meaning of the citizen-suit bar, because they are not "civil or criminal actions in a court." Only if DEQ or the Attorney General of Virginia files a judicial action in court does the diligent prosecution bar apply. As of the date of this Notice, Notifier is not aware that EPA, DEQ, or the SWCB has commenced any such judicial action against the City for the violations described herein.

## IX. PRESERVATION OF EVIDENCE

The City is hereby placed on notice that it has an obligation to preserve all documents, records, data, and other materials relevant to the violations described herein, including but not limited to:

- All MS4 Program Plans, TMDL Action Plans, and Annual Reports submitted to DEQ;

- All land-disturbing permit applications, plan reviews, and approvals issued under Appendix D (VESMP ordinance), together with all supporting wetland delineations, CWA § 404 and § 401 permit evidence, Virginia Water Protection Permit evidence, and Wetlands Board permit evidence submitted or required under CBPA Ordinance § 106(A)(6);

- All Wetlands Board application files, meeting minutes, hearing records, permits, and decisions under City Code App. A, §§ 1400–1418;

- All CBPA exception and variance application files, WQIAs, resiliency assessments, decisions, findings, conditions, and public access files maintained pursuant to CBPA Ordinance § 110(B)(1)(a);

- All CBPA Board meeting minutes, audio/video recordings, and hearing records;

- All GIS data and maps showing CBPA boundaries, RPA and RMA designations, wetland inventories, and the adopted CBPA Map current as of Ord. No. 3825;

- The complete text of Appendix D as re-enacted by Ord. No. 3784 (September 17, 2024), Appendix F as re-enacted by Ord. No. 3825 (August 19, 2025), and Appendix G as adopted by Ord. No. 2115 (March 24, 1992), together with all drafts, staff reports, and legislative history for each;

- All project files, plans, specifications, permits, and approvals for City capital projects, public works, road construction, drainage projects, utility installations, and municipal facilities involving land disturbance of 2,500 square feet or more within the MS4 service area, including all internal communications regarding whether such projects were subject to VESMP plan review, Wetlands Board permitting, CBPA Ordinance § 106(A)(6) verification, or CWA § 404/§ 401 coverage;

- All inspection reports, notices of violation, enforcement correspondence, and referrals to DEQ regarding industrial stormwater dischargers and high-risk facilities;

- All records of sewage spills, sanitary sewer overflows, force main failures, grinder pump malfunctions, and petroleum releases to the MS4, together with all response, cleanup, and reporting records for each event.

**Any destruction, alteration, or concealment of these records after receipt of this Notice may constitute spoliation of evidence and may result in adverse inferences in any subsequent litigation.**

## X. RELIEF SOUGHT

Notifier intends to seek:

1. A declaration that the City has violated and continues to violate the Clean Water Act and its Permit;

2. Injunctive relief requiring the City to:

   a. Immediately update the MS4 Program Plan to comply with the 2024 Permit, including specific reference to the CBPA ordinance as re-enacted by Ord. No. 3825 and accurate documentation of CBPA geographic coverage;

   b. Implement infrastructure improvements sufficient to prevent recurring sewage discharges to surface waters;

   c. Complete all required inspections of privately maintained stormwater management facilities;

   d. Complete all required TMDL reporting with quantified pollutant load reduction calculations;

   e. Conduct a comprehensive inventory of all industrial and commercial facilities subject to VPDES industrial stormwater permit requirements, verify permit status, refer all unpermitted dischargers to the DEQ, and establish mandatory coordination between the Department of Economic Development, the Stormwater Management Division, and the DEQ to prevent future non-compliance;

   f. Re-designate the Chesapeake Bay Preservation Area under Appendix F in accordance with the mandatory criteria of 9VAC25-830-80 and -90, including

designation of Resource Protection Areas wherever tidal wetlands, tidal shores, contiguous nontidal wetlands, and water bodies with perennial flow exist within the Southern Rivers Watershed, and designation of Resource Management Areas contiguous to the entire inland boundary of such RPAs;

g. Amend Appendix D (VESMP ordinance) to apply the 2,500-square-foot land-disturbance threshold throughout all areas properly designated as CBPA under the re-designation required above, and to apply no less protective a threshold to any area of the City containing physical features qualifying for RPA designation under 9VAC25-830-80;

