# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

**SFF CONSERVATION
INITIATIVE, INC., et al.**
      **Plaintiffs,**

**v.**
                        **Civil Action No. 2:26-cv-00738**

**CITY OF VIRGINIA BEACH; et al.**
      **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### I.       PRELIMINARY STATEMENT

The City of Virginia Beach (the "City") proposes to convey approximately 350 acres of publicly owned land, the Virginia Beach National Golf Club and four adjoining parcels, to a single developer, The Dragas Companies, Inc. ("Dragas"), for the construction of approximately 659 residential units, south of the City's Green Line, on hydric soils served only by private wells and on-site septic systems.

This location is in a sub-watershed that the City has certified, under penalty of perjury, that it is not complying with its Clean Water Act permit. This land is also the home of two active bald eagle nests for which no Defendant holds or has sought any federal authorization.

The certified land records add a dimension, that the City's public presentation of this transaction, has omitted entirely. The City does not hold this land as an unencumbered fee that it may simply sell. The City received the core assemblage, by

1

deed, for ten dollars in 1995.  Subsequently, the City dedicated the golf course to public recreation, by a forty-year ground lease, to its own Development Authority.  This lease does not expire until October 7, 2037.

In 2012, the City sold, a perpetual recorded easement over two of the five parcels, now under negotiation, to the United States for $3,760,000.  That specific easement categorically prohibits residential use of that land.  Additionally, the Commonwealth of Virginia holds a recorded lien, against this land, for fifty percent of any sale price.  None of this was disclosed to the Council or to the public up to and on the July 7, 2026 date.

Plaintiffs now seek what they have always sought, an order holding the status quo. This Motion asks the Court to enjoin the execution, delivery, and recording of any instrument conveying or encumbering the five parcels, to enjoin clearing and other land disturbance, to hold a 660-foot buffer around the two documented bald eagle nests until a survey and any required federal authorization are in hand, and to preserve the documentary record.

Plaintiffs ask the Court to enjoin the City from authorizing, permitting, or undertaking any further land-disturbing development, city wide and specifically within the Southern Rivers Watershed, until the City has brought its stormwater, wetlands, and Chesapeake Bay Preservation Area programs into full compliance with the Clean Water Act.  A deed, once delivered and recorded, and a site, once cleared, cannot be restored by any judgment this Court could later enter.

Additionally, the City has not been in compliance with Permit No. VA0088676. This permit has remapped the Southern Rivers Watershed and restored the jurisdictional wetlands, waters, and drainage features. The City should be in full compliance with the building and land-disturbance requirements it enforces against private owners, all under the continuing supervision of the Court until full compliance is achieved.

"The Court denied Plaintiffs' earlier application for a temporary restraining order without prejudice, observing that the dates on which that application depended had passed and that '[w]ithout further communication and allegations from Plaintiffs on this matter, the exigent and emergency aspects of the TRO and the Motion to Expedite are no longer present." (ECF No. 10 at 5).

This Court order, supplies that further communication and those further allegations, now supported by sworn declarations, by the City's own certified reports, and by copies of the instruments of record. Plaintiffs are likely to succeed on several claims that do not depend on any future vote; the threatened injury will be irreversible.

The only hardship on the other side of the scale, is a delay, in a transaction that the City cannot lawfully perform as proposed. There is a significant public interest in requiring a municipality to obey federal environmental law, its own recorded obligations, and the Commonwealth's disposition statutes before parting with 350 acres of public land.

## II.   STATEMENT OF FACTS

**A.   The Property, its dedication to public use, and its regulatory setting.**

Virginia Beach National Golf Club is a publicly owned, approximately 350-acre golf and recreation complex at 2500 Tournament Drive.  The City acquired the core assemblage from Nations Bank of Virginia, N.A., by special warranty deed, dated February 15, 1995, for the stated consideration of ten dollars, exempt from recordation tax as a conveyance to a political subdivision.  (*Exhibit A* (D.B. 3475, p. 497)).

By Ground Lease dated October 8, 1997, the City leased the golf course tracts to the Virginia Beach Development Authority (the "Authority") for forty years, to October 7, 2037.  This lease was for the operation of a public golf facility; a memorandum of that lease was included in the original complaint.  (*Exhibit B* (D.B. 3799, p. 626; plats M.B. 262, pp. 49–52)).

In 2016-2017, the City re-subdivided the assemblage by plats captioned "TO BE CONVEYED TO THE CITY OF VIRGINIA BEACH DEVELOPMENT AUTHORITY," carving out the golf course as Parcel E1, GPIN 1494-34-4919, containing 352.451 acres, this is the identical parcel later placed under the Dragas non-disclosure agreement.  This was done by deed dated, February 19, 2018, reciting consideration of $10.00, the City conveyed the flanking parcels to the Authority but retained fee title to Parcel E1.  (*Exhibit C*).

