**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

SFF CONSERVATION INITIATIVE, INC.
and LISA M. CLARKSON,

      Plaintiffs,

v.                                                                    Civil Action No. 2:26-cv-00738

CITY OF VIRGINIA BEACH, *et al*,

      Defendants.

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

I-3101939.4

NOW COME the City of Virginia Beach (the "City"), Robert M. Dyer, Rosemary A. Wilson, Patrick Duhaney, and Mark Stiles (collectively, the "City Defendants"), by counsel, and for their Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, state as follows:

## Preliminary Statement

Plaintiffs' Complaint facially purports to challenge a proposed project (the "Project") by the Dragas Companies, Inc. ("Dragas") to redevelop the Virginia Beach National Golf Club (the "Golf Club") and adjacent property (collectively, the "Property"). In reality, Plaintiffs' ultimate goal is to substitute their own judgment for that of elected officials to stop not only the Dragas Project, but all development below the "Green Line" in Virginia Beach and to dismantle the entities and processes through which the City manages City-owned property and approves development projects. The relief sought by Plaintiffs is extraordinary and includes, among other things, asking a federal court to dissolve the City of Virginia Beach Development Authority (the "Authority"), a political subdivision of the Commonwealth of Virginia duly created and existing under state law, to become the *de facto* receiver of all real property currently owned by the Authority, and to enjoin all development in the City until such time as the City complies with Plaintiffs' view of state and federal environmental laws.

The Complaint contains 19 individual counts, all searching in vain for a theory that gives Plaintiffs veto power over the elected members of the Virginia Beach City Council. It mischaracterizes the relevant facts and applicable law. It includes claims for which Plaintiffs could not possibly have standing, even if those claims were legitimate, which they are not. It threatens future claims against a litany of John Doe defendants that appear to be on Plaintiffs' revenge list. It seeks to undo actions taken years ago and to prevent actions that will not happen

1

I-3101939.4

until years in the future, if at all.

Plaintiffs' most recent Motion for Preliminary Injunction ("Motion") is a study in contradictions. After alleging a myriad of "injuries" that will occur if the development process continues, Plaintiffs ask the Court to enjoin the very process designed to make sure that the injuries *do not* occur. As discussed herein, the development project is in its infancy, and the anticipated lengthy due diligence process is designed to make certain that the very injuries about which Plaintiffs complain do not occur, making the relief Plaintiffs seek nonsensical.

Originally, Plaintiffs moved for an emergency temporary restraining order. That motion was filed *one day* before the scheduled vote on the Project and attempted to block the legislative vote by the Virginia Beach City Council scheduled for July 14, 2026 – an extraordinary request for relief. That request was denied as moot. Plaintiffs then filed this renewed Motion designed to freeze the development process not only for the Project, but for virtually *all development* in the "North Landing River-Middle subwatershed of the Southern Rivers Watershed" of Virginia Beach.[1] While the Motion suffers from the same general defects as the Complaint, it focuses on a subset of grievances that fall into two general buckets: (1) an alleged failure by the City to follow an unspecified "public process" for development of property; and (2) a laundry list of supposed environmental violations by the City. In addition, the renewed Motion added to both the Complaint and the original motion by claiming that the proposed development cannot proceed because certain parcels "are burdened by both recorded federal and state interests." While these new allegations do not justify the relief sought as the anticipated conveyance of any property will

---

[1]The Proposed Order asks the Court to enjoin every party from "taking any step to consummate" the conveyance (which effectively prevents any further action on the project, including due diligence) and to enjoin the City from "undertaking further land disturbing development" within the North Landing River-Middle subwatershed of the Southern Rivers Watershed.

2

not occur until long after the Court has addressed the merits of Plaintiffs' claims, the allegations further lack merit.

For the reasons discussed below, the City Defendants respectfully request that the Court deny the Motion as Plaintiffs cannot establish any of the elements necessary for preliminary injunctive relief. As an initial matter, the development timeline of the Project anticipates a transaction that will not be consummated for at least a year, and only with assurance that the development will comply with all federal, state and local laws and regulations applicable to the project. Although the parties have agreed upon a detailed Term Sheet, which is part of the public record, no definitive agreements for the conveyance of the Property have been completed and no closing can occur for many months. The Term Sheet requires that the final documents include a Plan of Development that will require Dragas to rezone and subdivide the property, obtain all necessary permits and approvals under state and federal law (including those referenced by Plaintiffs), and satisfy a series of related conditions prior to closing. At best, this process will take a year to complete, and the City is under no obligation to convey (and Dragas has no obligation to accept) the land until Dragas completes all of those steps. According to Plaintiffs' own Complaint the "point of no return is the conveyance…." Compl. ¶ 92. Given that the conveyance will occur, if at all, more than a year from now, no immediate, irreparable harm could possibly result before the court has an opportunity to consider the merits of the claims. Plaintiffs not only know this, they pled it.

Plaintiffs also have no likelihood of success on the merits. Regarding the "public process" claims, Plaintiffs have not identified any rule of law the City Defendants violated because there is none. Sales of real property are not subject to the Virginia Public Procurement Act ("VPPA"), and the Virginia Freedom of Information Act ("FOIA") expressly contemplates

3

and authorizes public and private parties to discuss projects confidentially so as not to expose a private party's confidential and proprietary information. The applicable exemptions reflect the careful balancing approach adopted by the General Assembly to encourage investment in Virginia-based projects. In fact, by issuing a request for proposals ("RFP") for sale and redevelopment of public land, which is not required by any statute or regulation, the City exceeded all statutory requirements, going above and beyond to ensure it thoroughly explored available options and selected the best proposal for the City. Plaintiffs cannot succeed on the merits of a claim that does not exist, particularly where the City's process was more competitive than required by state law. As for Plaintiffs' claim of a "due process violation," the City's decision to postpone the vote after realizing an inaccuracy in the land description contained in the initial public notice undermines, rather than supports, any due process claim. The City postponed the vote to issue a corrected public notice and ensure that all due process requirements were satisfied, in accordance with Virginia law.

Plaintiffs' environmental claims are rooted in a misapplication of environmental law, and a misrepresentation that the City is not in compliance with the primary permit regulating stormwater runoff in the Southern Rivers Watershed. Moreover, the alleged environmental injuries that do not exist are unlikely to exist during the pendency of this matter and are *unlikely to ever* exist.

As to the additional grounds for injunctive relief added to the preliminary injunction but found nowhere in the Complaint, neither the existence of a 40-year ground lease, the alleged federal easement nor the Commonwealth's recorded deed are legal impediments at all, much less impediments that would prevent the lengthy due diligence process that is absolutely necessary before there could be any conveyance of the property.

