**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
*Norfolk Division*

| | |
|---|---|
| **SFF CONSERVATION INITIATIVE,** **INC., et al.** | **Civil Action No. 2:26-cv-00738** |
| Plaintiffs, | |
| v. | |
| **CITY OF VIRGINIA BEACH; et al.** | |
| Defendants. | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION AND
MOTION TO DISQUALIFY WILLCOX & SAVAGE, P.C.**

## I.  PRELIMINARY STATEMENT

The City Defendants' Memorandum in Opposition (ECF No. 21) does not dispute the recorded instruments that make this transaction unlawful as proposed.  It does not dispute that the City is operating under a federal easement that categorically prohibits residential use on two of the five parcels.  It does not dispute that the Commonwealth of Virginia holds a recorded lien against those parcels.  It does not dispute that the forty-year ground lease dedicating the Property to public recreation runs through October 7, 2037.

Instead, the Opposition retreats to two themes: that everything will work itself out during "due diligence," and that Plaintiffs should simply trust the City to comply with the law later.  Neither theme answers the fundamental problem:  the City cannot lawfully perform this transaction as proposed, and a preliminary injunction is the proper remedy to preserve the status quo while this Court examines the merits.

As a threshold matter, Plaintiffs move to disqualify the law firm of Willcox & Savage, P.C. from representing any Defendant in this action.  Lisa Murphy, Chair of the Virginia Beach Development Authority, one of the named Defendants, is a partner at Willcox & Savage.  The firm simultaneously

purports to represent the City Defendants and appears on behalf of a governing body whose chair is a member of the firm.  This structural conflict is disqualifying under Virginia Rule of Professional Conduct 1.7 and Fourth Circuit precedent, and each Defendant must obtain independent counsel.

## II.  MOTION TO DISQUALIFY WILLCOX & SAVAGE, P.C.

Before addressing the merits, Plaintiffs raise a matter bearing on the integrity of these proceedings.  The City Defendants are represented by Willcox & Savage, P.C.  Lisa Murphy is a partner at Willcox & Savage and simultaneously serves as the Chair of the Virginia Beach Development Authority ("Authority"), which is a named Defendant in this action.  (Compl. ¶¶ 26-27).  The Authority is a political subdivision of the Commonwealth created under Virginia Code Section 15.2-4900 *et seq*., and it holds title to portions of the Property at issue.  Ms. Murphy, as Chair, has fiduciary duties to the Authority and has participated in the very decisions Plaintiffs challenge.

This arrangement creates an irreconcilable conflict of interest.  Virginia Rule of Professional Conduct 1.7(a) provides that a lawyer shall not represent a client if the representation involves a concurrent conflict of interest, which exists where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  Va. R. Prof. Conduct 1.7(a)(2).  A partner's personal interest in the outcome of litigation involving her own governing body is precisely the kind of conflict the Rule targets.

The Fourth Circuit has recognized that disqualification is required where joint representation creates a serious potential for conflict, even absent a showing of actual prejudice.  *Wheat v. United States*, 486 U.S. 153, 163 (1988) (courts must be "allowed substantial latitude in refusing waivers of conflicts of interest"); *Burket v. Angelone*, 208 F.3d 172, 184 (4th Cir. 2000) (disqualification warranted where counsel's relationship with one party creates divided loyalties).  In *Fanning v. John A. Sheppard Memorial Ecological Reservation, Inc*., No. 2:18-cv-01183 (S.D.W. Va. Oct. 26, 2018), the court granted

disqualification where a single firm represented both an entity and the individual board members whose conduct was at issue, finding the conflict non-consentable under Rule 1.7.

Here, the conflict is structural and pervasive. The Complaint alleges that the Authority's actions in facilitating this transaction were ultra vires and that the Authority's board failed to exercise independent judgment. (Compl. ¶¶ 30-35). Willcox & Savage cannot simultaneously defend the Authority's institutional decisions while a partner of the firm sits as the Authority's Chair and bears personal responsibility for those decisions. The firm's duty to the City Defendants may require it to argue that the Authority acted independently and properly; its duty to the Authority (through its partner-Chair) may require it to argue that the Authority simply followed City Council's direction. These positions are inherently antagonistic.