h. Develop and implement a wetlands identification, protection, and coordination program as part of the MS4 Program Plan, including: (i) mandatory wetland delineation as a condition of plan submission for all land-disturbing activities of 2,500 square feet or more; (ii) mandatory verification of CWA § 404, CWA § 401, Virginia Water Protection Permit, and City Wetlands Board permit coverage prior to issuance of any local land-disturbing, grading, or building permit for activity in or adjacent to delineated wetlands, as required by CBPA Ordinance § 106(A)(6); (iii) mandatory referral of all applications involving tidal or vegetated wetlands to the City's Wetlands Board for the permit required by City Code App. A, §§ 1400–1418 and Va. Code §§ 28.2-1302 *et seq.*; and (iv) accounting for wetland losses in TMDL and pollutant reduction calculations;

i. Subject all City capital projects, public works, road construction, drainage projects, utility installations, and municipal facilities involving land disturbance of 2,500 square feet or more within the MS4 service area to the same VESMP plan review, CBPA Ordinance § 106(A)(6) wetland-permit verification, Wetlands Board permitting, and CWA § 404/§ 401 coverage requirements that the City applies to private applicants, with documentation of such compliance in the project file and in the MS4 Annual Report;

j. Amend local ordinances as necessary to provide adequate legal authority to implement the foregoing requirements, including amendment of Appendix G (Southern Rivers Watershed Management Ordinance) to incorporate the water-quantity technical criteria of 9VAC25-875-600 and the water-quality criteria of 9VAC25-875-580, or in the alternative, repeal of Appendix G and extension of Appendix D and Appendix F coverage to the entire Southern Rivers Watershed;

3. Civil penalties of up to $64,618 per day per violation pursuant to 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4;

4. Reasonable attorney fees, expert witness fees, and costs of litigation pursuant to 33 U.S.C. § 1365(d);

5. In the alternative to or in addition to civil penalties, an order directing the City to fund and implement a Supplemental Environmental Project to restore degraded wetlands, Resource Protection Areas, and tidal marshes within the City's MS4 service area;

6. Such other relief as the Court deems just and proper.

## XI. RESERVATION OF RIGHTS

Notifier reserves the right to supplement this notice with additional violations, add claims, add parties, and seek all relief available under law. This notice is based upon information presently available to the Notifier, including but not limited to the City's publicly filed Annual Report for FY2025, the Permit, Appendix D (Ord. No. 3784), Appendix F (Ord. No. 3825), Appendix G (Ord. No. 2115), and the City's published ordinances. Additional violations may be identified through public records requests, investigation, and discovery.

Notifier further reserves the right to pursue, concurrently with or independently of the federal citizen suit contemplated herein, a petition for writ of mandamus in the Circuit Court of the City of Virginia Beach to compel the City to perform the non-discretionary ministerial duties described herein – including the mandatory CBPA designation required by Va. Code § 62.1-44.15:74(A), the mandatory 2,500-square-foot VESMP threshold required by Va. Code § 62.1-44.15:27(A), the mandatory wetland-permit-verification condition precedent of CBPA Ordinance § 106(A)(6), and the mandatory Wetlands Board referral required by Va. Code § 28.2-1302 and City Code App. A, §§ 1400–1418. Service of this Notice does not waive, and shall not be construed to waive, Notifier's right to seek extraordinary relief in state court.

## XII. CONCLUSION

The Clean Water Act was enacted to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251(a). The City of Virginia Beach has accepted the privilege of operating a municipal storm sewer system that discharges to some of the most ecologically significant and publicly treasured waters on the Atlantic coast. With that privilege comes the legal obligation to protect those waters – not only for the residents who use them today, but for the generations who will depend upon them tomorrow.

The violations documented herein are not isolated incidents. They reflect systemic failures: an infrastructure that discharges sewage into impaired waters with alarming regularity; a stormwater program governed by a plan that has not been updated in five years; an economic development apparatus that recruits industry without ensuring environmental compliance; a comprehensive disregard for the wetlands that are the living foundation of this coastal community's resilience; a regulatory map that artificially excludes two-thirds of the City's territory from the protections the General Assembly mandated; and a municipality that has decided its own projects need not follow the rules it is charged with enforcing.

The residents of Virginia Beach deserve better. The waters of Virginia Beach demand better. The law requires better.

If the City does not take meaningful corrective action within sixty days of this notice, Notifier will file suit in the United States District Court for the Eastern District of Virginia, Norfolk Division.

Sincerely,

Lisa M. Clarkson
SFF Conservation Initiative, Inc.