The Virginia Beach National Golf Course remains in active public use.  The golf course operates as an eighteen-hole course, open to the public under a management

agreement, through December 31, 2026.  *Compl. ¶ 40*.  The golf course hosts the nine-hole, First Tee youth facility, under a lease through 2030, which the City's own Request for Proposals required every respondent to honor.

The City's published description of the Property calls it "a recreational and tourism asset for the community" and states that the City's "goal is to keep the course open to the public."[1]  The Authority has reported *annual* net income from the facility of approximately $740,000, and the public has invested roughly $9.4 million in it.  This investment includes a $3.5 million construction contribution, a $4.5 million buyout of the original operator's lease, and $1.4 million of repairs authorized in 2024.

The Property lies south of the Green Line, within the Southern Rivers Watershed, and drains to the North Landing River and ultimately to Back Bay and the Currituck and Albemarle Sounds.  (*Compl. ¶¶ 32, 60*).  The Property is zoned Agricultural (*AG-1*) and lies within the Interfacility Traffic Area overlay, under which residential development is limited to one single-family dwelling per fifteen acres of developable land.

The City adopted this development restriction as part of its response to the 2005 Base Realignment and Closure process.  (*Compl. ¶ 33*).  The Dragas proposal would place 659 housing units on approximately 42 acres of "unconstrained footprint", roughly fifteen units per acre.  (*Compl. ¶¶ 52, 59*).

---

[1] City's published description of the Property calls it "a recreational and tourism asset for the community" and states that the City's "goal is to keep the course open to the public. https://communications.virginiabeach.gov/hot-topics/virginia-beach-national-golf-club

The plaintiff, Lisa M. Clarkson, owns property within the watershed. This property is hydrologically downstream of the parcels at issue. The plaintiff and numerous members of Plaintiff SFF Conservation Initiative, Inc. draw their drinking water from private wells in the shallow aquifer. (*Compl*. ¶¶ 16–18).

**B.      The parcels that are the subject of negotiation, are burdened by both recorded Federal and State interests.**

The Request for Proposals advertised "the property located at 2500 Tournament Drive and a nearby parcel, totaling approximately 350 acres." The confidential negotiation was broader.[2]

Parcels A and B were not acquired as development inventory. In fact they were purchased explicitly for preservation and not development. They were purchased by the City in 2011, from the trustees of a church, under the City's post-BRAC program, in order to remove development potential beneath the Oceana–Fentress flight corridor. The land was purchased using grant funds from the Commonwealth's Military Strategic Response Fund. (*Exhibit E* (Instr. 20110823000866970)). There are two recorded instruments, that burden them today.

The first instrument, by Reimbursement Agreement and Memorandum of Lien, is dated November 15, 2011 and recorded against those GPINs, the Commonwealth holds a

---

[2] ((*Exhibit A to the August 7, 2024 Mutual Non-Disclosure Agreement identifies five parcels:  GPINs 1494-03-5237*) (Parcel A, approximately 42.857 acres), 1494-13-7202 (Parcel B, approximately 27.000 acres), (1494-34-4919) (the Golf Course Parcel), (1494-41-2582, and 1494-52-3434). (*Exhibit D*).

judicially enforceable lien. This lien is for fifty percent of the sales price, upon any disposition. (*Exhibit F*).

The second instrument, by Grant of Easement EI-11534, dated September 2012 and recorded September 21, 2012. The City conveyed to the United States, for $3,760,000 and under the Readiness and Environmental Protection Integration authority, 10 U.S.C. § 2684a, a perpetual restrictive easement over 516.16 acres including those parcels. (*Exhibit G*).

The recorded easement, among other things, limits the use of the land to those designated compatible in the September 25, 2007 text of the City's own compatibility table. *City Code Article* 18, § 1804. This compatibility table provides that "[t]he Property may not be used for residential use."[3]

Plaintiffs do not ask this Court to enforce the United States' easement or the Commonwealth's lien, and neither sovereign is a party to this action. Plaintiffs offer these recorded instruments for what they show: that a material portion of the residential program the City proposes to authorize cannot lawfully be built where the proposal places it, that half of the price of two parcels is spoken for, and that the City's public account of this transaction omitted these facts.

---

[3] The compatibility table imposes height, lighting, and glare controls; prohibits bird-attracting features including ponds except as expressly allowed; conditions any stormwater impoundment on prior written federal approval; requires ninety days' certified-mail notice before any new use or construction, the omission of which "shall be deemed a breach"; and requires that its terms be incorporated in any instrument divesting any interest in the land, including leases.

**C.** **There are two active bald eagle nests and no survey nor permit has been sought to authorize a disturbance of these nests.**

Two active bald eagle nests are located on the Property. Their presence was confirmed on the public record at the City Council's July 7, 2026 public hearing. These nests have been reported by regional media and have been reported to the Center for Conservation Biology, which administers Virginia's annual bald eagle nest survey in coordination with the Virginia Department of Wildlife Resources. (*Compl.* ¶ 41).