4

I-3101939.4

Finally, the public's interest and the balance of equities plainly favor the City. From a public policy perspective, granting the requested relief rewards Plaintiffs for their naked attempt to usurp the role of the legislature and replace the opinions of elected officials with their own. When balancing the equities, what Plaintiffs propose *does not* preserve the status quo, it essentially "freezes" all development activities by the City within the Southern Rivers Watershed including continued work with Dragas on the sale of property, a process that allows the City to determine if proceeding is in the best interest of its citizens, and critical to the goal of converting a City liability into an asset.

<u>**Overview of the Project and the Development Timeline**</u>

*A.     The Golf Club and Project*

The City leased the property on which the Golf Club sits to the Authority in 1997 for the development of a Tournament Players Club ("TPC") Golf Course. *See* Declaration of Amanda C. Jarratt ("Jarratt Decl.," attached as **Exhibit 1**) at ¶ 2.[2] When the Golf Club opened in 1999, the City had high hopes the course would attract professional golf tournaments similar to the Kingsmill Resort in Williamsburg, and, for a brief period between 2000-2006, it hosted the Virginia Beach Open (a professional golf tournament on the Buy.com Tour, a minor league circuit for the PGA). *Id.* at ¶ 3.

In conjunction with the cessation of the Virginia Beach Open, the City bought out the TPC's interest in the property and improvements in December 2006. *Id.* at ¶ 3. In 2007, the Authority and Virginia Beach Golf Club, LLC, entered into a management agreement for the golf course (renamed "Virginia Beach National"), which expires December 2026. *Id.* The

---

[2] The City Defendants are prepared to present testimony to support the Declarations submitted with this Memorandum.

5

I-3101939.4

Authority does not intend to extend this agreement beyond December 2026 and informed the operator of this in February 2026. *Id.*

In 2023, the City Auditor finalized an audit of the Golf Club that identified numerous capital and operational/maintenance deficiencies and the need for substantial investment to prevent further deterioration of the golf course and associated facilities. *See* Declaration of Emily Archer ("Archer Decl.," attached as **Exhibit 2**) at ¶ 2. The lack of maintenance has affected the course and physical facilities as well as multiple stormwater ponds on the site that serve the Golf Club and the nearby Innovation Park. *Id.* The cost of the work to restore the Golf Club, including the stormwater ponds, was estimated to exceed $7 million and will continue to increase given the deficient revenue stream. *Id.* In short, the Golf Club is a financial liability for the City that has no prospect of reversing its trajectory in its current state. *Id.*

The Dragas Project solves the financial burden facing the City by shifting both the repair expenses and needed investment to the developer, all of which would otherwise be paid for with tax dollars. Archer Decl. at ¶¶ 9-10. When complete, the Project also will deliver immediate, substantial benefits to the City and its residents including: (1) generating "but-for" tax revenue estimated to be $3.4 million annually; (2) restoring the golf course to a championship level facility once again capable of hosting professional tournaments; (3) bolstering the City's growing sports tourism industry; and (4) the construction of affordable housing[3] the City desperately

---

[3] Plaintiffs attempt to vilify the proposed residential units throughout the Complaint but conveniently omit that these multi-family units will be constructed across the street from the Virginia Beach Circuit Court, where a shopping center and apartments already exist to provide additional diverse housing types at mixed income costs. Archer Decl. at ¶ 10. Plaintiffs also fail to mention that there are multiple residential neighborhoods between this site and Plaintiffs' address. Plaintiffs further misrepresent the characteristics of the land where the proposed housing units will be built, suggesting that there is an easement with the United States prohibiting any construction. The referenced easement, which would prohibit residential development, is over land to the West of the existing golf course where two of the existing golf holes would be

6

needs. *Id.*

B.       *The Development Timeline*

Attempting to manufacture immediate, irreparable harm, the Complaint grossly mischaracterizes the development process for the Project, suggesting that construction work will begin immediately after City Council approval (assuming City Council approves the Project moving forward). Incredibly, Plaintiffs own pleading admits that the "point of no return is the conveyance…," Compl. ¶ 92, apparently not realizing that any conveyance of the Property will not occur for at least a year. This admission, by itself, is fatal to Plaintiffs' Motion.

The proposed ordinance coming before City Council on August 11, if passed, does nothing more than approve a Term Sheet negotiated by City staff and Dragas and authorize the City Manager to finalize the sale if Dragas satisfies the conditions and obligations in the Term Sheet. *See* Archer Decl. at ¶ 11. The approval of a Term Sheet, however, does not mean the parties are anywhere near ready to convey the property. At this point, the parties have not even completed drafting of a Purchase and Development Agreement, *id.*; they simply have an outline for an agreement. Moreover, the Term Sheet requires that the definitive agreements include a "Plan of Development" with at least the following elements:

- a due diligence period commencing upon execution of the Purchase and Development Agreement and expiring on the later of (a) 120 days from execution or (b) 45 days from Dragas's receipt of the City's second round of comments on all engineered site plans;

- reasonable deadlines for completing the subdivision process;

- reasonable deadlines for the parties to agree on a redesign of the golf course;

---

relocated. The easement does not prohibit that construction. The residential units will only be built on a small portion of the parcel that is outside the ITA overlay and the land encumbered by the easement granted to the federal government. Therefore, there are no external agreements that prohibit use of the land for residential purposes, and the proposed development can occur as long as the land on which the housing will be built is rezoned.

7

I-3101939.4

- reasonable deadlines to have the property rezoned and to obtain the necessary conditional use permits and inspections needed for the Project; and

- reasonable deadlines for Dragas to obtain "all permits, approvals, and other authorizations for all elements of the Project."

*See* Archer Decl. at ¶ 12 and Term Sheet referenced therein ("Term Sheet") § 8.

The development of the Project will involve multiple reviews by the planning commission, the Wetlands Board, the Transition Area/Inter-Facility Traffic Area Advisory Board, and others. If the project is to move forward, City Council will have to formally vote on a re-zoning and then issue conditional use permits necessary for various elements of the Project. Development of the Project will require, among other things, completion of surveys, traffic studies, and a geotechnical analysis (12 weeks)[4]; completion of the residential rezoning process (16 weeks); preliminary site plan review and approval (9 weeks); a master stormwater study (8 weeks); completion of a wetlands disturbance application and receipt of a permit approving the disturbance (34 weeks); completion and approval of a master utility study (10 weeks); and site plan and subdivision review and approval. *See* Archer Decl. at ¶ 14. Even with the City committing to diligently participate in the process, the Term Sheet does not set a deadline but rather an aspirational hope that Dragas will complete the process by June 30, 2027, i.e., almost a year from now. *Id.*; Term Sheet § 8. The Term Sheet further provides that the transfer of title to the Property will only occur during a 30-day window *after* Dragas receives "all local, state, and federal permit approvals (including rezoning) and subdivisions necessary or desirable." Term Sheet § 3(b). The Term Sheet also requires Dragas to comply with all laws, including the statutes relied on by Plaintiffs in seeking injunctive relief. Archer Decl. at ¶ 15; Term Sheet § 10(d) ("All development contemplated for the Project shall comply with all laws, rules and ordinances,

---

[4] The timeframes referenced in these steps are only estimates and could take longer.