Moreover, Ms. Murphy is likely to be a material witness regarding the Authority's deliberations, its receipt (or non-receipt) of information about the federal easement and Commonwealth's lien, the Authority's role in the ground lease and the 2018 deed conveying parcels to the Authority. Virginia Rule of Professional Conduct 3.7 generally prohibits a lawyer from acting as advocate at a trial in which the lawyer is likely to be a necessary witness. Because Ms. Murphy is a partner, this prohibition is imputed to the entire firm under Rule 1.10(a).

The conflict cannot be cured by consent. Rule 1.7(b)(1) provides that a conflicted representation may proceed only if "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client." Where a partner of the firm is a named fiduciary of one defendant and may be called to testify against the interests of another, no reasonable lawyer could make that determination. *See Fanning*, No. 2:18-cv-01183 (finding that joint representation of an entity and its board members non-consentable where the interests of the entity and individuals diverged).

Plaintiffs respectfully request that the Court enter an order disqualifying Willcox & Savage, P.C. from representing any Defendant in this action and requiring each Defendant to retain independent

3

counsel.  Because this conflict bears on the adequacy of representation for purposes of the preliminary injunction hearing, Plaintiffs raise it now rather than by separate motion.

### III.  ARGUMENT IN REPLY

City Defendants' Opposition (ECF No. 21) rests on two pillars, both hollow.  The first is a timing argument:  because the conveyance is allegedly a year away, Plaintiffs can suffer no irreparable harm in the interim.  The second is a legality argument: because the City issued a request for proposals characterized, as exceeding statutory requirements, no law was broken.  Neither pillar withstands scrutiny.

On legality, the City never grapples with the central deficiency that Plaintiffs have identified from the outset: the statutory exemptions that the City invokes to justify seventeen months of concealed negotiation do not apply to these facts.  The closed-session exemption under Code § 2.2-3711(A)(5) applies to "a prospective business or industry . . . where no previous announcement has been made of the business' or industry's interest in locating or expanding its facilities in the community."

Dragas Companies is a well-known, long-established Virginia Beach developer.  It is not a "prospective business" seeking to "locat[e]" in the community.  The FOIA records exemption under Code § 2.2-3705.6(3) applies to "businesses that are considering locating or expanding in Virginia." Dragas is already located in Virginia Beach and has been for decades.  The City never explains how either exemption applies to a sale of public land, to a local developer, whose identity and interest were known from the start.

The Opposition also fails to address the three recorded instruments that make this transaction impossible as proposed:  the perpetual federal easement prohibiting residential use, the Commonwealth's recorded lien, and the forty-year ground lease.  The are not "last-ditch arguments."  They are self-authenticating public records under Federal Rules of Evidence 902(1) and (4) that the City has an obligation to disclose and has never explained.

A.    **The FOIA and VPPA exemptions the City invokes do not apply to a sale of public land to a known local developer.**

The City's Opposition devotes several pages to the "balanced framework" that the General Assembly created through FOIA exemptions (ECF No. 21 at 14-19). But the City never connects those exemptions and they do not fit.

**i.  Virginia Code § 2.2-3711(A)(5) is inapplicable.**

Section 2.2-3711(A)(5) permits a closed meeting for "[d]iscussion concern[ing] a prospective business or industry or the expansion of an existing business or industry where no previous announcement has been made of the business' or industry's interest in locating or expanding its facilities in the community."

This exemption exists for economic development recruitment, the scenario in which a locality is trying to attract a business that may locate in the community, and premature disclosure could cause the business to choose another jurisdiction. *See* Va. FOIA Adv. Op. AO-17-01 (describing exemption in context of "economic development prospects"); Attorney General's Opinion 1974-75 #573 (industrial authority may use exemption to discuss "prospective business relocations provided there has been no prior public announcement about the business' intention to locate in the area").

Dragas Companies is not a "prospective business" considering whether to "locat[e] . . . its facilities in the community." It is a Virginia Beach-based developer that has operated in this community for decades. Dragas's interest in the Golf Club property was not a secret that required protection from competing jurisdictions; it was a proposal to purchase City-owned public land. The exemption's animating purpose is to prevent a business from choosing another locality, which has no application here. Dragas was not going to take its proposal to Norfolk or Chesapeake if the public learned of its interest in a Virginia Beach golf course.