Copy to:

Amy Van Blarcom-Lackey
Regional Administrator, EPA Region 3
U.S. Environmental Protection Agency
1650 Arch Street
Philadelphia, PA 19103

Virginia DEQ
Tidewater Regional Office
5636 Southern Blvd.
Virginia Beach, VA 23462

U.S. Army Corps of Engineers
Norfolk District – Regulatory Branch
803 Front St.
Norfolk, VA 23510
CENAO.REG_ROD@usace.army.mil

Mark D. Stiles, City Attorney
City Attorney's Office, Bldg. 1
2401 Courthouse Drive
Virginia Beach, VA 23456

Jay Jones, Attorney General
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

Office of the City Clerk
Virginia Beach City Council
2401 Courthouse Drive
Virginia Beach, VA 23456

Chesapeake Bay Local Assistance Program
Virginia Department of Environmental
Quality
P.O. Box 1105
Richmond, VA 23218
ChesapeakeBay@deq.virginia.gov

Virginia Marine Resources Commission
Habitat Management Division
380 Fenwick Road, Bldg. 96
Fort Monroe, VA 23651

# USPS Tracking®

Tracking Number:                                    Remove ✕

## 4202345691209410830109355008691644

Copy          Add to Informed Delivery (https://informeddelivery.usps.com/)

## Latest Update

Your item was picked up at the post office at 11:08 am on March 19, 2026 in VIRGINIA BEACH, VA 23456 by CITY MIXED. The item was signed for by C MAPSTONE.

**Get More Out of USPS Tracking:**

**USPS Tracking Plus®**

**Delivered**
Delivered, Individual Picked Up at Post Office

VIRGINIA BEACH, VA 23456
March 19, 2026, 11:08 am

Arrived at Post Office

VIRGINIA BEACH, VA 23456
March 19, 2026, 10:35 am

Out for Delivery

VIRGINIA BEACH, VA 23456
March 19, 2026, 6:35 am

Arrived at USPS Facility

VIRGINIA BEACH, VA 23456
March 19, 2026, 4:18 am

Arrived at USPS Regional Facility

RICHMOND VA DISTRIBUTION CENTER
March 18, 2026, 12:44 pm

Departed Post Office

VIRGINIA BEACH, VA 23456
March 17, 2026, 3:16 pm

USPS in possession of item

VIRGINIA BEACH, VA 23456
March 17, 2026, 11:26 am

Shipping Label Created, USPS Awaiting Item

VIRGINIA BEACH, VA 23456
March 15, 2026, 7:16 pm

**Hide Tracking History**

**What Do USPS Tracking Statuses Mean?** **(https://faq.usps.com/s/article/Where-is-my-package)**

**Text & Email Updates** ⌄

**Proof of Delivery** ⌄

**USPS Tracking Plus®** ⌄

**Product Information** ⌄

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

# Need More Help?

Contact USPS Tracking support for further assistance.

**FAQs**



March 12, 2026

<u>*Via Certified Mail, Return Receipt Requested*</u>

Interim, Director
Virginia Department of Environmental Quality
1111 E. Main Street, Suite 1400
P.O. Box 1105
Richmond, Virginia 23218

Chairman, State Water Control Board
c/o Virginia Department of Environmental Quality
1111 E. Main Street, Suite 1400
P.O. Box 1105
Richmond, Virginia 23218

Chesapeake Bay Local Assistance Program
Virginia Department of Environmental Quality
1111 E. Main Street, Suite 1400
Richmond, Virginia 23219
ChesapeakeBay@deq.virginia.gov

Regional Director
Tidewater Regional Office
Virginia Department of Environmental Quality
5636 Southern Blvd.
Virginia Beach, Virginia 23462

**RE:  FORMAL COMPLAINT AND DEMAND FOR ENFORCEMENT ACTION AGAINST THE CITY OF VIRGINIA BEACH FOR NONCOMPLIANCE WITH THE CHESAPEAKE BAY PRESERVATION ACT, THE VIRGINIA EROSION AND STORMWATER MANAGEMENT PROGRAM, AND VPDES MS4 PERMIT NO. VA0088676 – REQUEST FOR IMMEDIATE COMPLIANCE REVIEW AND ISSUANCE OF CORRECTIVE ACTION ORDER UNDER 9VAC25-830-260**

Dear Directors and Chairman:

## I. PURPOSE OF THIS COMPLAINT

The undersigned, Lisa Clarkson, a resident and taxpayer of the City of Virginia Beach, Virginia, and SFF Conservation Initiative, Inc., a Virginia nonstock corporation whose members use and enjoy the waters of the Chesapeake Bay and its tributaries within the City of Virginia Beach ("Complainant"), hereby file this formal complaint and demand for enforcement action

against the City of Virginia Beach ("the City") pursuant to the Chesapeake Bay Preservation Act ("CBPA"), Va. Code §§ 62.1-44.15:67 through :79, the Chesapeake Bay Preservation Area Designation and Management Regulations ("CBPA Regulations"), 9VAC25-830, and the Virginia Erosion and Stormwater Management Program ("VESMP"), Va. Code §§ 62.1-44.15:24 *et seq.*

This complaint is filed concurrently with a 60-Day Notice of Intent to File Citizen Suit under Section 505 of the Clean Water Act, 33 U.S.C. § 1365, copies of which are served on the Director and the State Water Control Board ("Board") with this mailing. **This complaint specifically requests that the Virginia Department of Environmental Quality ("DEQ") exercise its compliance review and enforcement authority under 9VAC25-830-260 and that Board exercise its exclusive enforcement authority under Va. Code § 62.1-44.15:70 to bring the City into compliance with state law.**

This complaint is necessitated by the fact that these same violations have been brought to the attention of the DEQ and the Board on multiple prior occasions, and that the DEQ's response has been, in substance, to defer to the City's own self-certification of compliance. Such deference is not oversight. It is abdication. The General Assembly did not vest "exclusive authority" in the Board (Va. Code § 62.1-44.15:70) so that the Board could disclaim any responsibility to use it. If only the Board may enforce the CBPA against a locality, and the Board declines to enforce, then the CBPA is a dead letter – and the residents of Tidewater Virginia have no remedy at all. This cannot be what the General Assembly intended, and it is not what the law requires.

## II. STATUTORY AND REGULATORY AUTHORITY FOR THIS COMPLAINT

The Board's authority and obligation to act derive from the following provisions, each of which uses mandatory language:

1.  Va. Code § 62.1-44.15:70: "The Board shall have the exclusive authority to institute or intervene in legal and administrative actions to ensure compliance by local governing bodies with this article and with any criteria or regulations adopted hereunder." This authority is exclusive – no other entity may compel a locality to comply with the CBPA. That exclusivity carries a correlative obligation: where noncompliance is demonstrated, the Board must act, because no one else can.

2.  9VAC25-830-260(A): "The Board evaluates compliance with the implementation of local Bay Act programs" on a five-year review cycle. The regulation identifies the specific components that DEQ must evaluate, including CBPA designation, performance criteria implementation, and ordinance consistency with the Act and the regulations.

3.  9VAC25-830-260(B): When the compliance review identifies deficiencies, "the department shall identify necessary compliance actions and establish a schedule for their completion." "Shall" is mandatory. The DEQ does not have discretion to ignore deficiencies.

4.  9VAC25-830-260(C): If the local government fails to implement compliance actions within the established schedule, "the department shall have the authority to issue a special order to any local government imposing a civil penalty not to exceed $5,000 per day with the maximum amount not to exceed $20,000 per day per violation for noncompliance with the state program."

5. 9VAC25-830-270: Before taking legal action against a local government, DEQ "shall, unless it finds extraordinary circumstances, initiate a proceeding under the Act and 9VAC25-830-260 and give the locality at least 15 days' notice." This provision contemplates that DEQ will use its 9VAC25-830-260 authority as a prerequisite to enforcement – it does not contemplate that DEQ will use it as a substitute for enforcement or, worse, not use it at all.

## III. SPECIFIC VIOLATIONS REQUIRING ENFORCEMENT ACTION

Upon information and belief, the City of Virginia Beach is in violation of the CBPA, the CBPA Regulations, the VESMP, and VPDES MS4 Permit No. VA0088676 in the following specific and material respects:

### A. Failure to Designate the CBPA in the Southern Rivers Watershed

Va. Code § 62.1-44.15:74(A) requires that "[c]ounties, cities, and towns in Tidewater Virginia shall use the criteria developed by the Board to determine the extent of the Chesapeake Bay Preservation Area within their jurisdictions." Virginia Beach is a statutory Tidewater locality under Va. Code § 62.1-44.15:68. The Board's criteria at 9VAC25-830-80 define the Resource Protection Area by physical features – tidal wetlands, tidal shores, contiguous nontidal wetlands, and water bodies with perennial flow – not by the downstream destination of those features' drainage. The criteria require RPA designation wherever features exist that "provide for the removal, reduction or assimilation of sediments, nutrients and potentially harmful or toxic substances in runoff entering the bay and its tributaries, and minimize the adverse effects of human activities on state waters and aquatic resources." The Southern Rivers Watershed contains extensive tidal wetlands, tidal shores, and water bodies with perennial flow along Back Bay, the North Landing River, the Northwest River, the Pocaty River, and their tributaries. Every water body in the Southern Rivers Watershed is a "state water."

Upon information and belief, the City's CBPA designation under Appendix F of the Virginia Beach City Code does not extend to the Southern Rivers Watershed. If this is the case, the City has failed to apply the Board's mandatory designation criteria to approximately 67 percent of its land area, in direct violation of Va. Code § 62.1-44.15:74(A) and 9VAC25-830-80.

### B. Failure to Apply the 2,500-Square-Foot Land-Disturbance Threshold

Va. Code § 62.1-44.15:27(A) mandates that a VESMP locality regulate land-disturbing activities of 2,500 square feet or more "in an area of a locality designated as a Chesapeake Bay Preservation Area." By under-designating the CBPA, the City has artificially excluded the majority of its jurisdiction from this mandatory threshold, resulting in land-disturbing activities between 2,500 and 9,999 square feet proceeding in the Southern Rivers Watershed without VESMP plan review, without erosion and sediment control, without stormwater management, and without the wetland-permit verification required by CBPA Ordinance § 106(A)(6).

### C. Failure to Enforce Wetlands Zoning Ordinance and § 106(A)(6)

CBPA Ordinance § 106(A)(6) requires that "[p]rior to the authorization and initiation of grading or other on-site activities, evidence of all wetland permits required by Sections 1400 through 1418 of the Zoning Ordinance . . . and Sections 401 and 404 of the Clean Water Act . . . shall be obtained and evidence of such submitted by the applicant to the City." Upon information

and belief, the City does not enforce this condition precedent. Land-disturbing activities proceed in and adjacent to jurisdictional wetlands without wetland delineation, without verification of CWA § 404 and § 401 coverage, and without referral to the City's own Wetlands Board under City Code App. A, §§ 1400–1418. This failure exists in all land-disturbing activities, because the City no longer requires strict adherence to the 2,500-square-foot threshold that triggers § 106(A)(6) verification.

### D. Self-Exemption of City Projects

Upon information and belief, the City does not apply to its own capital projects, public works, and municipal facilities the same VESMP plan review, § 106(A)(6) wetland-permit verification, Wetlands Board permitting, and CWA § 404/§ 401 requirements that the City applies – or purports to apply – to private applicants. No provision of state law exempts a locality from the programs it administers. Va. Code § 62.1-44.15:34 expressly subjects state agency and federal entity land-disturbing activities to the VESMP. Va. Code § 28.2-1300 defines "person" to include any governmental body. The CBPA Ordinance contains no municipal carve-out.

### E. Obsolescence of Appendix G (Southern Rivers Watershed Management Ordinance)

The City's Appendix G, adopted in 1992 and never substantively amended, predates the Virginia Erosion and Stormwater Management Act, the Virginia Stormwater Management Handbook, and the Virginia Runoff Reduction Method. It does not incorporate the water-quantity criteria of 9VAC25-875-600 or the water-quality criteria of 9VAC25-875-580. Under Dillon Rule, Appendix G cannot serve as a lawful substitute for CBPA compliance. The General Assembly mandated CBPA designation under § 62.1-44.15:74(A); it did not authorize localities to create alternative programs that achieve lesser protections.

### F. Additional Permit Violations Documented in the 60-Day Notice

As described in detail in the enclosed 60-Day Notice, the City has also: (1) discharged raw sewage to waters of the United States on at least twelve separate occasions in a single reporting year; (2) discharged approximately 4,300 gallons of jet fuel near the Upper North Landing River; (3) failed to eliminate illicit discharges within the required timeframe; (4) failed to update the MS4 Program Plan since 2020; (5) failed to inspect approximately 191 privately maintained stormwater management facilities; (6) failed to complete required TMDL reporting; and, (7) facilitated unpermitted industrial stormwater discharges while actively recruiting polluting industries. These violations are independently enforceable under the Clean Water Act, but they also reflect a CBPA program that DEQ has certified as compliant despite systemic, documented deficiencies.