Upon information and belief, no Defendant holds or has applied for any eagle take permit, none has commissioned a survey, and neither the Request for Proposals, the staff presentations to Council, nor the Dragas proposal mention the bald eagles. (*Compl.* ¶ 44).

Dragas held a community meeting before the City Council public hearing. In fact, at the community meeting, Dragas's President and Chief Executive Officer was asked about the bald eagles and responded, "That's the first I've heard of that." (*Compl.* ¶ 45; Ex. C). The re-development cannot be accomplished without tree removal, clearing, grading, and construction within 660 feet of one or both nests. (*Compl.* ¶ 46).

**D.** **The City has admitted ongoing Clean Water Act violations within the receiving sub-watershed.**

The City holds VPDES Municipal Separate Storm Sewer System Phase I Permit No. VA0088676, effective January 26, 2024. This permit authorizes stormwater discharges across approximately sixty-seven percent of the City's land area. (*Compl.* ¶ 34). The City's own FY25 MS4 Annual Report and Total Phosphorus TMDL Action Plan,

signed under penalty of perjury on September 30, 2025 pursuant to 40 C.F.R. § 122.22(d), admit material non-compliance. (*Compl*. ¶ 62).

This property drains into the North Landing River-Middle sub-watershed. Although the permit requires full Chesapeake Bay TMDL compliance by June 30, 2028, the City designated its mandatory phosphorus load-reduction calculations "TBD."[4] The City reported zero reductions attributable to stormwater facilities for fourteen consecutive years. (*Compl*. ¶¶ 60, 62–63). The City's own figures show that converting pervious land to impervious development increases per-acre phosphorus loading roughly three and one-half fold. (*Compl*. ¶ 63).

The City's admissions are not limited to loading calculations. Between July 1, 2024 and June 30, 2025, the City discharged or allowed the discharge of raw sewage and petroleum products into waters of the United States, including the Upper North Landing River, many already impaired under Section 303(d). (*Compl*. ¶¶ 64-65).

The City failed to eliminate illicit discharges within the Permit's thirty-day timeframe, including a heating-oil contamination event that persisted approximately fifteen months; the City has not updated its MS4 Program Plan since 2020; the City failed to inspect approximately 191 private stormwater facilities; and the City's TMDL reporting is incomplete. (*Compl*. ¶ 66).

Since 2018, the City has applied a weaker, pre-statutory ordinance to the southern

---

[4] City of Virginia Beach, MS4 Permit Annual Report, July 1, 2024 - June 30, 2025, p. 47-48.

two-thirds of the City.  As a result of this application, there has not been any wetlands verification.  The City's own ordinance makes the wetlands verification a condition precedent to land-disturbing authorization.  (*Compl*. ¶¶ 36-37, 39.).

On March 12, 2026, the City was served with the sixty-day notice that is required by 33 U.S.C. § 1365(b)(1)(A).  The delivery was completed on March 19, 2026; more than sixty days had elapsed before this suit was filed; and no judicial enforcement action has commenced.  (*Compl*. ¶¶ 12-13; Ex. A.).

**E.     The City engaged in seventeen months of concealed negotiation to accomplish a pre-determined outcome.**

Pursuant to a request under the Virginia Freedom of Information Act request, the City produced certain records establishing that confidential negotiations with Dragas began no later than April 2024, approximately seventeen months before any public solicitation for proposals was issued.  (*Compl*. ¶¶ 47-48; Ex. D.).

In July 2024, a Dragas vice president, sent City staff a document entitled "Exclusivity Non-Disclosure Agreement."  (*Compl*. ¶ 49; Ex. G.).  This document would have locked out all other potential buyers. (*Compl*. ¶ 49; Ex. G.).  On August 7, 2024, the City and Dragas executed a Mutual Non-Disclosure Agreement barring disclosure of the transaction.  This agreement includes its wetlands and drainage data, to "any third party, includ[ing] any member or members of any appointed committees or commissions of the city" which excluded the Virginia Beach Development Authority board, the Planning

Commission, the Wetlands Board, and the Chesapeake Bay Preservation Area Board. (*Compl.* ¶ 50; Ex. I.).

Upon information and belief, the City Attorney's Office executed that Agreement without any discussion with Council, a Council vote, or any recorded authorization by Council. (*Compl.* ¶ 51.). The day after the Agreement was signed, City staff identified the unconstrained residential footprint as "about 42 acres," the footprint that would later yield the 659 units, and Dragas received the City's complete due-diligence file more than a year before any public solicitation was issued. (*Compl.* ¶ 52; Ex. J.).

In late September 2024, Dragas's President, Helen Dragas, sent text messages to at least three sitting Council members. (*Compl.* ¶ 54; Ex. N). These text messages included the Mayor and the Vice Mayor, to arrange private meetings concerning "a large, exciting project." (*Compl.* ¶ 54; Ex. N.). On October 25, 2024, the City Attorney produced records, to a sitting Council member, in response to his FOIA request. (*Compl.* ¶ 55). The City attorney advised the councilman, on the basis of the Dragas agreement, to "refrain from publicizing" the documents. (*Compl.* ¶ 55.).