8

including, but not limited to Article 18 of the City's Zoning Ordinance regarding special regulations in air installations compatible use zones.").

Thus, as a condition to the conveyance of the property, Dragas must obtain all of the approvals and permits required by law for the Project, including everything Plaintiffs complain Dragas does not already have. If, and only if, Dragas completes each of these steps and gets the required approvals and permits will the City actually convey the property, which will happen, if at all, no earlier than a year from now. The broad injunctive relief sought by Plaintiffs, if granted, would arguably prevent each of these steps from occurring notwithstanding that none of those steps could conceivably cause any irreparable harm.

C.      *The Regulatory Framework*

Plaintiffs' claims alleging a violation of various federal statutes (including the Clean Water Act ("CWA")) are based on either a misunderstanding or an intentional misrepresentation of the regulatory framework governing property in the Southern Rivers Watershed where the Golf Club is located. Plaintiffs allege that the City is in violation of its Municipal Separate Stormwaters and Sewer System ("MS4") permit largely because properties within the Southern Rivers Watershed, including the Project, fail to comply with the Chesapeake Bay Preservation Act ("CBPA"). The allegation assumes that the CBPA applies to the Property, which drains into the Southern Rivers Watershed rather than the Chesapeake Bay. Plaintiffs are simply wrong. *See* Declaration of Melanie Coffey ("Coffey Decl.," attached as **Exhibit 3**) at ¶¶ 2-3. Unsurprisingly, the CBPA applies to property that drains into the Chesapeake Bay, not property that drains into the Atlantic Ocean or the Southern Rivers Watershed such as the Project. *Id.* at ¶ 3. In its most recent environmental audit of the City, the Virginia Department of Environmental Quality ("DEQ"), the agency that issued and monitors the City's MS4 permit, found that the City is in

9

I-3101939.4

full compliance with the permit. *Id.* at ¶¶ 5-6. As to the allegations that the proposed development will somehow disrupt nesting bald eagles or in some other way violate federal law protecting various species, all development within the City must comply with all applicable federal statutes, including each statute cited in Count IV-The Bald and Golden Eagle Protection Act, The Migratory Bird Treaty Act, and The Endangered Species Act. Archer Decl. at ¶ 15. Regarding the unauthorized discharges alleged in the Complaint, the City's obligations with regard to such discharges are set forth in the MS4 permit, and the City has complied with all of its mandatory reporting and remediation obligations. Coffey Decl. at ¶ 8.

### Legal Standard

Plaintiffs' Memorandum correctly states the legal standard for granting a preliminary injunction. Plaintiffs must establish a likelihood of success on the merits, irreparable harm, that the balance of equity tips in Plaintiffs' favor, and that the relief requested is in the public's best interest. Not only do Plaintiffs fail to establish all four elements, Plaintiffs fail to establish a single one of them.

### Argument

I.     **Continuing the Development Process Will Not Result in Immediate or Irreparable Harm and Plaintiffs' Claims Will Not Succeed on the Merits**

      A.     <u>The City' Development Process Meets all Legal Requirements and Will Not Result in Immediate or Irreparable Harm</u>

Plaintiff's first theory for freezing the development process is that the Term Sheet resulted from a "17 month concealed negotiation, coupled with the materially false Anti-Collusion Form the City knowingly accepted, establishes a restraint of competition under the Virginia Antitrust Act[5] and deprivations of procedural due process and equal protection in the

---

[5] Plaintiffs' claim under Section 59.1-9.5 of the Virginia Antitrust Act is nonsense and sanctionable and will not be discussed beyond this footnote. That section is the state corollary to

10

I-3101939.4

disposition process." Compl. ¶ 88. See also ECF No. 19-1 at 16-21. Each of those claims is

demonstrably false and based on Plaintiffs' mischaracterization of the process that resulted in the

Term Sheet and a misrepresentation of the documents cited to support the theory.

### 1.     The City Exceeded the Requirements for a Sale of Public Land

The basic facts regarding the City's discussions with Dragas are neither disputed nor

unusual. A few months after the release of an audit detailing the deteriorated condition of the

Golf Club, three interested parties, Wakefield Development LLC (L.M. Sandler et al.), Dragas,

and professional golfer Marc Leishman, sought publicly available information from the City

and/or indicated an interest in acquiring part or all of the Property. See Jarratt Decl. at ¶¶ 5, 8.

As is typical in these situations, Dragas also met with City staff and certain City Council

members to discuss and gauge the City's interest in a potential redevelopment project on the site.

Archer Decl. at ¶ 3. By that time, Dragas had already spent considerable time and money

---

Section 1 of the Sherman Act and prohibits agreements among business competitors that restrain commerce unlawfully. Needless to say, there is no relevant market, Plaintiffs are not competitors with Dragas in any market, they have suffered no "antitrust injury" (i.e., an injury of the type sought to be prevented by the antitrust laws) and have no standing, and Plaintiffs have alleged no relevant market power. These are just a handful of obvious defects in this claim. *See Thompson Everett, Inc. v. Nat'l Cable Advert.*, L.P., 57 F.3d 1317, 1325 (4th Cir. 1995) ("[W]e agree with the district court that Thompson Everett is not a would-be competitor with the cable reps and is not being denied access to the cable company sales service market by any act in violation of the antitrust laws."); *Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 358 (4th Cir. 1983) (dismissing claim where defendant had "not been shown to have anything resembling monopoly power in any relevant market"); *Carpenter v. Drechsler*, No. 89-0066-H, 1991 U.S. Dist. LEXIS 15743, at *36 (W.D. Va. 1991) ("Moreover, an essential element of the plaintiff's antitrust claims in counts IV and V of his complaint is adequate identification and definition of the relevant product market and the relevant geographic market in which the defendants allegedly restrained trade."). The City Defendants are also immune under the state action doctrine and because every action Plaintiffs allege constitute the unlawful restraint is authorized under state law. *See* Va. Code § 59.1-9.4(B) ("Nothing contained in this chapter shall make unlawful conduct that is authorized, regulated or approved (i) by a statute of the Commonwealth or (ii) by an administrative or constitutionally established agency of the Commonwealth or of the United States having jurisdiction of the subject matter and having authority to consider the anticompetitive effect, if any, of such conduct.").

11

I-3101939.4

researching, analyzing, and formulating ideas for redevelopment. Jarratt Decl. at ¶ 6. Also as typical in these situations, and consistent with FOIA, Dragas requested that the City keep the details of the proposed project confidential while the discussions progressed. *Id.* Dragas also requested that the City agree to negotiate exclusively with Dragas, which the City *rejected* so as to not limit competition. *Id.* at ¶ 7.