The City may respond that the exemption also covers "the expansion of an existing business or industry." But the statutory text requires that "no previous announcement has been made" of the

5

business's interest.  Here, Dragas's interest was known: its representatives met with the Mayor, the Vice Mayor, and at least one additional Council member; the City's own Economic Development Director was briefed; and the NDA itself is evidence that the City knew of Dragas's interest.  (Compl. ¶¶ 47–51). The exemption protects unannounced interest, not interest that has been privately disclosed to the very officials who will vote on it.

FOIA's exemptions "shall be narrowly construed," and "[a]ny exemption from public access to records or meetings shall be narrowly construed and no record shall be withheld or meeting closed to the public unless specifically made exempt pursuant to this chapter."  Code § 2.2-3700(B).  The City bears the burden of demonstrating that the exemption applies, and it has failed to do so here.

### ii.  Virginia Code § 2.2-3705.6(3) does not cover this transaction.

The records exemption under Code § 2.2-3705.6(3) protects "[p]roprietary information, voluntarily provided by private business pursuant to a promise of confidentiality from a public body, used by the public body for business, trade, and tourism development or retention; and memoranda, working papers, or other information related to business that are considering locating or expanding in Virginia."  Both prongs of the exemption require a nexus to business location or expansion that does not exist here.

The first prong requires that the information be "used by the public body for business, trade, and tourism development or retention."  The City is not using Dragas's information for "business development or retention" in the statutory sense it is selling public land.  There is no business the City is trying to recruit or retain. The second prong applies to "businesses that are considering locating or expanding in Virginia."  Dragas is already located in Virginia and is not considering whether to do so.  It is proposing to buy City-owned property.

The City's reliance on FOIA Advisory Opinion AO-07-19 (ECF No. 21 at 16) is misplaced.  That opinion states that "depending on the specific facts and context of a given situation, proprietary

information provided by a private partner to a public partner pursuant to a promise of confidentiality may be protected from mandatory disclosure." (emphasis added). The operative phrase is "depending on the specific facts and context." The opinion does not hold that every NDA a city signs with a private party automatically triggers the exemption.

### iii.    The NDA concealed information from the City's own statutory bodies, an act no FOIA exemption authorizes.

Even if FOIA exemptions could theoretically apply to some information exchanged between the City and Dragas, the August 7, 2024 NDA went far beyond what any FOIA exemption authorizes. The NDA prohibited disclosure to "any third party, including any member or members of any appointed committees or commissions of the City." (Compl. Ex. D, § 2(c)). This language excluded the Virginia Beach Development Authority board, the Planning Commission, the Wetlands Board, and the Chesapeake Bay Preservation Area Board, the very bodies charged by state law with reviewing land-use decisions, wetlands impacts, and environmental compliance. (Compl. ¶ 50).

No FOIA exemption authorizes the city to conceal, from its own appointed boards, the information those boards need to discharge their statutory duties. The Commonwealth is a *Dillon Rule* jurisdiction. A municipal corporation possesses only those powers expressly granted, those necessarily implied, and those essential and indispensable. *Bd. of Supervisors v. DeGroff Enters., Inc.*, 214 Va. 235 (1973). "Any fair, reasonable doubt" about whether a power exists "is resolved against the [locality]." *Commonwealth v. Cnty. Bd. of Arlington Cnty.*, 217 Va. 558, 565 (1977). No statute grants the City Manager authority to execute an agreement that bars disclosure of development information to the City's own regulatory commissions. The NDA is *ultra vires* and void. *City of Richmond v. Confrere Club of Richmond*, 239 Va. 77 (1990).

## B.    The City cannot invoke a "competition" exemption when it eliminated competition.

The City contends that it "exceeded all statutory requirements" by issuing an RFP "which is not required by any statute or regulation." (ECF No. 21 at 4). This argument collapses under the weight of

7

the undisputed timeline.  The City began confidential negotiations with Dragas in April 2024.  (Compl. ¶¶ 47–48).  Dragas proposed an exclusivity agreement in July 2024.  (Compl. ¶ 49).  The City and Dragas executed the NDA in August 2024.  (ECF No. 19, Ex. D).  Only after seventeen months of exclusive engagement did the City issue the RFP in September 2025.  (Compl. ¶¶ 52, 56).  This gave the nine other respondents a six-week window to compete against a developer that had the City's complete due-diligence file for almost a year and a half. (Compl. ¶¶ 52, 56).