## IV. SPECIFIC ACTIONS DEMANDED

Complainant demands that the DEQ and the Board take the following actions within thirty (30) days of receipt of this complaint:

1. Initiate a comprehensive compliance review of the City of Virginia Beach's CBPA program and VESMP program under 9VAC25-830-260, specifically addressing: (a) the geographic extent of CBPA designation under Appendix F (Ord. No. 3825, August 19, 2025), including whether the designation extends to the Southern Rivers Watershed; (b) whether the City applies the 2,500-square-foot land-disturbance threshold throughout all areas where the Board's criteria at 9VAC25-830-80 require CBPA designation; and, (c) whether the City enforces CBPA Ordinance § 106(A)(6) wetland-permit verification as a condition precedent to land-disturbing authorization.

2. Identify all necessary compliance actions and establish a schedule for their completion under 9VAC25-830-260(B), including: (a) re-designation of the CBPA in the Southern Rivers Watershed to include all areas meeting the RPA criteria of 9VAC25-830-80 and the RMA criteria of 9VAC25-830-90; (b) amendment of Appendix D (VESMP ordinance) to apply the 2,500-square-foot threshold throughout all properly designated CBPA areas; (c) amendment or repeal of Appendix G to bring the Southern Rivers Watershed under the same regulatory framework as the rest of the City; and, (d) implementation of a mandatory wetland-permit verification process consistent with CBPA Ordinance § 106(A)(6).

3. If the City fails to implement the identified compliance actions within the schedule established, issue a special order under 9VAC25-830-260(C) imposing civil penalties for noncompliance.

4. Provide a written response to this complaint within thirty (30) days, identifying the specific actions the DEQ intends to take and the timeline for each.

## V. CONSEQUENCES OF CONTINUED INACTION

Complainant respectfully advises the DEQ and the Board that if this complaint does not receive a substantive response within thirty (30) days, Complainant intends to pursue the following additional legal remedies:

- A petition for writ of mandamus in the Circuit Court of the City of Richmond to compel the Board and the DEQ to perform the nondiscretionary duties identified herein, including the mandatory compliance review under 9VAC25-830-260 and the mandatory identification of compliance actions under 9VAC25-830-260(B);

- Judicial review under the Virginia Administrative Process Act, Va. Code §§ 2.2-4000 *et seq.*, of the DEQ's failure to act on this complaint as agency inaction reviewable under Va. Code § 2.2-4027;

- A petition to the U.S. Environmental Protection Agency under 40 C.F.R. § 123.64 to investigate whether the Commonwealth's VPDES program is being administered in compliance with the requirements of CWA § 402 and EPA's implementing regulations, and to consider withdrawal of NPDES delegation to the extent the state program fails to ensure permit compliance;

- A citizen suit against the EPA Administrator under CWA § 505(a)(2), 33 U.S.C. § 1365(a)(2), for failure to perform nondiscretionary oversight duties with respect to the delegated VPDES program.

Complainant does not seek confrontation. Complainant seeks compliance. If the DEQ will exercise its authority under 9VAC25-830-260 and the Board will exercise its exclusive authority under Va. Code § 62.1-44.15:70, the citizen suit provisions of the Clean Water Act will be unnecessary. But if the DEQ continues to defer to the City's self-certification of compliance, and the Board continues to treat its "exclusive authority" as a shield rather than a sword, then the residents of Virginia Beach will have no choice but to seek relief in court – from the federal courts under the CWA, and from the state courts under the VAPA and the law of mandamus.

## VI. CONTACT INFORMATION

All communications regarding this complaint should be directed to:

Lisa M. Clarkson
SFF Conservation Initiative, Inc.
3808 North Landing Road
Virginia Beach, Virginia 23456
Phone: 757-450-3329

Respectfully submitted,

Lisa M. Clarkson
SFF Conservation Initiative, Inc.