The Request for Proposals was not issued until October of 2025, and it required every respondent to execute an anti-collusion certification. (*Compl.* ¶ 56.). This "anti-collusion certification" disclaimed the arrangement that Dragas had long enjoyed and

benefitted from.  (*Compl.* ¶ 56.).  The City, subsequently received, nine proposals after approximately six weeks' notice.  (*Compl.* ¶¶ 56–57).

**F.  At the July 7, 2026 City Council meeting, the Council deferred the vote regarding the Virginia Beach National Golf Course.**

The City held its public hearing on July 7, 2026 and set the vote for July 14, 2026. (*Compl.* ¶ 1.).  At that hearing, the City Attorney presented the City's legal account of the transaction.  The City Attorney's recitation did not disclose the 1997 ground lease running through 2037, the United States' recorded easement, the Commonwealth's recorded lien, the frozen compatibility table, the 1995 ten-dollar provenance, the 2016-2018 re-subdivision and the $10.00 conveyance that pre-positioned the sale parcel, nor the facility's net income.

The City Attorney described the transaction as arising from "unsolicited proposals"[5] based on publicly available information that any party "could have sought and obtained."[6]  The City Attorney did advise the Council that a three-fourths super-majority (nine affirmative votes) would be required to approve the sale.

The previously scheduled vote did not occur.  The City announced that because of an error in the notice it had published, the hearing and the vote would be deferred and the

---

[5]  Virginia Beach City Council meeting July 14, 2026, at 1:44:08. https://www.youtube.com/watch?v=l20Jr8Cu-bo&t=6501s
[6]  Virginia Beach City Council meeting July 14, 2026, at 1:45:15. https://www.youtube.com/watch?v=l20Jr8Cu-bo&t=6501s

hearing would be re-advertised.[7]  The published notice described the Property as approximately 300 acres rather than the 352.451 acres that its own recorded plat reflected.

Public reporting states that the re-advertised hearing and the Council vote are now set for August 11, 2026.  The City Clerk's published agenda for the August 11, 2026 shows an agenda item titled "DECLARATION AND SALE OF EXCESS PROPERTY Approximately 341.4+/- acres at 2500 Tournament Drive (known as Virginia Beach National Golf Course) to Dragas Associates, Inc.".  (*Exhibit H*).

## G.     This matter's procedural history and present posture.

Plaintiffs filed their Complaint on July 13, 2026.  (ECF No. 1.).  On July 14, 2026, Plaintiffs filed a Motion to Expedite and for an Emergency Hearing, (ECF Nos. 6 and 7), and a memorandum of law.  (ECF No. 8.).  On July 17, 2026, this Court denied the application for a temporary restraining order contained in the Complaint without prejudice and found the Motion to Expedite moot, because the relevant dates had passed. (ECF No. 10 at 5).

Subsequently, on July 20, 2026, summonses were issued to each of the seven named Defendants.  (ECF No. 12).  Service, under Rule 4, is being completed and proofs of service have been filed under Rule 4(l).  Additionally, counsel for the City, Mr. Duhaney,

---

[7] Slow Play: VB city leaders postpone vote on proposed sale of city-owned golf course. https://www.wtkr.com/news/in-the-community/virginia-beach/slow-play-vb-city-leaders-postpone-vote-on-proposed-sale-of-city-owned-golf-course.
See also https://communications.virginiabeach.gov/hot-topics/virginia-beach-national-golf-club

Mr. Stiles, Mr. Dyer, and Ms. Wilson have entered notices of appearance on behalf of their clients.  (ECF No. 13-15).

### III.   LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish (1) that the plaintiff's claim is likely to succeed on the merits, (2) that it is likely there will be irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the plaintiff's favor, and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

A plaintiff need not show a likelihood of success on every claim; a likelihood of success on one claim supporting the relief sought suffices.  *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014).

The purpose of a preliminary injunction is "to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355 (4th Cir. 2012) (internal quotation marks omitted); accord *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411 (4th Cir. 1999).

The relief requested here is prohibitory: it commands no affirmative program, requires no Defendant to spend money, and asks only that the Property remain in public ownership and physically undisturbed while this action proceeds.  Prohibitory injunctions

preserving the status quo are governed by the ordinary *Winter* standard not the heightened showing required of mandatory injunctions. *See Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013); *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517 (4th Cir. 2003).

Where the government is the opposing party, the balance-of-equities and public-interest inquiries merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (internal quotation marks omitted).

## IV. <u>ARGUMENT</u>

**A. The Plaintiffs are likely to succeed on the merits of their claims, that do not depend on any future vote.**

**1. The City is in admitted, on-going violation of the Clean Water Act and the City's own MS4 Permit.**

The Clean Water Act prohibits the discharge of any pollutant except in compliance with a permit, 33 U.S.C. § 1311(a), and authorizes any citizen to sue any person, including a municipality, alleged to be in violation of an effluent standard or limitation, including a permit condition, 33 U.S.C. § 1365(a)(1), (f)(6).