In October 2024, City staff evaluated and briefed the City Council on the interest of the three parties who had reached out to the City. Jarratt Decl. at ¶ 8. After another briefing in June 2025, Council directed staff in July 2025 to work with two of the proposers, Dragas and Wakefield Development, on a potential redevelopment project. *Id.* Two months later, in September 2025, after learning about additional interest in the property, Council directed staff to issue an RFP to permit all interested parties to submit proposals for consideration, which staff did on October 12, 2025. Archer Decl. at ¶ 4. The RFP was not required as the sale of property is not subject to the VPPA. The City made the decision to issue the RFP in light of additional interest to make certain that any other party had an opportunity to present any proposal that the City could consider in determining the best use of the property. *Id.* at ¶ 5.

The RFP remained open until November 21, 2025, during which time the City received nine proposals. Archer Decl. at ¶ 6. Staff briefed City Council on all of the proposals during a closed session on January 6, 2026. *Id.* The City shortlisted four proposals – two proposals that included residential development and two that did not. *Id*. A review committee was formed and interviewed the shortlisted proposers and, on February 24, 2026, briefed Council. *Id.* Following that briefing, Council directed staff to negotiate a possible Term Sheet with Dragas. *Id.*

Neither the VPPA nor FOIA, nor any other law or regulation, required the City to issue the RFP, s*ee infra* at 15-16, and during the process, all interested bidders had access to the same

12

public information about the Golf Club (if requested) and were free to submit proposals. Archer Decl. at ¶ 7. As required by Virginia law, the City Council held a public hearing on the Project on July 7, 2026,[6] and scheduled a vote for July 14, 2026, which Council later moved to August 11, 2026. *Id.* at ¶¶ 7-8.

While Plaintiffs' attempt to vilify the process due to an error in the publication advertising the vote, the City's decision to postpone the vote after discovering the error in the advertisement undermines Plaintiffs' claims of due process violations. The vote was postponed so the vote could be readvertised with a corrected notice and ensure citizens had the ability to be heard. That is not a due process violation. Instead, it is exactly what the City is supposed to do. Errors in a public notice are not uncommon, and the proper way to rectify them is to postpone the vote to issue a corrected notice. Plaintiffs also cite the fact that the sale has not yet been approved by a supermajority vote as a defect in the process. *See* ECF No. 19-1 at 19. This is nonsensical as the vote simply has not yet occurred.

In their Complaint, Plaintiffs attempt to turn this basic fact pattern, some form of which occurs in every complex redevelopment project in the Commonwealth, into a loosely defined conspiracy to deny Plaintiffs (and apparently all purported class members) their procedural and substantive due process rights. They assert these claims notwithstanding that Plaintiffs are not developers, they had no interest in competing for the project, did not submit a proposal, and have not identified any process or rights they were denied.[7] More conspicuously, Plaintiffs have not

---

[6] The Notice for the July 7 public hearing incorrectly listed the acreage of the property proposed for sale. As a result, a second public hearing will be advertised as required by Virgina law and conducted on August 11, 2026, prior to the proposed vote on the transaction.

[7] Plaintiffs seemingly recognize they have a standing problem but claim that "a plaintiff need not be a member of a class to invoke" the Equal Protection Clause. ECF No. 19-1 at 20. In doing so, they rely on *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). That case, however, does not help them because it does not dispense with the traditional standing requirements that something

I-3101939.4

identified or cited a single law, statute, regulation, rule, ordinance, or precedent the City violated through this process. The reason is simple – the City's process not only exceeded the requirements of Virginia law, it also directly tracked the expected path for redevelopment projects laid out by the General Assembly.

Contrary to Plaintiffs' claims, there is no formal bid process required for the sale of public land under Virginia law. In fact, the only two requirements the City must comply with are holding a public hearing and having a public vote. *See* Va. Code § 15.2-1800(B) ("Subject to any applicable requirements of Article VII, Section 9 of the Constitution, any locality may sell, at public or private sale, ... or otherwise dispose of its real property, … provided that no such real property, whether improved or unimproved, shall be disposed of until the governing body has held a public hearing concerning such disposal.") The closest possible analog is the VPPA, but that statute only applies to the purchase of goods and services, not the purchase, sale, or leasing of real property. *See* Va. Code §§ 2.2-4300 and 2.2-4301; *Mid-Atlantic Bus. Commc'ns., Inc. v. Va. DMV*, 269 Va. 51, 56 (2005) ("The VPPA is a specific statute relating to the acquisition of goods and services by public bodies.").

Plaintiffs' related claim that the non-disclosure agreement ("NDA") signed by the City and Dragas somehow violated Virginia law similarly ignores the balanced framework created by the General Assembly for business and development projects. As noted above, Virginia law ultimately requires a public hearing and vote prior to the sale of real property. At the same time, however, the General Assembly has recognized that some level of confidentiality is necessary to protect developers and other businesses looking to invest in public projects in Virginia.

---

must be done to the plaintiff. *See id.* at 564 (recognizing "equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").

14

I-3101939.4

Both FOIA and the VPPA reflect the delicate balance adopted by the General Assembly. In FOIA, for example, multiple public records and public meeting exemptions contemplate and permit confidential discussions and/or exchanges of information.[8] In addition to these general exemptions, FOIA contains seven specific record exemptions that apply when made pursuant to a "promise of confidentiality." *See* Va. Code §§ 2.2-3705.4(8); 2.2-3705.6(3), (12), (13), and (28); 2.2-3705.7(12) and (14). The VPPA similarly protects bids, proposal records, and negotiations until sealed bids have been opened publicly and/or the public body has decided to award a contract. Va. Code § 2.2-4342. Even then, confidential and proprietary records submitted by bidders and/or proposers remain exempt from disclosure. *Id.*

Most relevant here, Section 2.2-3705.6(3) of FOIA exempts from disclosure "[p]roprietary information, voluntarily provided by private business pursuant to a promise of confidentiality from a public body, used by the public body for business, trade, and tourism

---

[8] *See, e.g.*, Va Code §§ 2.2-3705.1(8) (appraisals and cost estimates of real property subject to a proposed purchase, sale, or lease, prior to the completion of such purchase, sale, or lease); 2.2-3705.1(12) (information relating to the negotiation and award of a specific contract where competition or bargaining is involved and where the release of such information would adversely affect the bargaining position or negotiating strategy of the public body); 2.2-3705.6 (contains 35 exemptions for "proprietary records and trade secrets"); 2.2-3705.7 (information relating to the negotiation and award of a specific contract where competition or bargaining is involved and where the release of such information would adversely affect the bargaining position or negotiating strategy of the public body); 2.2-3711(3) (discussion or consideration of the acquisition of real property for a public purpose, or of the disposition of publicly held real property, where discussion in an open meeting would adversely affect the bargaining position or negotiating strategy of the public body); 2.2-3711(5) (Discussion concerning a prospective business or industry or the expansion of an existing business or industry where no previous announcement has been made of the business' or industry's interest in locating or expanding its facilities in the community); 2.2-3711(6) (discussion or consideration of the investment of public funds where competition or bargaining is involved, where, if made public initially, the financial interest of the governmental unit would be adversely affected); 2.2-3711(29) (discussion of the award of a public contract involving the expenditure of public funds, including interviews of bidders or offerors, and discussion of the terms or scope of such contract, where discussion in an open session would adversely affect the bargaining position or negotiating strategy of the public body).