The FOIA exemptions the City invokes all require that "competition or bargaining is involved." Code §§ 2.2-3705.6(3); 2.2-3711(A)(6); 2.2-3705.1(12).  But a process that gives one developer a seventeen-month head start, access to the City's internal data, and meetings with three Council members who will vote on the proposal is the antithesis of competition.  The City rejected Dragas's request for a formal "Exclusivity Non-Disclosure Agreement" (Compl. ¶ 49), but it then provided de facto exclusivity through seventeen months of confidential bilateral engagement.  Rejecting the label while granting the substance does not create "competition or bargaining."

The City's assertion that it "exceeded" statutory requirements by issuing an RFP is thus precisely backwards.  The City did not exceed requirements, it undermined them.  An RFP that follows seventeen months of exclusive dealing is not a competitive process; it is a ratification ceremony.  This Court need not take Plaintiffs' word for it: the City's own records, produced under FOIA, establish the timeline. (Compl. ¶ 48; Ex. D).

**D.    The City is not in compliance with its MS4 permit, and reporting violations does not cure them.**

The City's principal response to the Clean Water Act claims is that its MS4 Annual Report "demonstrates full compliance" because the City "did exactly what it is required to do—report the discharges and take actions to address them." (ECF No. 21 at 23).  This argument confuses the obligation *to report* with the obligation *to comply*.  These two obligations are not the same.

The Clean Water Act prohibits "the discharge of any pollutant" except in compliance with a permit. 33 U.S.C. § 1311(a).  A permittee that discharges raw sewage into waters of the United States violates the Act even if it reports the discharge. Reporting is a permit condition; it is not a safe harbor. The City's logic would mean that a factory that dumps toxins into a river is "in compliance" so long as it files the right paperwork afterward.  No court has ever accepted that proposition, and the statute does not support it.  *See Sierra Club v. Union Oil Co. of Cal.*, 813 F.2d 1480, 1491 (9th Cir. 1987) ("A discharger's own monitoring reports are evidence of the violations they reveal."), vacated and reinstated, 853 F.2d 667 (9th Cir. 1988).

The City's own FY25 Annual Report, which the City attached as Exhibit 4 to the Opposition, confirms what Plaintiffs have alleged:  twelve sewage discharge events, a single force-main failure releasing approximately 20,000 gallons into London Bridge Creek, and a discharge of approximately 4,200 gallons of jet fuel – all into waters of the United States, many already impaired under Section 303(d).  (Compl. ¶¶ 64–65).

These are not administrative paperwork failures.  They are unauthorized discharges of pollutants. The City's argument that "noncompliance results from failing to report," rather than from the discharges themselves (ECF No. 21 at 23), contradicts the plain text of 33 U.S.C. § 1311(a).

The City's TMDL obligations further demonstrate non-compliance.  The MS4 permit requires full Chesapeake Bay TMDL compliance by June 30, 2028.  The City designated its mandatory phosphorus load-reduction calculations for the receiving sub-watershed as "TBD" after fourteen consecutive years of zero reported reductions.  (Compl. ¶¶ 60, 62–63).  The City's Opposition does not contest these facts; it simply asserts, without support, that DEQ found the City "in full compliance." (ECF No. 21 at 10).

But a DEQ audit reviewing administrative compliance with reporting requirements is not an adjudication that the City has met every substantive condition of its permit.  The 60-day notice letter

under 33 U.S.C. § 1365(b)(1)(A) was served on March 12, 2026, and no federal or state enforcement action has been commenced.  (Compl. ¶¶ 12–13).