Enclosure

Copy to:

Lee Zeldin, Administrator, U.S. Environmental Protection Agency
Amy Van Blarcom-Lackey, Regional Administrator, EPA Region 3
Jay Jones, Attorney General of Virginia
Patrick A. Duhaney, City Manager, City of Virginia Beach
Mark D. Stiles, City Attorney, City of Virginia Beach

# USPS Tracking®

**Track Packages Anytime, Anywhere**

Get the free Informed Delivery® feature to receive automated notifications on your packages

**Learn More**

**Tracking Number:**

Remove ✕

## 9410830109355008691620

Copy          Add to Informed Delivery

**Latest Update**

Your item was delivered to an individual at the address at 11:43 am on March 19, 2026 in RICHMOND, VA 23219. The item was signed for by V VA.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

● **Delivered**

**Delivered, Left with Individual**
RICHMOND, VA 23219
March 19, 2026 11:43 AM

**Out for Delivery**
RICHMOND, VA 23219
March 19, 2026 7:16 AM

**Arrived at Post Office**
RICHMOND, VA 23232
March 19, 2026 7:05 AM

**Arrived at USPS Facility**
RICHMOND, VA 23232
March 18, 2026 10:14 PM

**Arrived at USPS Facility**
RICHMOND VA DISTRIBUTION CENTER
March 18, 2026 12:44 PM

**Departed Post Office**
VIRGINIA BEACH, VA 23456
March 17, 2026 3:16 PM

**USPS in possession of item**
VIRGINIA BEACH, VA 23456
March 17, 2026 11:26 AM

**Shipping Label Created**
VIRGINIA BEACH, VA 23456
March 15, 2026 7:16 PM

● Hide Tracking History

**What Do USPS Tracking Statuses Mean?**

| Text & Email Updates | ⌄ |
|---|---|
| Proof of Delivery | ⌄ |
| USPS Tracking Plus® | ⌄ |
| Product Information | ⌄ |

See Less ⌃

# USPS Tracking®

FAQs ›

## Track Packages Anytime, Anywhere

Get the free Informed Delivery® feature to receive automated notifications on your packages

Learn More

Remove ✕

**Tracking Number:**

## 9410830109355008691637

Copy      Add to Informed Delivery

● **Delivered**

### Latest Update

Your item was delivered to the front desk, reception area, or mail room at 11:34 am on April 21, 2026 in WASHINGTON, DC 20460 to EPA 20460 R4. The item was signed for by L TERK.

**Get More Out of USPS Tracking:**

USPS Tracking Plus®

**Delivered, Front Desk/Reception/Mail Room**
WASHINGTON, DC 20460
April 21, 2026 11:34 AM

**Arrived at Post Office**
WASHINGTON, DC 20018
April 21, 2026 6:33 AM

**Arrived at USPS Facility**
WASHINGTON DC DISTRIBUTION CENTER
March 20, 2026 3:01 AM

**Departed USPS Facility**
WASHINGTON DC DISTRIBUTION CENTER
March 20, 2026 2:44 AM

**Arrived at USPS Facility**
WASHINGTON DC DISTRIBUTION CENTER
March 19, 2026 6:02 PM

**Arrived at USPS Facility**
WASHINGTON DC DISTRIBUTION CENTER
March 19, 2026 11:30 AM

**Arrived at USPS Facility**
WASHINGTON DC DISTRIBUTION CENTER
March 19, 2026 9:01 AM

**Departed USPS Facility**
WASHINGTON DC DISTRIBUTION CENTER
March 19, 2026 7:34 AM

**Arrived at USPS Facility**
WASHINGTON DC DISTRIBUTION CENTER
March 19, 2026 5:10 AM

**Departed USPS Facility**
RICHMOND VA DISTRIBUTION CENTER
March 19, 2026 4:07 AM

**In Transit to Next Facility**
March 19, 2026 3:55 AM

**Arrived at USPS Facility**
RICHMOND VA DISTRIBUTION CENTER
March 18, 2026 12:44 PM

**Departed Post Office**

VIRGINIA BEACH, VA 23456
March 17, 2026 3:16 PM

**USPS in possession of item**

VIRGINIA BEACH, VA 23456
March 17, 2026 11:26 AM

**Shipping Label Created**

VIRGINIA BEACH, VA 23456
March 15, 2026 7:16 PM

**Hide Tracking History**

**What Do USPS Tracking Statuses Mean?**

| Text & Email Updates | ⌄ |
|---|---|
| Proof of Delivery | ⌄ |
| USPS Tracking Plus® | ⌄ |
| Product Information | ⌄ |

See Less ⌃

Track Another Package

Enter tracking or barcode numbers

# Need More Help?

Contact USPS Tracking support for further assistance.

**FAQs**