A citizen plaintiff must make a good-faith allegation of continuous or intermittent violation. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987).

Plaintiffs' showing does not depend on expert reconstruction or on discovery. Instead, the showing rests on the City's own FY25 MS4 Annual Report and TMDL Action Plan, certified under penalty of perjury, these documents admit unauthorized sewage and

petroleum discharges to impaired waters. The City has failed to eliminate illicit discharges within the Permit's thirty-day timeframe. There are approximately 191 uninspected private stormwater facilities, incomplete TMDL reporting, and load-reduction obligations for the receiving sub-watershed designated "TBD" after fourteen consecutive years of zero reductions. (*Compl.* ¶¶ 60, 62, 64–66.).

A discharger's own monitoring and compliance reports are competent evidence of the violations they report. *See Sierra Club v. Union Oil Co. of Cal.*, 813 F.2d 1480 (9th Cir. 1987), *vacated and reinstated*, 853 F.2d 667 (9th Cir. 1988). The statutory prerequisites are satisfied, (*Compl.* ¶¶ 12–13; Ex. A.), and standing is established by the injuries that downstream and in-watershed property owners sustain from unlawful discharges, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000) (en banc).

Conveying this acreage for development, clearing and then grading it, would deepen the precise violations, that the City has already admitted, in the very sub-watershed for which it has reported nothing for fourteen years.

**2.    The August 7, 2024 Non-Disclosure Agreement is *ultra vires* and void.**

The Commonwealth of Virginia is a *Dillon Rule* state. A municipal corporation possesses only those powers expressly conferred, those necessarily or fairly implied, and those essential and indispensable; an act beyond those powers is void, and any fair doubt is resolved against the locality. *Bd. of Supervisors v. DeGroff Enters., Inc.*, 214 Va. 235

(1973); *Commonwealth v. Cnty. Bd. of Arlington Cnty.*, 217 Va. 558 (1977); *City of Richmond v. Confrere Club of Richmond*, 239 Va. 77 (1990).

No statute confers upon the City Manager's Office or the City Attorney's Office, the authority to bind the City, to conceal from its own appointed boards, the information those bodies require to discharge their statutory duties. Despite the lack of authority to authorize this agreement, the City entered into the August 7, 2024 Agreement. (*Compl.* ¶ 50; Ex. I).

Upon information and belief, that the agreement was executed without any Council vote or recorded authorization, (*Compl.* ¶ 51.), this claim presents a question of law on an undisputed document, and the Agreement predetermined the solicitation that followed. (*Compl.* ¶¶ 52, 56).

**3. The recorded instruments establish that the transaction cannot be performed as proposed.**

A preliminary injunction is particularly appropriate where the transaction a plaintiff seeks to halt cannot lawfully be completed in the form proposed. Three recorded instruments, each self-authenticating, establish that here. Fed. R. Evid. 902(4), 803(8), 803(14)(15).

First, the City's own dedication. The Golf Course Parcel is subject to a forty-year ground lease to the Authority running through October 7, 2037. (*Exhibit B*). The City

cannot deliver the Property to a private developer free of that leasehold without terminating the very instrument by which it dedicated the land to public recreation.[8]

Second, the United States has a perpetual easement over the property. Two of the five parcels under negotiation are burdened by a recorded easement for which the United States paid $3,760,000 under 10 U.S.C. § 2684a, the easement provides that "[t]he Property may not be used for residential use." (*Exhibit G*). The easement freezes permitted uses to a 2007 compatibility table, restricts the ponds that a development of this scale would require, demands ninety days' notice before any new use or construction, and requires that its terms be carried on the face of any divesting instrument. *Id*.

Whatever rezoning the City might later grant, it cannot enlarge the uses permitted on that land; that approval belongs to the United States. Plaintiffs do not seek to enforce the easement and do not ask the Court to adjudicate the rights of the United States. Plaintiffs offer this to show that the residential program the City proposes to authorize, cannot be built at this location.

Third, is the Commonwealth's recorded lien. Half of the sale price of those same two parcels is committed to the Commonwealth upon any disposition. This fact conveniently does not appear anywhere in the fiscal case made to the Council, and this fact materially changes it.

---

[8] A forty-year term is the maximum that Article VII, § 9 of the Constitution of Virginia permits for any lease or right to use such public property in a manner not permitted to the general public.

Taken together with the Interfacility Traffic Area overlay's limit of one dwelling per fifteen acres and the AG-1 classification, (*Compl.* ¶ 33), these instruments mean that there is no configuration of the five parcels on which the proposed 659 units can lawfully be placed on the present record. A transaction that is illegal on its face, should not be consummated while its legality is before the Court.