15

development or retention… where competition or bargaining is involved and where disclosure of such information would adversely affect the financial interest of the public body." *Id.*; *see also* Va. FOIA Adv. Op. AO-07-19 ("Therefore, depending on the specific facts and context of a given situation, proprietary information provided by a private partner to a public partner pursuant to a promise of confidentiality may be protected from mandatory disclosure under FOIA."). A non-disclosure agreement is, of course, a promise of confidentiality, which is not only permitted under FOIA, it is required for this exemption. Moreover, the NDA expressly references this exemption and confirms that it only promises confidentiality to the extent permitted by law and does not protect information that was otherwise public. In other words, all bidders would have access to the same publicly available information about the Golf Club. The NDA only protects Dragas's confidential and proprietary information conveyed pursuant to the promise of confidentiality in the NDA.

Realizing the weaknesses in the claims they pled, Plaintiffs now claim that the conveyance cannot lawfully occur for three reasons, none of which have merit. First, Plaintiffs claim that the vote cannot occur because conveying the property would require terminating the ground lease through which the property was dedicated to public use. This imposes no impediment to conveyance, as Article VII, Section 9 of the Virginia Constitution explicitly authorizes selling land that was dedicated to public use, so long as the sale is approved by a three-fourths majority of the governing body. Va. Const. Atr. VII, § 9; *Stendig Dev. Corp. v. Danville*, 214 Va. 548, 550 (1974) ("The three-fourths vote limitation of the Constitution applies only to the sale of property dedicated to public use."). Second, they claim that the United States has a perpetual easement over two of the five parcels which prohibits residential use. This poses no impediment because the residential development will be confined to a limited portion of the

16

I-3101939.4

land that is not encumbered by the easement. Third, they point to a lien by the Commonwealth that would entitle the state to a portion of the proceeds of the sale. A lien does not take away the City's authority to sell the land, however, it just directs where a portion of the funds will go. Accordingly, these last-ditch arguments relying on facts nowhere alleged in the Complaint fare no better than the arguments originally included in the Complaint.

> 2.      *Plaintiffs' Conspiracy Theories about Private Discussions with City Staff and Certain City Council Members Have No Merit*

Plaintiffs' personal attacks[9] directed at individual Council members for meeting with Dragas similarly have no support in the law. As noted above, both FOIA and the VPPA contemplate that members of public bodies will have confidential discussions with potential partners from the private sector. This can include preliminary meetings to discuss conceptual ideas and measure the public body's interest in a project as nobody wants to waste time and money on a project that would be dead on arrival. It also can, and usually does, include a confidential exchange of information, *see supra*.

The fact that these discussions did not meet the definition of a "Meeting" under FOIA and thus did not trigger the statute's public meeting requirements is neither surprising nor nefarious. The statute itself makes clear that it "shall not be construed to discourage the free discussion by government officials or employees of public matters with the citizens of the

---

[9] Plaintiffs' insinuation that the Project resulted from corrupt agreements and payments should be rejected, if not completely stricken from the Complaint. Plaintiffs' have not alleged any facts to support this claim but instead point to how the system is set up and ask the Court to connect the imaginary dots. For example, the Complaint notes that that the Authority is not an elected body. Rather, City Council appoints its members, and, according to Plaintiffs, the members of the Authority therefore are beholden to City Council and to the people and businesses that have contributed to public campaigns. Needless to say, the General Assembly determined how development authorities are created and how their members are appointed. The fact that City staff and City Council members *did their job* and met (in accordance with state law) with a business proposing to spend tens of millions of dollars on a development project in the City is not a conspiracy.

17

I-3101939.4

Commonwealth." Va. Code § 2.2-3700. The statute further provides that "nothing contained herein shall be construed to prohibit (i) separately contacting the membership, or any part thereof, of any public body for the purpose of ascertaining a member's position with respect to the transaction of public business, whether such contact is done in person, by telephone or by electronic communication, provided the contact is done on a basis that does not constitute a meeting as defined in this chapter…." Va. Code § 2.2-3710(B).

These provisions and the three-person threshold under the definition of "Meeting" reflect a balance between transparency and practicality – if a public meeting occurred every time two members of a public body spoke about public business, the affairs of government would grind to a halt. As explained by Virginia Freedom of Information Advisory Council:

> Certainly FOIA is weighted in favor of public access and openness in government. However, through several of its provisions, it is also clear that FOIA considers the need of government to operate efficiently and effectively. One such provision is the definition of a meeting, which generally allows two members of a public body to consult and freely discuss topics of public business without it rising to the level of a meeting under FOIA, unless those two members constitute a committee or a quorum of the public body.

Va. FOIA Adv. Op. AO-12-04. As the Advisory Council further pointed out, the requirement for a vote at an open public meeting also means that the substance of proposed action will be public:

> While public policy arguments can be formulated to advocate that these discussions should be open to the public, ultimately the public will learn of the content of these discussions at the meetings of the full public bodies or through any public records generated at these gatherings. Even if the leadership of each public body reached what they thought to be a suitable agreement, any action must still be discussed and voted upon by the full public body at an open meeting, and would not become binding until such vote took place.

*Id.*; *see also* Va. FOIA Adv. Op. AO-38-01 ("Thus, one member could contact another member to ascertain how the other will vote on an issue of public business to be discussed at an upcoming meeting without violating the provisions of FOIA. This provision alludes to the balance that FOIA seeks to achieve between allowing the public to witness the workings of government while

18

at the same time allowing government to operate efficiently and effectively.").

<em>3. Dragas Did Not Submit a False Certification in its Proposal</em>

Plaintiffs' allegation that Dragas furthered the conspiracy by falsely certifying that it did not discuss the Project with the City prior to submitting its proposal is also demonstrably false. As support for this claim, Plaintiffs have attached the "Anti-collusion Form" submitted with Dragas's proposal. As is clear from the plain language of the form, that certification only addresses federal and state antitrust laws and confirms that the party submitting the proposal did not collude with competitors and that no City official has a personal, financial stake in the project or the submitting party, all of which was and is true.

In summary, the City's process violated no laws, strictly complied with the framework established by the General Assembly for the sale of public property, and exceeded those standards by issuing an RFP that was not required by Virginia law. For the reasons noted above, there is no immediate, irreparable harm that would flow from the continuation of the development process for the Project, and Plaintiffs have no chance of success on the merits of these claims.