### i. The CBPA applies based on physical features, not drainage destination.

The City argues that the Chesapeake Bay Preservation Act applies only to property that "drains into the Chesapeake Bay" and therefore does not apply to the Southern Rivers Watershed.  (ECF No. 21 at 9–10).  This misreads the statute.  The CBPA designates Chesapeake Bay Preservation Areas based on physical features "tidal wetlands, tidal shores, and other lands considered by the board to be necessary to protect the quality of state waters."  Va. Code § 62.1-44.15:72.  The implementing regulations define Resource Protection Areas by the presence of "tidal wetlands, tidal shores, and . . . a 100-foot buffer area."  9 VAC 25-830-80.  These are feature-based criteria, not drainage-destination criteria.

More fundamentally, the City's argument ignores the MS4 permit itself.  Permit No. VA0088676 imposes TMDL requirements on the City's stormwater discharges across its entire MS4 coverage area, including the Southern Rivers Watershed.  The permit does not exempt the southern two-thirds of the City from compliance.  Whether or not the CBPA overlay applies to the Southern Rivers Watershed, the MS4 permit's TMDL conditions do, and the City admits it has achieved "TBD" against those conditions for fourteen years.

### D.    The recorded encumbrances are not "last-ditch arguments" they make the transaction unlawful as proposed.

The City dismisses the three recorded instruments as "last-ditch arguments relying on facts nowhere alleged in the Complaint."  (ECF No. 21 at 17).  This characterization is blatantly wrong on both the facts and the law.

### i. The federal easement prohibits residential use on two of the five parcels.

The City's response to the perpetual easement held by the United States is a single sentence: "the residential development will be confined to a limited portion of the land that is not encumbered by the easement."  (ECF No. 21 at 16-17).  The City offers no declaration, no site plan, and no evidence to

10

support this assertion.  The recorded easement covers GPINs 1494-02-1476, 1494-03-5237, 1494-13-7202, 1484-81-7296, 1484-71-9043, and 1484-71-2633 – 516.16 acres in total.  (ECF No. 19, Ex. G).  Two of the five parcels listed on the Dragas NDA GPINs 1494-03-5237 (Parcel A, approximately 42.857 acres) and 1494-13-7202 (Parcel B, approximately 27.000 acres) are squarely within the easement area.

The easement further requires ninety days certified-mail notice to the United States before any new use or construction, the omission of which "shall be deemed a breach."  (ECF No. 19, Ex. G).  No Defendant has alleged that such notice has been given.  This is not a matter that can be resolved "during due diligence," it is a recorded encumbrance that restricts the property's permitted uses by federal instrument.

### ii. The BRAC commitments, the ITA overlay, and the impending F-35 transition foreclose the proposed residential density.

The City's assertion that residential development "will only be built on a small portion of the parcel that is outside the ITA overlay" (ECF No. 21 at 7 n.3) understates the legal constraints and ignores the direction in which those constraints are moving.  The Interfacility Traffic Area overlay is not merely a planning preference, it is a binding zoning restriction the City adopted as a condition of preserving Naval Air Station Oceana from closure under the 2005 Base Realignment and Closure ("BRAC") process.

In August 2005, the BRAC Commission voted to maintain NAS Oceana only on the condition that Virginia Beach, Chesapeake, and the Commonwealth of Virginia commit to halting encroachment within the NAS Oceana and NALF Fentress overlays.

On December 20, 2005, the Virginia Beach City Council complied by adopting Ordinance No. 2905.  This ordinance established the ITA as an overlay zoning district encompassing the area south of Princess Anne Road (east of Landstown High School) and north of Indian River Road, within Air Installation Compatible Use Zones ("AICUZ") at 65 dB DNL or greater.  City of Virginia Beach Zoning Ordinance, Art. 18; *see also* Virginia Beach Comprehensive Plan, Chapter Four (Princess Anne

11

Commons and Transition Area) ("One of the principal effects of this new designation was to reduce the residential density to what could be achieved by-right with Agricultural zoning (one unit per 15 acres)").

The ordinance is unambiguous. It provides that "residential development on property within the Interfacility Traffic Area shall be limited to single-family dwellings at a density no greater than one (1) dwelling per fifteen (15) acres of developable land." Virginia Beach Zoning Ordinance Section 1802(b) (adopted Ord. No. 2905, 12-20-05; amended Ord. No. 3006, 1-8-08). The Property is classified AG-1 and lies within the ITA overlay. (Compl. ¶ 33). At one dwelling per fifteen acres, the approximately 350-acre assemblage could support, at most, approximately 23 single-family dwellings, not 659 multi-family residential units. The proposed density exceeds the ITA maximum by a factor of nearly thirty.