**4.      The Constitutional and statutory defects in the disposition process.**

Article VII, § 9 of the Constitution of Virginia and Va. Code § 15.2-2100(A) provide that no rights of a city in and to its "parks … or other public places" shall be sold except by an ordinance passed by a recorded affirmative vote of three-fourths of all the members elected to the council.

The City Attorney advised the Council on July 7, 2026 that nine affirmative votes are required here, an acknowledgment that this Property is within that regime, as the City's own forty-year dedication and its published description of the Property as a public recreational asset independently confirm.

Virginia law further requires a public hearing before a locality may dispose of real property, Va. Code § 15.2-1800(B), advertised once at least seven days before the hearing, Va. Code § 15.2-1813. The City concedes that the advertisement for the July 7 hearing misdescribed the asset and that the hearing must be re-advertised. Local legislative action taken on defective statutory notice is void ab initio. *Glazebrook v. Bd. of Supervisors*, 266 Va. 550 (2003); City *Council of Alexandria v. Potomac Greens Assocs. P'ship*, 245 Va. 371 (1993).

Article X, § 10 of the Constitution of Virginia provides that the credit of a city shall not "be directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation." Public participation in private development is permissible only where the public benefit is primary and any private benefit incidental. *Harrison v. Day*, 200 Va. 764 (1959). The land was conveyed to the City for ten dollars; the public has invested roughly $9.4 million in it; produces approximately $740,000 in annual net income; and half of the price of two parcels belongs to the Commonwealth of Virginia.

**5.      Procedural Due Process and Equal Protection.**

The Equal Protection Clause protects against intentional and arbitrary differential treatment, and a plaintiff need not be a member of a class to invoke it. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

The record is one of intentional differentiation: seventeen months of exclusive, confidential engagement for one developer; delivery of the City's complete due-diligence file to that developer before any solicitation; private serial contacts with the Mayor, the Vice Mayor, and a third Council member; a six-week public window for nine competing respondents into a process already shaped; and the acceptance of an anti-collusion certification the City knew to be false. (*Compl*. ¶¶ 47-57).

Plaintiffs and the putative class also hold constitutionally protected interests in their real property and in the groundwater on which their homes depend, (*Compl*. ¶¶ 17-18, 36-39). Due process requires notice reasonably calculated to apprise interested parties of

action affecting those interests and an opportunity to be heard at a meaningful time and in a meaningful manner, *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Jones v. Flowers*, 547 U.S. 220 (2006).

The City's concession that its published notice misdescribed the asset, together with the omission from its public presentation of the ground lease, the federal easement, the Commonwealth's lien, the provenance of the land, and the facility's profitability, is evidence that the process afforded was not the process the law requires. The City answers for the conduct of those who speak for it. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

**6.      The bald eagles and the effect of the July 14, 2026 rescission.**

Plaintiffs seek no civil or criminal penalty under the Bald and Golden Eagle Protection Act or the Migratory Bird Treaty Act and do not ask this Court to enforce those statutes in the stead of the United States. Instead, Plaintiffs seek a declaration under 28 U.S.C. § 2201.

Plaintiffs seek a declaration as to whether the Property may lawfully be conveyed for, and cleared in furtherance of, construction that federal law forbids absent a permit. A permit, that no Defendant holds, has sought, or has inquired about. Plaintiffs also seek injunctive relief, ancillary to the claims on which they are likely to prevail.

Federal law prohibits the take, molestation, or disturbance of a bald eagle or its nest, absent such authorization, 16 U.S.C. §§ 668(a), 668c; 50 C.F.R. § 22.6, and the

Service's management guidelines prescribe buffers of up to 660 feet from active nests, 72 Fed. Reg. 37,346 (July 9, 2007).

The Services' July 14, 2026 final rule rescinding the regulatory definition of "harm" under the Endangered Species Act does not bear on this analysis. The bald eagle is not a species listed under the Endangered Species Act; it was delisted in 2007, and the Bald and Golden Eagle Protection Act and the Migratory Bird Treaty Act are the statutes the Service designated as its continuing federal protection. 72 Fed. Reg. at 37,346.

The rescission neither amends those statutes nor touches the permit requirements of 50 C.F.R. Part 22. Plaintiffs note, for completeness, that the rescission takes effect on September 14, 2026, that it is the subject of pending litigation, and that Plaintiffs' sixty-day notice under the citizen-suit provision of the Endangered Species Act, served with the Complaint, (*Compl.* ¶ 14), matures on September 11, 2026. Plaintiffs do not rest this Motion on any habitat-based theory of federal take.

Virginia law supplies a further, independent reason to preserve the site pending survey. Virginia prohibits the taking within the Commonwealth of any fish or wildlife appearing on the federal endangered and threatened species list, Va. Code § 29.1-564.

The Board of Wildlife Resources has both adopted that federal list and designated additional state-listed species, 4VAC15-20-130. Virginia's own regulation defines "harm," within the definition of "take," as "an act which actually kills or injures wildlife," and provides that "[s]uch act may include significant habitat modifications or degradation

22

where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  4VAC15-20-140(4).