**B.** <u>The Development Process Will Not Result in Immediate or Irreparable Environmental Harm and Plaintiffs' Environmental Claims Will Not Succeed on the Merits</u>

Plaintiffs ask this court to enjoin "any further disposition, lease, or encumbrance of city-owned property… until the City achieves Clean Water Act compliance as set forth in Part IX..." Compl. ¶ 7. Plaintiffs contend that "the City is in admitted, ongoing violation of the Clean Water Act and its MS4 permit," and insist that Plaintiffs are entitled to the requested relief because "two documented bald eagle nests stand on the property" and that "federal law forbids their disturbance absent a Fish and Wildlife service permit," noting that "no defendant holds or has sought one..." Compl. ¶ 89.

19

I-3101939.4

      1.     *Plaintiffs Fail to Allege Facts that Implicate Immediate or Irreparable Harm*

Plaintiffs will not succeed on any claim that the City is in violation of either the CWA or its MS4 permit. Regardless, injunctions are not designed to address injuries that have already occurred – they are designed to prohibit immediate and irreparable harm. Alleged past violations obviously cannot meet that standard. Even as to the speculation that future violations will occur—which is denied—the continued development of the Project pursuant to the Term Sheet that is unlikely to result in a conveyance before the Court has an opportunity to consider the merits of this action does not cause any immediate or irreparable harm. Indeed, the Complaint concedes as much stating the "point of no return is the conveyance…."

As to Plaintiffs' claim that there will be a future harm due to CWA violations or because bald eagle nests are on the Property, it is impossible to link this alleged injury to the continuation of the development of the Project pursuant to the Term Sheet negotiated by the City and Dragas, which authorizes the City Manager to finalize the sale if Dragas satisfies the conditions and obligations in the Term Sheet. To the extent that Plaintiffs claim the development of the property will cause either environmental injury or disturbance of a bald eagle's nest, such an allegation presumes that the City will not follow its long-established procedure for developing property. If the development plan fails to comply with any federal, state or local environmental regulations, the City will not convey the Property.

The use of litigation to secure injunctive relief on "environmental grounds" is nothing new. The Supreme Court has made clear in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), however, that granting such relief requires the moving party to demonstrate that irreparable injury is *likely* in the absence of an injunction, not simply *possible*. In *Winter*, the plaintiffs asserted that certain Navy sonar operations could violate the National Environmental

20

Protection Act, the Endangered Species Act and the Coastal Zone Management Act, and successfully enjoined the Navy's activity under Ninth Circuit precedent that only required the plaintiffs to establish "at least a 'possibility' of irreparable harm..." *Id.* Overturning the decision, the Supreme Court made clear that injunctive relief is never appropriate when the irreparable injury is speculative or a mere possibility:

> We agree with the Navy that the Ninth Circuit's "possibility" standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.

*Id.* (citing *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)); *see also* 11A Charles A. Wright, Arthur R. Miller, & Mary Kaye Cain, Federal Practice and Procedure § 2948.1, at 139 (2nd ed. 1995) (an applicant must demonstrate that, in the absence of a preliminary injunction, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered" and "a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury"). Here, the Complaint alleges nothing more than the mere possibility of some injury in the distant future that will not occur before this Court has had an opportunity to rule on the merits.

  2. *Plaintiffs' Environmental Claims Are Not Likely to Succeed on the Merits*

    a. The City is in compliance with its MS4 Permit

Throughout the Complaint, Plaintiffs allege that the City is in violation of the CWA because it is not in compliance with its MS4 permit regulating stormwater runoff. The first basis alleged for this contention is that the City has failed to comply with provisions of the Chesapeake Bay Preservation Act as applied to City property that drains instead into the Southern Rivers Watershed, arguing that the CBPA applies not based on whether water drains into the Chesapeake Bay, but rather on "physical features, namely tidal wetlands, tidal shores, contiguous

21

non-tidal wetlands, and water bodies with perennial flow, not by whether those features drain into the Chesapeake Bay." Compl. ¶ 35.

Plaintiffs are wrong. The applicable section of the City's ordinance, which includes the regulations mandated by the CBPA, applies to City property that drains into the Chesapeake Bay, not City property that drains into the Southern Rivers Watershed, and never reaches the Chesapeake Bay. Coffey Decl. ¶¶ 2-3. The purpose of the CBPA regulations is to protect the waters *of the Chesapeake Bay*. The CBPA authorizes localities to develop Chesapeake Bay Preservation Areas and provides that the DEQ shall "ensure the local government comprehensive plans, subdivision ordinances and zoning ordinances are in accordance," with the CBPA. 9 VAC 25-830-260. The City worked closely with DEQ in developing its Chesapeake Bay Preservation Area, which *does not* include the portions of Virginia Beach draining into the Southern Rivers Watershed *because the CBPA does not apply to those areas*. Coffey Decl. ¶ 3. If the City had violated the CBPA by failing to apply its regulations to property within the Southern Rivers Watershed, DEQ would have noted the violation. Rather than note any such violation, DEQ's most recent audit specifically states that the City is in compliance with its MS4 permit.[10]

Plaintiffs cite the City's discharge of "raw sewage and petroleum products" and the alleged failure "to eliminate illicit discharges" as evidence of noncompliance, insisting that "the City's own annual report documents no fewer than 12 separate sewage discharge events…" Complaint ¶¶ 64, 66. Despite attaching 24 exhibits to the Complaint, Plaintiffs conveniently omit the very document on which they base the claim that the City is not in compliance with its MS4

---

[10] Plaintiffs also claim "non-compliance" by virtue of the alleged failure to file annual reports. Even accepting this allegation as true, the filing of reports is an administrative matter, *not* a compliance issue. The DEQ has *never* cited the City of Virginia Beach for failing to comply with its MS4 permit relating to the failure to file annual reports. Coffey Decl. ¶ 10.

I-3101939.4

permit. Attached as **Exhibit 4** is the MS4 Permit Annual Report, which Plaintiffs so often cite. The Annual Report demonstrates that the City did exactly what it is required to do—report the discharges and take actions to address them. *See* Annual Report at Appendix C (listing illicit discharges and action taken) and Appendix D (listing reportable spills and action taken).

Plaintiffs, either ignorantly or intentionally, allege that every illicit discharge and reportable spill makes the City somehow out of compliance with the MS4. Noncompliance results from failing to report and address illicit discharges. The Annual Report demonstrates full compliance. *See also* Coffey Decl. at ¶¶ 6, 10.

b. Jurisdictional Wetlands Have Not Been Rezoned

Plaintiffs seem to allege a CWA violation by claiming the City "administratively" reclassified parcels in the agricultural district as residential "without any ordinance, Planning Commission review, public hearing or written notice to effective owners" allegedly in violation of Virginia statutes. Compl. ¶ 79. Plaintiffs allege that this "reclassification... removed the tax-exempt status from parcels that had long been carried as drainage and open space land, without notice, hearing, or any change-in-use determination..." *Id*. Even disregarding that these properties have nothing to do with the Golf Club, Plaintiffs' claims fail because they confuse rezoning (through which a locality legislatively determines the uses to which real property can be put), with the annual reassessment of real property performed by the City's Real Estate Assessor ("REA") to determine fair market value.