The City concedes the existence of the ITA overlay but claims the residential units "will only be built on a small portion of the parcel that is outside the ITA overlay and the land encumbered by the easement granted to the federal government." (ECF No. 21 at 7 n.3). This assertion is unsupported by any survey, site plan, or engineering analysis.

No Defendant has submitted a declaration or exhibit identifying which portion of the Property lies outside the ITA, or demonstrating that a sliver of land outside the overlay can physically accommodate 659 units at any lawful density, with the required infrastructure, stormwater management, road access, and setbacks. The assertion is conclusory and the Court should not credit it.

Code § 15.2-2283.1 requires localities to "take every action to be compatible with military operations" and to "prevent encroachment" around military installations. This state-law obligation reinforces that the City's BRAC commitments are not merely voluntary, but are embedded in the legal framework governing local land-use decisions.

More significantly, the ITA overlay is poised to expand, not contract. The City itself has invited the expansion. On July 2, 2024, Virginia Beach City Council unanimously adopted a resolution supporting the basing of F-35C Lightning II Joint Strike Fighter aircraft at NAS Oceana to replace the

12

current F/A-18E/F Super Hornet squadrons.[1]  The United States Navy has accepted the invitation and has commenced the formal environmental review process.

In late 2025, the Navy initiated a 30-day public scoping period for an Environmental Impact Statement evaluating the transition of seven F/A-18E/F squadrons to F-35C squadrons at either NAS Oceana or NAS Lemoore, California.  Congresswoman Jen Kiggans (VA-02), has introduced legislation expressing the sense of the House that NAS Oceana "should remain a critical component of the future carrier-based strike fighter capability of the Navy and receive F-35C squadrons as part of the modernization strategy of the Navy."[2]

The relevance to this case is direct.  The F-35C generates significantly higher peak noise levels than the F/A-18 Super Hornet on takeoff, which is the operation that drives the AICUZ noise contour extending over this Property.  The Government Accountability Office has specifically found that the Department of Defense "needs to update noise assessments near military airfields" in connection with F-35 basing decisions because the aircraft's noise footprint differs materially from legacy platforms. GAO-20-384 (May 2020).

When the Navy completes its Environmental Impact Statement for the Oceana F-35 transition, the AICUZ will be updated.  The noise contours will expand.  The 65 dB DNL line that currently defines the ITA overlay boundary will shift outward.  The portion of this Property that the Opposition claims lies "outside" the ITA overlay today, the only sliver on which Defendants contend 659 units might theoretically fit, is the portion most likely to be brought within the expanded overlay once the updated AICUZ is published.

The City thus faces a self-created contradiction.  The same City Council that unanimously invited the F-35 to Oceana now proposes to authorize 659 residential units in the precise area where the F-35's

---

[1] City Council resolution dated July 2, 2024, Resolution Supporting the Navy's Assignment of New Aircraft to the East Coast Master Jet Base at Naval Air Station Oceana.
[2] 119th Congress, H. Res. 572 introduced July 10, 2025.

expanded noise footprint will fall. The 2005 BRAC commitments were made to prevent exactly this kind of encroachment. Those commitments were not aspirational; they were the price of keeping NAS Oceana open. The Property was acquired by the City with funds from the Commonwealth's Military Strategic Response Fund, and the Commonwealth's recorded lien (ECF No. 19, Ex. F) exists precisely because the State co-funded the purchase to remove incompatible uses from the AICUZ. Now the City proposes to reintroduce, at thirty times the permitted density, the very incompatible residential use the acquisition was designed to eliminate.

The legal effect is that even if this Court were to credit the City's unsupported assertion that some portion of the Property lies outside the current ITA overlay, that assertion has a limited shelf-life. The Navy's Environmental Impact Statement process, already underway, will in all likelihood extend the AICUZ noise contours across the very land on which the City proposes to place the residential component of this project. Approving a conveyance for 659 residential units today, on the assumption that a sliver of land will remain outside the ITA overlay, is to authorize a development that will be nonconforming before the first foundation is poured. The Court should not permit the City to race a conveyance through the door before the Navy closes.