That regulation is a matter of state law, adopted under state statutory authority, and the federal rescission does not repeal or preempt it:  The Endangered Species Act expressly permits that states may take prohibitions that are "more restrictive than" the federal prohibitions.  16 U.S.C. § 1535(f).

Plaintiffs assert no private right of action under Va. Code § 29.1-564.  Plaintiffs identify the state prohibition because it is one more legal constraint that a qualified survey (which no Defendant has commissioned) is necessary to evaluate, and because it bears directly on the public interest in maintaining the buffer relief requested in paragraph C of the proposed order.

**B.      Absent an injunction, Plaintiffs will suffer irreparable harm.**

The Property is unique and a rare gem in Virginia Beach.  It is 350 acres of public land, held in public ownership since 1995 and dedicated by the City's own recorded instrument to public recreation until 2037.  Once a deed is delivered, recorded, and site work begins, no judgment can restore the land, the public's interest in it, or the public's lost opportunity for notice, hearing, and genuine competition.

The Fourth Circuit has recognized that harm to real property interests is not readily compensable in damages, *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019), and that irreparable harm exists where damages are difficult to

ascertain or inadequate, *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691 (4th Cir. 1994).

Virginia law channels challenges to local land-use decisions into a narrow state-court window but supplies no mechanism to arrest the recording of a deed or the commencement of site work in the interim, and Plaintiffs' federal claims are subject to no exhaustion requirement. *Patsy v. Bd. of Regents*, 457 U.S. 496 (1982).

A conveyance made in the face of the recorded encumbrances compounds the injury rather than resolving it. The United States's easement must by its terms be carried forward in any divesting instrument; a purchaser takes with record notice; and the Commonwealth's lien follows the land.

If a conveyance occurred now, it would not produce a clean transfer of a public asset in exchange for value. Instead, it would produce a clouded title, a recorded federal prohibition overhanging the very acreage the program depends upon, and a dispute among the City, the Commonwealth of Virginia, the United States, and a private developer. If this transfer were to occur, Plaintiffs would have no remedy or recourse.

Third, environmental injury is the classic irreparable injury. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987). The threatened injury is the destruction of wetlands and natural drainage capacity, the multiplication of stormwater loading in a sub-watershed where the City admits it has achieved nothing for fourteen years, and the contamination

of the shallow aquifer from which Plaintiffs draw their drinking water. (*Compl*. ¶¶ 18, 60, 62-63).

Fourth, the disturbance or destruction of an active bald eagle nest is irreparable in the most literal sense. No award of damages restores an abandoned nest territory, and the federal review that must precede any disturbance cannot be reconstructed after the clearing has occurred. (*Compl*. ¶¶ 41-44).

Fifth, the harm is imminent rather than speculative. *Di Biase*, 872 F.3d at 230. The transaction has not been abandoned; it has been re-scheduled for a vote on August 11, 2026. If the Property is conveyed and cleared, while the Court considers the lawfulness of the process that produced the conveyance, this case will be about damages beyond measure instead of about land that can still be protected. *Aggarao*, 675 F.3d at 378.

## C. The balance of equities favors relief.

On Defendants' side of the scale there is, at most, a delay and the record now shows that even that is slight. The golf course on the property is operating. It is open to the public. The golf course produces approximately $740,000 in annual net income, in which the Authority participates.

The golf course is home to First Tee, a youth golf facility. First Tee is under a lease that runs through 2030, which the City's own solicitation required every respondent to honor. The leasehold under which it is operated does not expire until October 7, 2037.

The requested injunction takes nothing from the City that it currently enjoys, imposes no obligation to spend money, and delays no revenue stream; it preserves a performing public asset in the condition the City's own instruments require it to be kept.

The City, on its own accord, has itself twice delayed this transaction. Once by scheduling a public hearing, only after a Council member objected to the absence of any public process, (*Compl.* ¶ 58), and once by publishing a defective advertisement.

A brief delay causes no hardship to the City. No Defendant has a legitimate interest in consummating a transaction tainted by an *ultra vires* concealment agreement, a knowingly false certification, conveying land burdened by a recorded federal prohibition on the very use proposed, or in disturbing federally protected nests without the authorization federal law requires.

On the Plaintiffs' side, if this vote was allowed to proceed, the consequence would be the irreversible loss of a unique public asset, a loss of wetlands and drainage capacity in the most flood-prone watershed in the City, a loss of the groundwater on which Plaintiffs' homes depend, and of two protected bald eagle nests.

**D.     An injunction serves the public interest.**

Because the principal Defendants are governmental, this factor merges with the balance of equities. *Nken*, 556 U.S. at 435. There is a strong public interest in compelling a municipality to comply with federal environmental law before it enlarges violations it has already admitted, *Amoco*, 480 U.S. at 545, and Congress struck that balance in favor

of protection when it enacted the statutes at issue, *see TVA v. Hill*, 437 U.S. 153, 194 (1978).