To be clear, (1) private property that contains wetlands or open space, or that may be used for drainage is not tax-exempt, and (2) the City did not rezone these specific properties as alleged by Plaintiffs. *See* Declaration of Sue Cunningham ("Cunningham Decl.," attached as **Exhibit 5**) at ¶¶ 2-3. The City Charter requires each parcel of real property to be assessed each fiscal year. Virginia Beach City Charter Sec. 8.07. *Id.* ¶ 2. Article X Section 2 of the Virginia Constitution

23

I-3101939.4

requires that property be assessed at its fair market value. As part of the reassessment process, the REA reviews whether property contains wetlands as required by Virginia Code Section 58.1-3284.3. *Id.* If a buildable lot contains wetlands, any portion of the property that is unsuitable for development is taken into consideration when finalizing assessed value. *Id.* at ¶ 3. This is standard process and has occurred consistently here. *Id.*

Similarly, the REA uses an internal classification designation of "Residential Stabilized Land," for vacant land that does not appear to be buildable or otherwise usable and assesses that land at a nominal value, e.g. $1000. *Id.* The use of "Residential Stabilized Land" is citywide. *Id.* If a property within this classification is later developed or the REA determines that it could be developed, the REA removes the classification and determines the fair market value as a developed property (or developable property) and not vacant land. *Id.* This classification or the removal of this classification is not a rezoning of property or removal of a tax exemption. *Id.* The zoning classification and wetlands status for each parcel remained the same before and after the assessment, and any party seeking to develop the property would have to obtain the same permits and approvals if the proposed use was not consistent with the zoning classification and/or would unlawfully impact wetlands. [11]

In essence, Plaintiffs do not like that there is development below the Green Line and are attempting to use the *tax* reclassification in furtherance of the annual assessment process as evidence of a major *environmental* change, which is simply not correct. From this false premise, Plaintiffs then ask the Court to make another huge, logical leap to not only enjoin the conveyance

---

[11] The Complaint makes reference to reassessments which began in 2018 when the Treasurer's Office "sent out tax notices on tax-exempt parcels citywide, assessing 10-years of taxes on buildable value to induce the transfer of lands to a list of specific builders." While the City denies the allegation, such reassessment gives rise to no cause of action by these Plaintiffs and have nothing to do with the Property at issue.

I-3101939.4

of the Property, but to enjoin *all conveyances* unless they meet some regulatory requirement imposed by neither the federal, state nor local governments. This request should be flatly rejected for any number of reasons, but, as relevant here, the answer is straightforward – if a purchaser like Dragas acquires property, it must develop that property in full compliance with all applicable laws and regulations. If the Dragas plan fails to do so, the development will not be approved by the City and the Property will not convey.

c.        <u>The City is Not Responsible for Unauthorized Discharges</u>

Count IV of the Complaint alleges numerous violations of the CWA regarding unauthorized discharges. When stripped of the conclusory allegations, the Complaint identifies three specific incidents, and even those are only vaguely alleged. In paragraph 66, Plaintiffs allege that the City failed to eliminate illicit discharges included "a heating-oil contamination event that persisted for approximately 15 months..." In paragraph 64, Plaintiffs allege that the City "discharged or allowed the discharge of raw sewage and petroleum products" between July 1, 2024, and June 30, 2025, and that the City's annual report documents "no fewer than 12 separate sewer discharge events, including a single force-main failure that released approximately 20,000 gallons into London Bridge Creek, and a discharge of approximately 4,200 gallons of jet fuel." As discussed above, Plaintiffs drew these allegations from the Annual Report, but refused to include it as an exhibit. A simple review of the Annual Report demonstrates that the City is in full compliance with the MS4 as it reported each of these discharges, and further outlined in detail the steps taken to address the discharges. This reflects *compliance* with both the MS4 and the CWA.[12]

---

[12] Exhibit A to the Complaint is Plaintiffs' 60-day Notice of intent to sue under the Clean Water Act. Tellingly, the Notice fails to mention the Golf Course Property or the Dragas Project *at all*. Instead, it appears Plaintiffs are attempting to use alleged violations of the Clean Water Act to freeze all activity related to the Project.

25

I-3101939.4

### d. Unspecified Violations Fail to State a Claim

In the section of the Complaint subtitled, "Clean Water Act Citizen Suit," Plaintiffs allege in conclusory fashion a myriad of CWA violations, presumably incorporating all of its prior allegations. These conclusory allegations fail to state a claim because they provide no supporting factual information, and certainly not enough to allow the City to respond to the allegations.

Similar conclusory allegations are found throughout the Complaint. For example, while alleging that the City recruits "industrial and commercial" operations to the City without requiring the necessary VPDES permit, the Complaint fails to cite a single incident in which the City has allowed an industrial or commercial operation without any necessary VPDES permit. Compl. ¶ 67. Similarly, the Complaint alleges that the City "does not apply to its own capital projects" requirements it imposes on private applicants, again without citing a single incident. Compl. ¶ 68. The Complaint alleges that City crews "placed fill in jurisdictional wetlands and discharged construction phase sediment into the MS4 without Wetlands Board permits" without citing a single incident. Compl. ¶ 69. Plaintiffs are unlikely to succeed on the merits of such claims as they fail to provide any specifics that would allow the City to offer a meaningful response.

### e. Claims Based on Disturbance of Nesting Eagles are Factually Incorrect and Speculative

The Complaint alleges that there are two active bald eagle nests on the property, that absent a permit issued by the government, federal law "prohibits disturbance of the nest," and that on information and belief, no one has applied for the necessary permit. Compl. ¶ 106-07. Alternatively, Plaintiffs allege that, "to the extent site surveys confirm the presence on or adjacent to the property of any endangered species," Plaintiffs assert "a citizen suit claim" under federal law. Compl. ¶ 110.