Finally, the federal interest in this Property is not limited to the perpetual easement. The Property sits within the operational envelope of the East Coast Master Jet Base, an installation the BRAC Commission valued sufficiently to condition its survival on the City's encroachment commitments. The United States paid $3,760,000 for the restrictive easement over two of the five parcels under 10 U.S.C. § 2684a, which authorizes the Secretary of Defense to enter into agreements with state and local governments to limit incompatible land use near military installations.

The purpose of that statute is to prevent precisely what the City now proposes. While Plaintiffs do not ask this Court to adjudicate the rights of the United States, the federal interest reinforces the public interest in maintaining the status quo: this land should not be conveyed for high-density residential

14

development while the Navy is actively studying whether to station louder, more capable aircraft at the adjacent installation.

### iii. The Commonwealth's recorded lien was concealed from Council.

The City's response to the Commonwealth's lien is that "[a] lien does not take away the City's authority to sell the land, however, it just directs where a portion of the funds will go." (ECF No. 21 at 17). That is technically true but entirely beside the point. Plaintiffs do not argue that the lien prevents the sale as a matter of legal authority. Plaintiffs argue that the lien which entitles the Commonwealth to fifty percent of the sale price was never disclosed to City Council or to the public. (Compl. ¶¶ 90–91).

The City's fiscal case to the Council touted $3.4 million in annual tax revenue but said nothing about the Commonwealth's recorded right to half the sale proceeds. This omission goes directly to the adequacy of the public process and the due process owed to the public.

### iv. The forty-year ground lease requires a three-fourths supermajority to terminate.

The City acknowledges that Article VII, Section 9 of the Virginia Constitution "explicitly authorizes selling land that was dedicated to public use, so long as the sale is approved by a three-fourths majority." (ECF No. 21 at 17). That is precisely Plaintiffs' point. The Golf Course Parcel is subject to a forty-year ground lease to the Authority running through October 7, 2037. (ECF No. 19, Ex. B).

The City cannot deliver the Property to a private developer, free of that leasehold, without terminating the very instrument by which it dedicated the land to public recreation. That termination requires three-fourths of all members elected to the Council, nine votes, and must follow the public hearing and notice requirements of Code §§ 15.2-1800(B) and 15.2-1813. The City concedes that its first public notice misdescribed the asset. (ECF No. 21 at 4–5). Legislative action taken on defective statutory notice is void ab initio. *Glazebrook v. Bd. of Supervisors*, 266 Va. 550 (2003); *City Council of Alexandria v. Potomac Greens Assocs. P'ship*, 245 Va. 371 (1993).

**E.       Irreparable harm is not speculative – it is imminent and irreversible.**

The City's irreparable-harm argument is that the conveyance is a year away and therefore no immediate harm can result.  (ECF No. 21 at 3–4).  But the City simultaneously asks this Court to allow the entire predevelopment process to proceed:  the Council vote on August 11, 2026 to declare the property "excess"; the termination or surrender of the ground lease; the rezoning and subdivision of the property; and the commencement of Dragas's due diligence, which includes site studies, borings, and environmental assessments that themselves involve land disturbance.

Each of these steps creates harm that cannot be undone.  A Council vote declaring public land "excess" changes the property's legal status.  A ground-lease surrender extinguishes a recorded instrument dedicating the property to public use until 2037.  A rezoning changes the zoning map.  None of these can be reversed by a later judgment if the Court ultimately finds the process unlawful. That is the very definition of irreparable harm.

The City's selective quotation of Plaintiffs' Complaint that the "point of no return is the conveyance" (Compl. ¶ 92) does not help the City.  That statement identifies the conveyance as the moment after which no remedy exists at all, not as the earliest moment at which harm begins.  The predevelopment steps the City proposes to take are themselves harmful and irreversible, and they are scheduled to begin on August 11, 2026.

Environmental harm is the classic irreparable injury.  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).  The disturbance or destruction of an active bald eagle nest cannot be undone by any judgment this Court could later enter. 16 U.S.C. §§ 668(a), 668c; 50 C.F.R. § 22.6.