There is an equally strong public interest in the transparency of the disposition of public land: the people of Virginia Beach are entitled to the notice, the hearing, the supermajority, and the competition that Va. Code §§ 15.2-1800 and 15.2-1813 and Article VII, § 9 require *before* 350 acres of their property, land they received for ten dollars and have since improved at a cost of roughly $9.4 million, is conveyed to a private developer.

The public interest also reaches beyond this transaction. The two encumbered parcels were acquired with Commonwealth grant funds, and then encumbered to the United States for $3,760,000, for the express purpose of keeping development out from under the Oceana-Fentress flight corridor pursuant to the 2005 Base Realignment and Closure process.

Preserving the status quo while this Court determines whether the proposed transaction can lawfully proceed protects that federal and state investment. An order requiring the City to comply with the law before disposing of public property necessarily serves the public interest; it cannot disserve it. *See Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020).

**E.      The requested relief is narrow, specific, and related to the claims pleaded.**

Rule 65(d) requires that an injunction state its reasons, state its terms specifically, and describe in reasonable detail the restrained acts. The proposed order does each. It identifies the five parcels by GPIN, the instruments that may not be executed or recorded,

the physical activities that may not be undertaken, the 660-foot buffer and the two conditions on which it lifts, and the records that must be preserved. It binds the parties and those in active concert with them who receive actual notice, as Rule 65(d)(2) provides.

The relief is properly connected to the claims. A preliminary injunction must be related to the injury the complaint alleges. *Omega World Travel, Inc. v. TWA*, 111 F.3d 14 (4th Cir. 1997). The claims concerning the concealed negotiation, the void Non-Disclosure Agreement, and the defective notice are claims about how this Property came to be conveyed, and the conveyance is therefore what must be held; the Clean Water Act claim concerns the loading that clearing and developing this acreage would add to a sub-watershed already out of compliance, and that land disturbance is therefore what must be held; and the eagle-related relief is limited to a buffer that lifts as soon as a survey and any required authorization are obtained.

## F.     Security should be waived or set in a nominal amount.

Rule 65(c) conditions a preliminary injunction on security in an amount the Court considers proper, and the amount rests in the Court's discretion. *Hoechst Diafoil*, 174 F.3d at 421; *Pashby*, 709 F.3d at 332. No Defendant faces a quantifiable loss. The City retains a revenue-producing public golf facility operating under a leasehold that runs to 2037; Dragas has no interest in the land, no closing date of record, and no expenditure the order would strand.

Plaintiffs are a nonprofit conservation corporation and an individual homeowner, suing to enforce federal environmental law and the Commonwealth's public-disposition statutes. Security should be waived or set at a nominal amount.

**G.      Notice, Service, and Scheduling**

Plaintiffs do not seek relief without notice. Fed. R. Civ. P. 65(a)(1). Each Defendant received actual notice of this action and of the relief sought, by hand delivery and on August 6, 2026, Certificates of Service were filed with this Court. (ECF No. 18).

Summonses were issued on July 20, 2026 as to each of the seven named Defendants; service under Rule 4 has been effected; and proofs of service have been filed under Rule 4(l). Plaintiffs respectfully request that the Court hear this Motion promptly and, if the Court deems it appropriate, shorten Defendants' time to respond under Local Civil Rule 7(F)(1).

Should the Court prefer not to reach the merits of the requested injunction before Defendants have appeared and been heard, Plaintiffs respectfully submit that paragraph D of the requested relief of fourteen days' written notice to Plaintiffs and to the Court before any instrument of conveyance is executed, delivered, or recorded and before any land disturbance begins imposes no burden on any Defendant and preserves the Court's ability to act if the Property is about to change hands. That interim measure may be entered without resolving any disputed question, and Plaintiffs request it in the alternative.

# V. **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the Motion and enter a preliminary injunction in the form of the accompanying proposed order, set an expedited hearing, waive or set nominal security under Rule 65(c), and grant such further relief as is just.

Dated: August 7, 2026
Respectfully submitted,

_____/s/_____

Suzanne Seidel Richmond
VSB No. 75888
Law Office of Suzanne Seidel Richmond
3808 North Landing Road
Virginia Beach, Virginia 23456
Telephone: 757-301-8822
suzanneseidel@gmail.com
*Counsel for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I certify that on August 7, 2026, I filed the foregoing Motion, the accompanying Memorandum of Law, and the proposed order electronically using the Court's CM/ECF system, and that a copy is to be served upon each Defendant, and upon known counsel for each Defendant, by electronic mail and CM/ECF court filing.

_____/s/_____

Suzanne Seidel Richmond
VSB No. 75888
Law Office of Suzanne Seidel Richmond
3808 North Landing Road
Virginia Beach, Virginia 23456
Telephone: 757-301-8822
suzanneseidel@gmail.com
*Counsel for Plaintiffs and the Putative Class*