26

I-3101939.4

From these allegations Plaintiffs seek to enjoin the development process pursuant to which the City might eventually convey the Property to Dragas. Of course, Plaintiffs do not allege that there has been any disturbance to nesting eagles or that anything that may occur prior to the conveyance will disturb nesting eagles. The allegation that there will be some sort of violation of either the Bald and Golden Eagle Protection Act, the Migratory Bird Treaty Act or the Endangered Species Act is entirely speculative and assumes that the City will not enforce its long-standing requirement that any and all developments fully comply with federal law, including the aforesaid acts. Simply put, Plaintiffs will not succeed on their claim of any violation of the Bald and Golden Eagle Protection Act, the Migratory Bird Treaty Act or the Endangered Species Act, or any state law corollaries, because there has been no such violation and there is no basis to conclude that a violation will occur in the future.[13]

## II.   Public Policy and the Balance of Equities Do Not Support Injunctive Relief

### A.   Public Policy Considerations Weigh Against the Use of Litigation to Block Legislative Action

Allowing a lawsuit to freeze a development process approved by a majority of elected officials raises significant concerns as it clearly undermines the democratic process, legislative independence and the separation of powers. This is particularly true when a plaintiff asks a federal court to invade the domain of a state or local legislative body. Traditionally, courts avoid interfering with internal legislative proceedings at any level of government unless there is a clear constitutional violation or statutory mandate. As set forth above, in this case there is neither.

Legislative votes are a core mechanism of democratic representation. If Plaintiffs are

---

[13] In addition to ignoring the timing issue and the fact that Dragas will have to get the required approvals and permits, if any, Plaintiffs are also factually wrong. Upon information and belief, the nests identified on the Property are not located in the vicinity of the golf holes that are proposed to be relocated or substantially modified.

I-3101939.4

allowed to literally *block* the process approved by a vote of elected officials, it enables minority interests to obstruct majority rule through litigation rather than persuasion or the electoral process. That is *precisely* what is happening in the instant case. Plaintiffs' counsel addressed City Council at an initial public hearing regarding this transaction and was present at the public meeting at which the delayed vote was to occur and was given a platform to express Plaintiffs' concerns over the vote to approve the Term Sheet for future conveyance of the Property to Dragas. *See* Declaration of Amanda Barnes ("Barnes Decl.," attached as **Exhibit 6**) at ¶ 2. Virtually *simultaneously* with the scheduled vote, Plaintiffs filed this federal lawsuit to prevent the vote that their counsel spoke against. Now, Plaintiffs seek to bring the entire development process to a halt, preventing even the due diligence and additional legislative approvals that would be necessary to consummate the proposed transaction. In essence, Plaintiffs are asking the Court to do what they could not do--disrupt the legislative process.

The principle that federal courts defer to legislative body when considering decisions related to the conveyance of property by municipalities is best illustrated in the Supreme Court decision of *Kelo v. City of New London*, 545 U.S. 469 (2005). The case involved a municipality's use of eminent domain to take property of individuals to develop a "small urban village" to include restaurants and shopping. *Id.* at 474-75. Over the objection of individual property owners arguing that eminent domain was inappropriate because the development was not a "public use," the Supreme Court explained why courts defer to the decisions of municipalities concerning the use of property:

> The City has carefully formulated an economic development plan that it believes will provide appreciable benefits to the community, including--but by no means limited to--new jobs and increased tax revenue. As with other exercises in urban planning and development, the City is endeavoring to coordinate a variety of commercial, residential, and recreational uses of land, with the hope that they will form a whole greater than the sum of its parts.

28

*Id.* at 483. This is the deference given to a legislative body that was using *the power of eminent domain* to acquire property *held by those plaintiffs* for a development project. Here, Plaintiffs have no interest whatsoever in the property at issue, which is held in fee simple by the City. If the Supreme Court urges deference to city council development plans that involve the *actual taking* of a plaintiff's property, how much more deference is appropriate in the current situation where Plaintiffs have no interest in the property at all?[14] Public policy strongly disfavors allowing a handful of citizens with interests divergent from those of a majority of elected officials to block a development process approved by a legislative vote concerning conveyance of property wholly owned by the City.

> B.      The Balance of Equities Mitigates Against Injunctive Relief

*All* of the equities favor denying the relief requested. As discussed above, the development process will do nothing more than allow the continuance of due diligence that may result in the conveyance of the Property held by the City to Dragas pursuant to certain terms. The conveyance itself will not occur until sometime next year and only after Dragas complies with all of terms of the yet-to-be-drafted Purchase and Development Agreement. Accordingly, the extraordinary relief requested by Plaintiffs to freeze the development process does nothing to prevent the harm Plaintiffs allege as they readily concede in paragraph 92 of the Complaint that the "point of no return" is the actual *conveyance* of the Property. Even the conveyance will not cause irreparable harm for the reasons stated above, as the City will not allow the development of the Property unless the project complies with any and all federal, state and local regulations, including any environmental regulations.

---

[14] Curiously, the named Plaintiff lives over two miles from the Property at issue, and there are high density residential developments *between* the residence of the named Plaintiff and the Property at issue.

I-3101939.4

By contrast, the extraordinary relief sought by Plaintiffs will disrupt the lengthy predevelopment process that goes into the private development of any City property and would delay the eventual construction of numerous affordable housing units that the citizens of the City need. Not only that, but it seeks to further "halt any further disposition, lease, or encumbrance of City owned real property…" Compl. ¶ 7. The requested relief is unprecedented, and draconian in every respect. It seeks to allow Plaintiffs through this litigation to block virtually any City property development below the Green Line in Virginia Beach.[15] Clearly, the balance of equities favors the City.[16]

WHEREFORE, for the reasons set forth above, the City Defendants respectfully request that the Court deny Plaintiffs' Motion and grant the City Defendants such other and further relief as the Court deems just and proper.

Dated: August 10, 2026

Respectfully submitted,

By:_____/s/ Gary A. Bryant_____
Gary A. Bryant (VSB No. 27558)
Brett A. Spain (VSB No. 44567)
Bethany J. Fogerty (VSB No. 94753)
*Counsel for City of Virginia Beach, Robert M. Dyer, Rosemary A. Wilson, Patrick A. Duhaney and Mark D. Stiles*
Willcox & Savage, P.C.
440 Monticello Avenue, Ste. 2200
Norfolk, Virginia 23510
757.628-5500 Telephone
757.628.5566 Facsimile
gbryant@wilsav.com
bspain@wilsav.com
bfogerty@wilsav.com

---

[15] By asking the Court to enjoin further development of City property below the Green Line, Plaintiffs are essentially asking the Court to block *unidentified* property development based on *unidentified* harms that Plaintiffs argue will *hypothetically* occur.

[16] Furthermore, Plaintiffs' assertion that there is no monetary harm is patently false. Delays in the development process lead to delays in the development of taxable assets.

I-3101939.4

CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of August 2026, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

By:            /s/ Gary A. Bryant
Gary A. Bryant (VSB No. 27558)
Brett A. Spain (VSB No. 44567)
Bethany J. Fogerty (VSB No. 94753)
*Counsel for City of Virginia Beach, Robert M. Dyer, Rosemary A. Wilson, Patrick A. Duhaney and Mark D. Stiles*
Willcox & Savage, P.C.
440 Monticello Avenue, Ste. 2200
Norfolk, Virginia 23510
757.628-5500 Telephone
757.628.5566 Facsimile
gbryant@wilsav.com
bspain@wilsav.com
bfogerty@wilsav.com

31

I-3101939.4