The City's response that, "upon information and belief, the nests identified on the Property are not located in the vicinity of the golf holes that are proposed to be relocated or substantially modified"

16

(ECF No. 21 at 27 n.13), is an unsworn, hedged assertion that concedes the nests exist and offers no survey data or expert opinion. An eagle survey is the minimum due diligence required before any land-disturbing activity, and no Defendant has commissioned one.

Moreover, the Navy's pending Environmental Impact Statement for F-35 basing at NAS Oceana (see Section D.ii, supra) confirms that the regulatory landscape governing this Property is actively tightening, not loosening, making a conveyance at this time particularly irreversible.

**F.      The balance of equities and the public interest favor the injunction.**

The City's policy argument that granting the injunction would "reward Plaintiffs for their naked attempt to usurp the role of the legislature" (ECF No. 21 at 5) inverts the relationship between law and legislation. Plaintiffs do not ask this Court to substitute its judgment for that of the City Council. Plaintiffs ask this Court to enforce the laws that bind the City Council: the Clean Water Act, the Bald and Golden Eagle Protection Act, the Virginia Constitution, FOIA, and the Commonwealth's disposition statutes. If the City complied with those laws, this case would not exist.

The City's reliance on *Kelo v. City of New London*, 545 U.S. 469 (2005), is inapposite. *Kelo* involved the scope of the "public use" requirement under the Takings Clause i.e. whether eminent domain could be exercised for economic development. It did not involve FOIA violations, CWA non-compliance, recorded federal encumbrances, or defective public notice. The deference *Kelo* extended to legislative land-use judgments presupposed that the legislative process was lawful. Here, Plaintiffs challenge the legality of the process itself.

On the other side of the scale, the requested injunction imposes no hardship. The golf course is operating. The golf course is open to the public. The golf course produces approximately $740,000 in annual net income. The First Tee youth facility operates under a lease through 2030. The ground lease does not expire until October 7, 2037. Dragas has no interest in the land, no closing date of record, and no expenditure the injunction would strand. The injunction preserves the status quo which is exactly

17

what preliminary injunctions are designed to do.  *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012).

Where the government is the opposing party, the public-interest and balance-of-equities inquiries merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The public interest in requiring a municipality to comply with federal environmental law, to honor its own recorded obligations, and to follow the Commonwealth's disposition statutes before parting with 350 acres of public land is self-evident.

The public interest in preserving the BRAC commitments that kept NAS Oceana open, an installation providing $1.5 billion in annual economic impact to the region, vastly outweighs any interest in accelerating a residential development that conflicts with the City's own encroachment-prevention obligations.

**G.     The Anti-Collusion certification cannot be dismissed as the City suggests.**

The City asserts that the Anti-Collusion Form "only addresses federal and state antitrust laws and confirms that the party submitting the proposal did not collude with competitors and that no City official has a personal, financial stake in the project."  (ECF No. 21 at 19).  This characterization of the form's language should be tested against the actual document.

The form was submitted after seventeen months of private engagement in which Dragas met with City staff and Council members, received the City's due-diligence file, and executed a mutual NDA.  Whether that engagement constitutes "collusion" in the antitrust sense is beside the point:  the form represents that the submitter's proposal was independently prepared, and the undisputed record shows that Dragas's proposal was prepared in consultation with City staff over a seventeen-month period.

**IV.  CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court disqualify Willcox & Savage, P.C. from representing any Defendant in this action and order each Defendant to obtain independent counsel; grant the Motion for Preliminary Injunction and enter a preliminary injunction in

18

the form of the accompanying proposed order; set an expedited hearing on both the disqualification motion and the preliminary injunction; waive or set nominal security under Rule 65(c), and grant such further relief as is just.

Dated: August 11, 2026

Respectfully submitted,

_____/s/_____

Suzanne Seidel Richmond (VSB No. 75888)
Law Office of Suzanne Seidel Richmond
3808 North Landing Road
Virginia Beach, Virginia 23456
Telephone: 757-301-8822
Email: suzanne@ssrichmondlaw.com
*Counsel for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I certify that on August 11, 2026, I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

_____/s/_____
Suzanne Seidel Richmond
