**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
*Norfolk Division*

**SFF CONSERVATION INITIATIVE, INC.,**

**LISA M. CLARKSON, and**

**NAKIA KEITH,**
individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**CITY OF VIRGINIA BEACH;**

**VIRGINIA BEACH DEVELOPMENT AUTHORITY;**

**ROBERT M. DYER,**
individually and in his official capacity as Mayor;

**ROSEMARY A. WILSON,**
individually and in her official capacity as Vice Mayor;

**PATRICK A. DUHANEY,**
individually and in his official capacity as City Manager;

**MARK D. STILES,**
Individually and in his official capacity as City Attorney;

**V. LEIGH HENDERSON,**
individually and in her official capacity as City Treasurer;

**DRAGAS ASSOCIATES, INC.**
(incorrectly named in the original Complaint as The Dragas Companies, Inc.);

**Civil Action No. 2:26-cv-00738-RBS-DEM**

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**and JOHN DOES 1-50,**

Defendants.

**FIRST AMENDED CLASS ACTION COMPLAINT**

Putative Class Plaintiffs SFF Conservation Initiative, Inc. ("SFF"), Lisa M. Clarkson ("Clarkson"), Nakia Keith ("Keith"), individually and on behalf of all persons similarly situated, by counsel, allege as follows.

Allegations concerning Plaintiffs' own acts are made on personal knowledge, all other allegations are made on information and belief following a reasonable investigation that included the public records, recorded instruments, sworn filings, audit reports, bankruptcy records, municipal minutes, court records, and press accounts cited herein.

Unless otherwise expressly stated herein, all allegations in this Complaint are based upon Plaintiff's personal knowledge as to matters within Plaintiffs' own knowledge and, as to all other matters, upon information and belief formed after an inquiry reasonable under the circumstances. Allegations made upon information and belief include, without limitation, matters that are particularly or exclusively within the knowledge, possession, or control of Defendants or third parties. Plaintiff believes that the factual contentions set forth herein have evidentiary support or, where specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

This First Amended Complaint is filed pursuant to, and attached as Exhibit 1 to, Plaintiffs' Motion for Leave to File First Amended Complaint, filed contemporaneously herewith, following the Rule(b) motions filed by Defendant Dragas Associates, Inc. (ECF Nos. 36-37), the Virginia Beach Development

Authority (ECF Nos. 30-31), and the City Defendants (ECF Nos. 38-39). This First Amended Complaint is filed with leave of Court under Federal Rule of Civil Procedure 15(a)(2).

## I. NATURE OF ACTION

1. This seeks to halt and unwind the unlawful disposition of a 350-acre public asset, the Virginia Beach National Golf Club ("VBN" or the "Property"), and to end the systemic practices through which the City of Virginia Beach (the "City"), the Virginia Beach Development Authority (the "Authority" or "VBDA"), and a recurring circle of favored developers and insiders have converted the public's land-use, environmental-permitting, tax, and property-disposition powers into instruments of private gain. Every decision challenged in this Complaint was made under the guise of public or municipal authority, and every one of those decisions operated to transfer public assets, public subsidies, or public regulatory forbearance to identified private persons and to the enterprise described in Part XI.

2. The VBN transaction was predetermined. Beginning no later than April 2024, City officials, including the Mayor, the Vice Mayor, the City Manager's office, and the City Attorney's office, conducted more than seventeen months of concealed negotiations with Defendant Dragas Associates, Inc. ("Dragas"), executed a Mutual Non-Disclosure Agreement that withheld the dealings from the City's own boards and commissions, shared a not-yet-final internal audit with the developer, and only then issued Request for Proposals #ED-25-04 (the "RFP") on October 12, 2025.

3. On August 11, 2026, the City Council adopted an "alternate version" of an ordinance concerning the Property by a recorded vote of 9 to 2. The ordinance declared approximately 341.4 acres of the Property "excess," approved a Term Sheet for its conveyance to Dragas, and authorized the City Manager to enter into a Purchase and Development Agreement (the "Disposition Ordinance"). The vote

followed an initial public hearing, for which the City has admitted under oath that the notice was defective, and a re-advertised public hearing at which seventy members of the public spoke.

4. The version that was adopted was not the version that was advertised. The original notice misdescribed the acreage and omitted the recorded encumbrances. The recorded vote of nine affirmative votes, the bare constitutional minimum, was cast on terms that did not yet exist, because the City Council had sworn that no purchase and development agreement had even been drafted.

5. The transaction cannot lawfully close as proposed. The Property lies below the City's "Green Line" growth boundary in the Southern Rivers Watershed, on hydric soils served only by private wells and on-site septic systems, within the Interfacility Traffic Area ("ITA") protecting NAS Oceana and NALF Fentress. The Property is encumbered by recorded instruments, including a perpetual federal easement prohibiting residential use on two parcels, a recorded lien of the Commonwealth for fifty percent of any sale price of those parcels, and a forty-year ground lease dedicating the Property to public recreation through October 7, 2037. The proposed Term Sheet fails to address these.

6. The Property contains two active bald eagle nests confirmed on the public record, and no Defendant holds or has sought the federal authorization that must precede any disturbance of those nests.

7. The transaction is also the product of a regulatory regime that is itself unlawful. Beginning in 2018, the City adopted and implemented an unwritten, internal, citywide administrative policy, never presented to, noticed for, or voted upon by the City Council, that substituted the weaker 1992 Southern Watersheds Management Ordinance (Appendix G) for the Chesapeake Bay Preservation Act program mandated by state law across the southern two-thirds of its territory, under-designating the Chesapeake Bay Preservation Area and disabling the wetland verification and land-disturbance checkpoints that state and federal law require.

8. The Commonwealth of Virginia is a *Dillon Rule* jurisdiction. A *Dillon Rule* locality possesses only the powers that have been expressly granted, necessarily implied, or essential and

indispensable, and it may exercise its legislative powers only through the statutory process of notice, hearing, and recorded vote of its governing body. *Marble Techs., Inc. v. City of Hampton*, 279 Va. 409 (2010) (locality may not depart from the state criteria governing Chesapeake Bay Preservation Area designation); *Sinclair v. New Cingular Wireless PCS, LLC*, 283 Va. 567 (2012) (legislative land-use functions may not be exercised except as state law authorizes).

9. The 2018, unwritten, internal policy was therefore void from its inception because it violates the City's own existing ordinances. Since 2018, every land-use approval the City has issued, on every parcel below the Green Line, was issued in violation of state law because the City remains in documented, ongoing violation of its Municipal Separate Storm Sewer System ("MS4") permit under the Clean Water Act ("CWA").

10. The VBN transaction is not an isolated lapse. It is the latest operation of a continuing enterprise, described in Parts VI through XI below, whose consistent method since at least 2012 has been: private access first, public process later or never; the Authority as pass-through; conflicted officials voting without disclosure; and oversight disabled during the critical period. That pattern includes the 2013 Cavalier transaction (an $11.8 million advance wire of public funds to enable a private closing, and the largest Economic Development Investment Program ("EDIP") grant in City history); the 2016-2018 pier scheme (in which the Authority itself bid one dollar per year on the City's own oceanfront land to hold it for a favored private consortium); the Atlantic Park commitments (grown from a represented $95-96 million to more than $300 million of public exposure); EDIP grants disbursed contrary to policy to failed and conflicted ventures; the embezzlement convictions of the long-time Economic Development director and of a second employee of the same department, which staffs the Authority; the Authority's five-year blackout of its annual reports (FY2018 through FY2023); the unnoticed December 2022 $12.8M purchase of the Oceanfront Dairy Queen; the 2018-present tax-lien and land-records scheme

that stripped recorded drainage, open-space, and elderly and disabled exemptions from parcels, including the Holley family land.

11. Plaintiff Keith is an heir to the Holley family land. This land was forced into developers' hands, a scheme that continues today through the stripping of elderly exemptions from occupied homesteads, 'tax lien' auctions of previously exempt parcels set aside for a public purpose, the administrative "reclassification" of auctioned parcels as buildable in the City's permitting systems, and the issuance of permits on the fiction that every recorded parcel in the City carries a "right to build".

12. Plaintiffs bring claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968; 42 U.S.C. §§ 1983, 1985(2), and 1986; the Clean Water Act citizen suit provision, 33 U.S.C. § 1365; the Endangered Species Act citizen-suit provision, 16 U.S.C. § 1540(g); the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; Article I, § 11 of the Constitution of Virginia; and supplemental Virginia law, including Va. Code §§ 18.2-499 and 18.2-500, §§ 59.1-9.5 and 59.1-9.12, and §§ 18.2-152.3 and 18.2-152.12.

13. Plaintiffs seek damages, declaratory and injunctive relief, a court-supervised accounting of the Authority's real-property holdings and subsidy obligations, and structural relief addressed to an Authority that has long outlived and abused its statutory purpose, including an injunction against further dispositions, the appointment of a special master or receiver over its land inventory, referral of the record assembled here to the Attorney General of Virginia, the United States Attorney, and the Virginia State Police, and a declaration establishing the predicate for the Authority's dissolution under Va. Code § 15.2-4914, with leave to proceed in the nature of quo warranto under Va. Code § 8.01-635 *et seq*. as required. Plaintiffs do not abandon and expressly preserve their request for the dissolution of the VBDA.

## II. JURISDICTION AND VENUE

14. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343(a)(3) (civil rights), 18 U.S.C. § 1964(c) (RICO), 33 U.S.C. § 1365(a) (Clean Water Act), and 16

U.S.C. § 1540(c) and (g) (Endangered Species Act), with supplemental jurisdiction over the Virginia-law claims under 28 U.S.C. § 1367(a) and authority to grant declaratory relief under 28 U.S.C. §§ 2201-2202.

15. Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a). All Defendants reside or transact affairs in the Eastern District of Virginia; the Property and the affected watersheds lie within the Eastern District of Virginia; and a substantial part of the events occurred in the Eastern District of Virginia.

16. Clean Water Act notice. On March 12, 2026, Plaintiffs served a sixty-day Notice of Intent to Sue under 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R. Part 135 on the Administrator of the EPA, the EPA Region 3 Regional Administrator, the Director of the Virginia Department of Environmental Quality ("DEQ"), the Chair of the State Water Control Board, and the City; delivery was completed March 19, 2026 (Compl. Ex. A). More than sixty days elapsed before the original Complaint was filed on July 13, 2026. No federal or state court enforcement action against the City has been commenced and diligently prosecuted within the meaning of 33 U.S.C. § 1365(b)(1)(B); administrative activity by DEQ is not such an action and is not a bar.

17. Endangered Species Act notice. Defendants were served contemporaneously with the original Complaint, Plaintiffs served written notice under 16 U.S.C. § 1540(g)(2) on the Secretary of the Interior, the Director of the U.S. Fish and Wildlife Service, and each Defendant named in Count VIII.

18. The claims are ripe and Plaintiffs have standing. The City Council adopted the Disposition Ordinance on August 11, 2026; the Term Sheet obligates the parties to proceed to a Purchase and Development Agreement and to pursue rezoning, subdivision, and site-plan approvals on a defined schedule; the City Manager is presently authorized to execute the definitive instruments; and the 2018 regulatory regime, the MS4 permit violations, and the flooding invasions of Plaintiffs' properties are present, continuing conditions.

19. Plaintiffs own property in close proximity to, and hydrologically downstream of, the parcels at issue and have suffered and will suffer particularized harm distinct from the public generally. *See Bd. of Cnty. Supervisors of Prince William Cnty. v. Oak Valley Homeowners Ass'n*, 2026 WL 873963 (Va. Ct. App. Mar. 31, 2026) (proximity and particularized risk of harm establish standing to challenge land-use approvals; rezonings adopted on defective statutory notice are void ab initio); *Friends of the Rappahannock v. Caroline Cnty. Bd. of Supervisors*, 286 Va. 38 (2013).

20. Plaintiffs Clarkson and Keith are also resident taxpayers of the City whose tax payments fund the expenditures challenged herein and whose common property the challenged dispositions dissipate; as municipal taxpayers they have standing to challenge the unlawful expenditure and disposition of municipal funds and assets. *Frothingham v. Mellon*, 262 U.S. 447, 486-87 (1923); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349 (2006).

## III. THE PARTIES

### A. Plaintiffs

21. Plaintiff SFF Conservation Initiative, Inc. is a Virginia nonstock corporation, active and in good standing with the Virginia State Corporation Commission, with its principal office at 3808 North Landing Road, Virginia Beach, Virginia. SFF's mission is the protection of the agricultural lands, wetlands, groundwater, and watersheds of the Commonwealth. From its North Landing Road property which includes SFF's offices, residences, and a working research farm within the Southern Rivers Watershed, SFF conducts environmental monitoring, research, public education, and advocacy, including enforcement-oriented engagement with federal, state, and local environmental and open-government law.

22. SFF's corporate existence was reinstated with the State Corporation Commission effective February 2, 2026. Its application for reinstatement of federal tax-exempt recognition is pending with the Internal Revenue Service, with retroactive reinstatement anticipated under Rev. Proc. 2014-11.

SFF's federal tax classification has no bearing on its corporate capacity under Rule 17(b), Va. Code § 13.1-827, or its Article III standing.

23. SFF sues on its own behalf for the diversion of its organizational resources to investigating and counteracting the concealed conduct alleged herein, and for injury to the waters, lands, and groundwater on and around its own property, and on behalf of its members under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977): (a) its members, including Plaintiffs Clarkson and Keith, would have standing to sue in their own right; (b) the interests at stake are germane to SFF's conservation purpose; and (c) neither the claims asserted nor the injunctive and declaratory relief requested requires the participation of individual members.

24. Plaintiff Lisa M. Clarkson is a resident, taxpayer, and property owner of the City and the Executive Director of SFF. The de-recognition and threatened development of the adjacent drainage parcels has already forced Clarkson to expend over $10,000 to retain counsel and bring suit in the Circuit Court of the City of Virginia Beach to prevent the adjacent builder from developing the drainage parcel on which her property depends, a concrete, out-of-pocket injury to her property and business directly traceable to the conduct alleged herein.

25. Clarkson owns real property within the Southern Rivers Watershed and the Chesapeake Bay Preservation Area, hydrologically downstream of both the West Neck drainage parcels described in Part VI and the VBN parcels described in Part IX. An adjacent parcel set aside for drainage from her subdivision, continuously tax-exempt since 1964, was stripped of its exemption in 2018, billed at a fabricated "buildable" value, and forced into the hands of a developer-purchaser, through the scheme described in Part VI.

Clarkson has suffered recurrent flooding, including inundation events during storm and rain events, diminution in property value, and threats to the private well that supplies her drinking water. Her injuries accrue anew with each inundation and are continuing. Clarkson sues individually and as a

representative of the Property Damage Class, the Injunctive Class, and the Taxpayer Class defined in Part IV.

26. Plaintiff Nakia Keith is a resident and taxpayer of the Commonwealth of Virginia, an heir of the Holley family, who had held the land for decades, was an owner of the three adjoining West Neck parcels off Indian River Road (GPINs 1493-33-98-0000, 1493-44-0002-0000, and 1493-33-77-21-0000) at the time the scheme described in Part VI was executed against them. The parcels had been continuously tax-exempt as drainage and open-space land since 1964.

27. In 2018, without ordinance, notice, hearing, or any change-in-use determination, and at the written request of Brown, a builder, who had asked the City Attorney's Office to institute a tax suit against the land, City personnel removed the parcels' exemption codes from the City's Revenue Assessment and Collection System ("RACS"), entered a fabricated "buildable" assessment, generated and mailed tax bills and delinquency notices premised on that fabricated value, and routed the manufactured delinquency into a judicial tax-sale proceeding in the Circuit Court of the City of Virginia Beach.

28. In March 2019, the Treasurer's Office refused the Holley heirs' request to redeem the land through an installment agreement, refused to suspend the sale, and forced the parcels to public auction. At the public auction members of the Holley family appeared and placed bids to buy their own land back but were nonetheless passed over in favor of Brown. Brown was the same builder who had solicited the tax suit.

29. Keith, individually and as an heir, successor, and beneficiary of the family's interests, lost her interest in the family land, the inheritance it represented, and the drainage protection it afforded the surrounding community. To this day, Keith has not received any portion of the surplus proceeds of that sale to which the family's heirs were and remain entitled under Va. Code § 58.1-3967.

30. Keith is also the attorney-in-fact, under a duly executed and acknowledged power of attorney, for her grandmother, Vernice Holley, now deceased, who resided on a separate Holley family parcel in the City at 3276 Indian River Road and whose real estate tax exemption for the elderly the City removed and then, as described in Part VI, refused to reinstate except upon conditions that the governing statutes and ordinance do not permit.

31. Keith did not know, and could not reasonably have known, that the delinquency divesting her family of their land had been manufactured through concealed record alterations, or that the builder who acquired the land had solicited the City to institute the tax suit, until the RACS audit-log and correspondence records described in Part VI came to light. *Exhibit A.*

32. Keith's injuries are concrete, particularized, and continuing; the surplus funds, the divested title, and the records necessary to trace both remain in Defendants' exclusive control and her claims are timely under the discovery, fraudulent-concealment, and continuing-violation principles pleadeed in Part XIII. Keith is a member of SFF and sues individually, and as a representative of the Classes and the Exemption-Stripping and Surplus Proceeds Subclasses defined in Part IV.

33. Plaintiffs Clarkson and Keith sue individually and as representatives of the Classes defined in Part IV. SFF sues individually and by association. Putative Class Plaintiffs assert the public-law claims herein, including the declaratory counts, the claims addressed to the Authority, and the claims of the Taxpayer Class, in their capacities as residents, taxpayers, and property owners on behalf of the public of the City as a whole, consistent with the citizen and taxpayer standing recognized in *Goldman v. Landsidle*, 262 Va. 364, 373 (2001), and the municipal-taxpayer standing recognized in *Frothingham v. Mellon*, 262 U.S. 447, 486-87 (1923).

**B. Defendants**

34. Defendant, City of Virginia Beach, is a Virginia municipal corporation and a "person" subject to suit under 42 U.S.C. § 1983 and the Clean Water Act, 33 U.S.C. § 1362(5). The City holds

Virginia Pollution Discharge Elimination System ("VPDES") MS4 Phase I Permit No. VA0088676. The City is not named as a defendant under 18 U.S.C. § 1962; it is pleaded as an instrumentality through which the enterprise described in Part XI operated, and as a victim of certain predicate acts.

35. Defendant Virginia Beach Development Authority is a political subdivision created by Chapter 643 of the 1964 Acts of Assembly, operating under the Industrial Development and Revenue Bond Act, Va. Code § 15.2-4900 *et seq*., and governed by an eleven-member board appointed by the City Council. The Authority is the lessee of the VBN golf-course grounds under a Ground Lease with the City dated October 8, 1997; recorded in Deed Book 3799 at page 626 (ECF No. 19-2).

36. The Authority holds record title to the flanking VBN parcels conveyed to it, by the City, for ten dollars by a deed that is dated February 19, 2018. The Authority administers the cigarette-tax-funded EDIP and tourism development financing. The Authority holds, conveys, leases, and finances real property including Innovation Park and Corporate Landing. The Authority's approval and an approximately $1.82 million contribution, from the Authority, are conditions of the Dragas Term Sheet.

37. On August 11, 2026, the same day the Disposition Ordinance was adopted, the Council authorized the Authority to issue up to $7 million in revenue bonds for a private apartment project. *Exhibit B*. The Authority has failed to publish an annual report for fiscal years 2018 through 2023. The Authority is named on the 42 U.S.C. § 1983, declaratory, and supplemental claims and on the structural-relief count; a RICO defendant.

38. Defendant Robert M. Dyer is the Mayor of Virginia Beach. He participated personally in the concealed Dragas negotiations, including a September 23-24, 2024 text-message exchange. In the text exchange, Dyer responded to Dragas's principal's request to discuss "a large, exciting project." Dyer replied that "by law" no more than two members could meet at a time and arranged a private meeting, at his office, structured to remain below the three-member threshold of Virginia's open-meeting law.

39. As a councilmember in 2018, Dyer co-sponsored the motion for an independent review of the Authority-assisted pier bids, a motion the Council voted down, and thus acted with full knowledge of the process defects he later presided over. Dyer is sued individually for damages and officially for injunctive relief.

40. Defendant Rosemary A. Wilson is the Vice Mayor and Council liaison to the Authority. Wilson participated personally in the concealed negotiations and, in November 2025, publicly attributed the City's interest in selling the Property to a developer. Wilson further stated that the developer approached the City "in September." Wilson's statement was falsified by the documentary record, by more than a year. Wilson is sued individually and officially.

41. Defendant Patrick A. Duhaney is the City Manager. Duhaney directed City staff throughout the Dragas negotiations. Additionally, Duhaney personally attended a September 6, 2024 meeting with a second developer group pursuing the Property. Duhaney rehired the Zoning Administrator who performed the reclassifications that have been described in Part VI, immediately after the limitations period for prosecuting malfeasance reported in 2021 had elapsed (Va. Code § 2.2-3125). Duhaney received real property by deed from a builder engaged in development on unlawfully reclassified land (Compl. Ex. B). Duhaney is sued individually and officially.

42. Defendant Mark D. Stiles is the City Attorney and has held that office continuously since 2009, spanning every reclassification, tax sale, grant, and disposition described in Parts VI through IX. The City Attorney's Office received, Brown's April 5, 2018 request, that a tax suit be instituted against the Holley parcels, and, on information and belief, the City Attorney's Office acted upon it.

43. An Assistant City Attorney, working in the City Attorney's Office, conferred with the Treasurer's collections counsel before refusing the Holley heirs an installment redemption in March

2019.[1] The City Attorney's Office negotiated and approved the August 7, 2024 Non-Disclosure Agreement; made, through a Deputy City Attorney, the admission that recorded drainage easements serving adjacent properties existed only as a "placeholder in the event the property is conveyed to a private party";

44. The City Attorney produced records to a sitting Council member on October 25, 2024, while advising him to "refrain from publicizing" them. The City Attorney's Office approved the legal sufficiency of each transaction described in Parts VI through IX, including the May 12, 2026 assignment of the Cavalier tourism-financing subsidy; and declined to correct or refer the reclassification and tax-lien conduct after receiving written notice from Clarkson in 2021.

45. The City Attorney's Office simultaneously advises the City, the City Council, the City Treasurer, and the Authority, parties whose interests diverge in every disposition at issue. The City Attorney's staff includes Senior City Attorney Alexander W. Stiles, who serves as the Authority's staff legal advisor and who, on information and belief, is Defendant Stiles's brother.

46. Alexander W. Stiles first appears in the City's records in 2012, approximately three years after his brother became City Attorney, in connection with the instruments effecting the Cavalier transfer, and has since drafted or approved origination instruments, including instruments in the 2012-2013 Cavalier transaction and in the Authority's land dispositions, whose legal sufficiency Defendant Stiles's Office now certifies and defends. This is a clear conflict of interest, in that one brother drafts the instruments and the other brother certifies their sufficiency. Defendant Stiles is sued individually and officially.

47. Defendant V. Leigh Henderson is the City Treasurer. On information and belief, she directed or permitted the removal of tax-exempt status from protected parcels, including the Holley

[1] The names of these individuals are not known to the plaintiffs. These names were redacted by the City, in the City's response to a FOIA request.

family parcels, the assessment and mailing through the United States mails of tax bills and delinquency notices premised on fabricated values, the selection of a captive auctioneer for the resulting judicial sales, the March 2019 refusal to permit the Holley heirs to redeem by installment agreement or to suspend the sale as Va. Code § 58.1-3965(C) contemplates, the forcing of the Holley parcels to an auction at which the family's own bids were passed over in favor of the builder who had solicited the tax suit, and the removal of the elderly exemption from the occupied homestead of Keith's grandmother and the imposition of extra-statutory conditions on its reinstatement.

48. The sale included court-appointed special commissioners and an auction company.[2] These individuals and businesses were handpicked by the City Treasurer, and they earned a five percent buyer's-premium commission from the resulting sales. These businesses failed to disclose their campaign-donor relationships with Henderson in any Circuit Court filing. Henderson is sued individually for damages and officially, solely for prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908).

49. Defendant, Dragas Associates, Inc., is a Virginia corporation and residential developer (incorrectly named in the original Complaint as The Dragas Companies, Inc.; this amendment conforms the caption to the correct entity with Dragas's consent). Together with its operating affiliates, Dragas conducted more than seventeen months of concealed negotiations for the Property before any competitor had an equal opportunity.

50. Dragas personally solicited at least three sitting Council members, including the Mayor and Vice Mayor, by text message; received nonpublic information including a not-yet-final internal audit and the City's complete due-diligence file *more than a year* before any public solicitation was issued. Dragas executed an Anti-collusion Form falsely certifying that no arrangement in restraint of free

---

[2] The court appointed special commissioners, earned a five percent buyer's-premium commission. Virginia Auction Company, 6/11/2021, $5,000; Jason Alan Dunn, 5/30/2019 and 8/31/2021, $1,100; James J. Reid, 7/22/2021 and 8/31/2021, $1,250.

competitive bidding existed and that no person acting for or employed by the City had an interest in or was concerned with its proposal. Dragas is named on the RICO, business-conspiracy, antitrust, and declaratory counts and is a necessary party to the injunctive relief.

51. John Does 1-50 are additional participants whose true names are not yet confirmed, described with particularity in Parts VI through XI below, including: Treasurer's Office personnel who directed the removal of tax-exempt status and the assessment and mailing of fabricated liens, including the Deputy Treasurer for Real Estate whose pre-June 6, 2018 request to delay a public-portal data extract evidences an advance knowledge of the batch delinquency run; the information-technology personnel of the RACS Solutions Team who executed the database alterations; the Planning Director and Zoning Administrator who effected reclassifications, "reclassified" auctioned parcels as buildable in the City's GIS and permitting systems, and issued permits without environmental review on the "right to build" rationale described in Part VI; the Commissioner of the Revenue personnel who removed, or conditioned the reinstatement of, elderly and disability exemptions; the regional financial institution that served as the enterprise's financial hub; the developer-purchaser "Brown" who solicited the City Attorney's Office to institute the tax suit against the Holley parcels and then acquired them at the resulting auction; the builder or builders who filled the drainage parcels upstream of the properties of Clarkson, and the builder who, on information and belief, sought to acquire the homestead of Keith's grandmother; the court officers, auctioneer, and special commissioners who conducted the judicial sales without disclosing conflicts; additional Council members, Authority members, City employees, developers, title and auction participants, and professional advisers. Plaintiffs will substitute true names by amendment as discovery confirms them.

## IV. CLASS ACTION ALLEGATIONS

52. Plaintiffs Clarkson and Keith, bring this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and, in the alternative, 23(c)(4), on behalf of the following Classes and Subclasses:

a. Property Damage Class (Rule 23(b)(3)): All persons and entities that own real property in the City of Virginia Beach located within the drainage catchments identified in North Landing River HUC that are adjacent to, downstream of, or within the drainage area of land whose recorded drainage or open-space function the City de-recognized, removed from its official records, re-designated, or conveyed or permitted for private development since January 1, 2016, and that have suffered recurrent flooding, loss of natural drainage capacity, diminution in property value, or contamination of or threat to well water. Excluded are Defendants, their officers, employees, agents, and immediate family members, and any judicial officer assigned to this case.

b. Injunctive Class (Rule 23(b)(2)): All persons who own or reside on real property within the Southern Rivers Watershed of the City of Virginia Beach that is served by a private drinking-water well or on-site septic system. Excluded are Defendants, their officers, employees, agents, and immediate family members, and any judicial officer assigned to this case.

c. Exemption-Stripping Subclass (Rule 23(b)(3)): All persons and entities that, from January 1, 2018 through the date of class certification, (i) held record title to, or were the heirs, successors, or beneficiaries of record owners of, real property in the City whose tax-exemption, drainage, open-space, elderly, or disability classification codes were removed from the City's assessment systems without an individualized change-in-use or qualification determination and without notice or hearing, and (ii) thereafter received tax

bills, delinquency notices, penalties, or interest premised on the removed classification, or lost title or redemption rights through a judicial tax sale premised on it. The Subclass includes living owners whose elderly or disability exemptions were removed or whose reinstatement was conditioned on requirements the governing statutes and ordinance do not impose, including Keith's grandmother, and the heirs, executors, attorneys-in-fact, and successors-in-interest of deceased owners, including Plaintiff Keith. Excluded are Defendants, their officers, employees, agents, and immediate family members, and any judicial officer assigned to this case.

d. Surplus Proceeds Subclass (Rule 23(b)(3)): All persons who were former owners, heirs, or successors in interest entitled to surplus proceeds from judicial sales of Virginia Beach parcels for delinquent taxes during the Class Period and whose surplus proceeds were not paid over, accounted for, or lawfully escrowed as Va. Code § 58.1-3967 requires. Excluded are Defendants, their officers, employees, agents, and immediate family members, and any judicial officer assigned to this case.

53. Taxpayer Class (Rule 23(b)(2), and in the alternative Rule 23(b)(3)): All natural persons who, at any time from January 1, 2013 through the date of class certification, resided in the City of Virginia Beach and paid real estate, personal property, or other taxes to the City, and who thereby bore, in proportion to their tax payments, the cost of the unlawful expenditures, below-market and nominal-consideration dispositions, forgone revenues, and misappropriations of public funds and assets alleged in Parts VI through IX and Count XXIII.

54. These transactions included the advance wire of public funds to enable the Cavalier closing; the EDIP and tourism-financing disbursements made contrary to policy and without disclosure of insider interests; the nominal-consideration leases and conveyances of public land; the Atlantic Park commitments; the discounted and below-market Authority land sales; the proposed below-market

disposition of VBN and the public funds committed to it; the public cost of the flooding and drainage projects made necessary by the de-recognition and filling of drainage parcels; and the forgone revenues and surplus-proceeds liabilities generated by the tax-lien scheme. Excluded are Defendants, their officers, employees, agents, and immediate family members, and any judicial officer assigned to this case.

55. Numerosity. Each Class includes at minimum several hundred owners, residents, heirs, and successors; joinder is impracticable. Between approximately January 2018 and June 5, 2018 alone, the exemption codes for hundreds of Virginia Beach parcels were removed from RACS, and on June 6, 2018 the City's RACS Solutions Team ran a batch "Apply Penalty & Interest" process against a larger volume of newly delinquent accounts than any prior comparable cycle. The affected parcels, catchments, and persons are identifiable from the City's own GIS, RACS, tax, and stormwater records. The Taxpayer Class comprises hundreds of thousands of resident taxpayers identifiable from the City's tax rolls.

56. Commonality and predominance. Common questions include: whether surplus proceeds of the judicial tax sales were accounted for, escrowed, and paid to the persons entitled to them as Va. Code § 58.1-3967 requires, or instead were retained or permitted to escheat to the Commonwealth; whether the City lawfully removed drainage, open-space, elderly, and disability classifications from its records without notice or hearing; whether the 2018 internal citywide policy substituting Appendix G for the mandatory Bay Act program was adopted without any council ordinance, notice, or vote and is void under the *Dillon Rule*; whether the City's practice of affording favored developers off process access to public land and approvals is an official policy or custom under *Monell*; whether the City's acceptance of site plans depicting jurisdictional wetlands and drainage as buildable land is policy or custom; whether the failure to subtract wetlands, water bodies, and drainage from minimum-lot-area calculations effects a taking; whether the City's MS4 permit violations are ongoing; whether the exemption-stripping and batch-delinquency operation was a common course of conduct; whether the City maintains a policy or

custom of administratively "reclassifying" auctioned drainage and open-space parcels as buildable and issuing permits on them on the theory that every recorded parcel carries a "right to build," irrespective of the lot-area, density, drainage, and environmental requirements of its ordinances; whether the City's refusal to acquire tax-delinquent drainage parcels under Va. Code §§ 58.1-3970 and 58.1-3970.1, and its auction of them to builders instead, is a policy or custom; whether Defendants expended, committed, or disposed of public funds and assets for private benefit in violation of Va. Const. art. VII, § 9, Va. Code §§ 15.2-1800 and 15.2-2100, and the EDIP and procurement policies, and the measure of restitution owed to the public treasury; and the measure of class-wide relief.

These questions predominate over individual issues, and individualized damages can be administered through established flood-damage, valuation, and tax-refund methodologies.

57. Typicality. The representative Plaintiffs' claims arise from the same course of conduct, the de-recognition of drainage infrastructure and protected classifications, the unlawful 2018 "right to build" policy, the manufactured delinquencies, and engineered auctions, the administrative "reclassification" and permitting of the auctioned parcels, the self-dealing dispositions of public assets, and the resulting flooding, divestitures, water-supply threats, and dissipation of the public treasury, that injures the Classes and the Subclasses.

58. Plaintiffs Clarkson and Keith each own well-dependent property downstream of de-recognized drainage that has been filled or permitted for development, and each pays the taxes that fund the expenditures challenged herein. Keith is an heir divested through the tax-sale pipeline and the attorney-in-fact of a living owner whose elderly exemption was stripped.[3]

59. Adequacy and class counsel. The representative Plaintiffs have no interests antagonistic to the Classes and will retain counsel experienced in the subject matter. Plaintiffs will associate and

[3] Plaintiff Nakia Keith held Power of Attorney to her late grandmother, Vernice Holley; and currently holds Power of Attorney for her cousin, William Perkins.

propose for appointment under Rule 23(g) additional class counsel experienced in class litigation and will ask the Court to structure the appointment so that any lawyer with a membership or officer relationship to Plaintiff SFF serves in a non-class-counsel capacity for the organizational and individual claims.

60. Rule 23(b)(2). Defendants have acted and refused to act on grounds generally applicable to the Injunctive Class and the Taxpayer Class, making final injunctive and declaratory relief appropriate for each Class as a whole.

61. Rule 23(c)(4) alternative. In the alternative, Plaintiffs seek issue certification of: (a) the unlawful 2018 "right to build" policy; (b) the existence of the *Monell* custom; (c) the ongoing character of the MS4 violations; (d) the common character of the exemption-stripping operation; (e) the validity of the VBN disposition process; (f) the existence and lawfulness of the "right to build" reclassification-and-permitting practice; and (g) whether the expenditures and dispositions of public funds and assets identified in Count XXIII were unlawful.

## V. THE PROTECTED SETTING AND THE REGULATORY FRAMEWORK BYPASSED

62. Approximately 67 percent of the City lies south of the "Green Line" growth boundary within the Southern Rivers Watershed, draining to Back Bay, the North Landing River, and ultimately Currituck and Albemarle Sounds. The area is characterized by hydric soils, a seasonal high-water table, extensive nontidal wetlands, and reliance on private wells and on-site septic, and lies within the Interfacility Traffic Area ("ITA") protecting Naval Air Station Oceana and Naval Auxiliary Landing Field ("NALF") Fentress.

63. The City's ordinances cap residential density below the Green Line at one dwelling unit per fifteen acres, and the 2005 ITA Overlay reduced density to that level in response to the federal Base Realignment and Closure conditions that preserved NAS Oceana. Virginia Beach, VA, Mun. Code Sec. 402(b) and Sec. 1803. The land below the Green Line was placed beyond intensive development because

its soils and hydrology cannot safely support it without endangering the residents, who build there, and everyone downstream. The 2017 ITA and Vicinity Master Plan provides that the extension of sewer and water utilities is "not intended south of Indian River Road."

64. The City holds VPDES MS Phase I Permit No. VA0088676, effective January 26, 2024. Virginia Beach is a Tidewater Virginia locality subject to the mandatory Chesapeake Bay Preservation Area ("CBPA") designation requirement of Va. Code § 62.1-44.15:74(A), applying criteria that define Resource Protection Areas by physical features, not by whether those features drain to the Chesapeake Bay. 9VAC25-830-80. A locality has no authority to adopt designation criteria other than those the state regulations prescribe. *Marble Techs., Inc. v. City of Hampton*, 279 Va. 409 (2010). Four separate regulatory authorities hold jurisdiction over wetlands: the local Wetlands Board (VMRC oversight), the U.S. Army Corps of Engineers (CWA § 404), DEQ (§ 401 and the Virginia Water Protection program), and the locality's Bay Act program.

65. Beginning in 2018, the City adopted and implemented an internal, citywide administrative policy under which it administered two different policies: the full Bay Act ordinance (Appendix F) in its northern watersheds, and the weaker 1992 Southern Watersheds Management Ordinance (Appendix G), which omits the mandatory 2,500-square-foot land-disturbance threshold, the water-quality criteria, and the wetland-verification checkpoint, across the southern two-thirds of the City. No ordinance of the City Council adopted, authorized, or ratified this substitution.[4] This new classification was never advertised, never the subject of the statutory notice that Virginia law requires for legislative action, and never put to a recorded vote of the governing body. And in fact, the City falsely certifies in annual MS4 reports they comply with the 2,500 sq. ft. requirement. This certification

[4] In 2018, the City of Virginia Beach only required land disturbing permits for parcels located in the Southern Rivers Watershed for land disturbance of 10,000 square feet, leaving 7,500 square feet unregulated in violation of the terms of their MS4 permit

is a knowingly false statement wherein the City proceeds in noncompliance as evidenced in the City's own pleadings.

66. As a *Dillon Rule* locality, the City possessed no power to substitute a lesser program of its own design for a mandatory statutory obligation, and its officers possessed no power to legislate by internal directive. The 2018 policy also violates the City's own existing ordinances which the policy instructs staff not to enforce south of the Green Line. The under-designation removes the final regulatory safeguard against unlawful wetland destruction across two-thirds of the City, and it remains in effect today. It is a present, continuing condition, not a historical event, and it infects every permit and approval the City has issued below the Green Line since 2018, on every single parcel.

67. Because 2018 "right to build" policy is citywide, uniform, and attributable to the City's final policymakers, it is an official policy or custom for purposes of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and because it was never lawfully adopted, every approval issued in reliance on it is voidable, and the permits the Dragas project requires cannot lawfully issue under it.

## VI. THE TAX-LIEN AND LAND-RECORDS, 2017-PRESENT

68. Beginning no later than 2017 and continuing to the present, City personnel in the Treasurer's Office, the Planning Department, and information technology, acting in concert with developer participants, executed a scheme to convert recorded drainage, open-space, and common-area parcels, and parcels protected by elderly and disability exemptions under Va. Code § 58.1-3210 *et seq.*, into developable inventory: (a) parcels continuously tax-exempt for decades, including the drainage parcel adjacent to Clarkson's property and the Holley family parcels, exempt since 1964, were administratively stripped of exemption without notice, hearing, or lawful re-classification; (b) fabricated "buildable" assessments were entered into the City's databases; (c) tax bills and delinquency notices premised on those fabricated values were generated and mailed through the United States mails; (d) the resulting manufactured delinquencies were channeled into judicial tax-sale proceedings in Virginia

Beach Circuit Court conducted through a captive auctioneer selected by Defendant Henderson and special commissioners compensated by a five percent buyer's-premium commission who did not disclose their campaign-donor relationships with her; (e) the parcels were acquired by developer-purchasers with the drainage function de-recognized in City records; and (f) the acquired parcels were then administratively "reclassified" as buildable in the City's land-records and permitting systems and issued permits on the theory that their new owners held a "right to build," without regard to the ordinances that had made them unbuildable for decades.

69. The exemptions and classifications that the scheme stripped were not discretionary indulgences of the Treasurer or the Assessor; they rested on the Constitution of Virginia and the general law. Article X, § 6(a)(7) of the Constitution exempts "[l]and subject to a perpetual easement permitting inundation by water as may be exempted in whole or in part by general law," and the General Assembly has declared wetlands and riparian buffers subject to such easements a separate classification of property that localities may exempt, Va. Code § 58.1-3666; Article X, § 2 and Va. Code §§ 58.1-3229 through 58.1-3244 provide for the use-value assessment of open-space land; Va. Code § 58.1-3284.3 requires that wetlands be taken into account in every assessment; Article X, § 6(b) and Va. Code §§ 58.1-3210 through 58.1-3217, implemented in City Code ch. 35, art. II, div. 3, exempt the sole dwellings of qualifying persons sixty-five years of age and older and of the permanently and totally disabled; and Article X, § 6(f) provides that property exempt from taxation on the effective date of the present Constitution "shall continue to be exempt until otherwise provided by the General Assembly."

70. The Holley parcels and the drainage parcel adjacent to Clarkson's property had been carried as exempt drainage and open-space land since 1964, seven years before the present Constitution took effect. By the City's own account in this case, the City carried vacant land that "does not appear to be buildable or otherwise usable" in a "Residential Stabilized Land" classification at a nominal value,

"e.g. $1000," and then removed that classification when the Assessor "determine[d] that it could be developed" (ECF No. 21 at 24 (citing Cunningham Decl., ECF No. 21-5)).

That is precisely the point: for the parcels at issue, the "determination" that fifty-year-old drainage land "could be developed" was made by no one with authority to make it, on no change in the land, by an unrecorded entry in a database.

71. No officer of the City may revoke a constitutionally grounded exemption or a statutory classification by keystroke. Any change in the assessed value of real estate requires written notice to the owner, Va. Code § 58.1-3330. A revocation of exempt status protected by Article X, § 6(f) requires an act of the General Assembly; and the omitted-assessment statute confines any back assessment to the three preceding tax years and bars penalty and interest for any period before the assessment where the omission was not the taxpayer's fault, Va. Code § 58.1-3903. None those protections were honored for any parcel in the 2018 "batch" of vacant land parcels.

72. The mechanism is documented in the City's own systems. RACS contains, for each parcel, an exemption-code field; when the code is set, no tax bill issues, and when it is removed, the parcel is placed on the taxable roll at its full assessed "buildable" value. All changes to the field are logged in a RACS audit table recording the parcel number, the editor's user ID, a timestamp, and the before-and-after values, currently in the custody of the City's Information Technology Department.

Between approximately January 2018 and June 5, 2018, the exemption codes for hundreds of Virginia Beach parcels were removed from RACS without individualized review, notice, or hearing. On the morning of June 6, 2018, the RACS Solutions Team ran a batch "Apply Penalty & Interest" process that added penalty and interest to a substantially larger volume of newly delinquent accounts than any prior comparable cycle.

The Deputy Treasurer for Real Estate (John Doe 1) had advance knowledge of the unusual volume, evidenced by a pre-June 6 request to delay a related public-portal data extract, a request that is

only rational if an anomalously large delta load was anticipated. On information and belief, the bills generated after the exemption codes were removed assessed as many as ten years of back taxes at the fabricated "buildable" value, with penalty and interest, in violation of the three-year limit and the penalty-and-interest bar of Va. Code § 58.1-3903, and the back-assessed amounts were then treated as already delinquent for purposes of the two-year sale trigger of Va. Code § 58.1-3965(A), so that parcels whose codes were removed in the spring of 2018 were in judicial-sale proceedings before the end of that year.

73. The Holley parcels: the template transaction. The complete operation of the scheme is documented in the three adjoining West Neck parcels off Indian River Road identified in paragraph 18 above, which lie in the Southern Rivers Watershed outside the City's MS4 service area and functioned as part of the area's natural drainage system. Brown did not approach the Holley family to try and purchase their land. Instead, Brown approached the City directly and provided his personal attorney to institute the tax suit.

74. On April 5, 2018, two months before the June 6 batch run, Brown wrote to the City Attorney's Office, headed by Defendant Stiles, requesting that a "tax suit be instituted" against the Holley parcels, that is, that the City assert and enforce tax liens against land that had been exempt for more than fifty years, and identifying himself as a prospective purchaser at the resulting tax sale (Compl. Ex. T, ECF No. 4-2).

75. A private builder's request that the City manufacture and enforce a tax delinquency against a stranger's tax exempt land necessarily presupposed knowledge that the exemption would be removed; on information and belief, the exemption codes were removed in connection with and in response to that solicitation, and the RACS audit table will establish the precise date, the user who performed the removal, and the before-and-after codes. The resulting bills and delinquency notices were

mailed to the 93-year-old record owner, and the manufactured delinquency was channeled into a judicial tax-sale suit in the Circuit Court of the City of Virginia Beach.

76. In March 2019, a qualifying Holley heir gave the Treasurer's Office written notice of the family's succession interest and sought, through counsel, to redeem the land through a payment arrangement. The Treasurer's collections counsel then conferred with an Assistant City Attorney, in Defendant Stiles's Office, after which the Treasurer stated she was "not inclined to agree to an installment plan at this juncture," and that the only "redemption" available was payment in full of "in excess of $37,000.00" in manufactured taxes, penalties, interest, and fees that the family could not lawfully have owed (Compl. Exs. S-U, ECF Nos. 4-1 to 4-3; see ECF No. 39 at 39 (quoting the same correspondence)).

77. Va. Code § 58.1-3965(C) authorizes the Treasurer to suspend a sale upon entering into an installment agreement and, upon written notice from an individual asserting ownership by testate or intestate succession, directs the Treasurer to "promptly advise the court of such claim and seek leave to add the individual asserting the claim as a party," so that the heir may enter into an installment agreement of up to several years. In the Holley case, the Treasurer did neither.

Pursuant to Va. Code § 58.1-3965(A), prior to any tax suit, the City Treasurer must advise the owner of their right to request an installment agreement. In the Holley case, the Treasurer failed to follow the Virginia Code and did not provide any such notice to the Holley family. Instead, the City Treasurer forced the parcels to go to public auction.

78. Members of the Holley family attended the auction and bid to buy their own land back. The parcels were nonetheless auctioned off to Brown, the builder who eleven months earlier had asked the City to institute the tax suit. The Holley family's bids to reclaim their land were not honored as the highest bids, and the outcome seemed predetermined before the auction began. Brown thereafter acquired title and, in 2022, filed a subdivision application creating seven residential lots on Lauren Lane, land with no City water or sewer service that would require private wells and on-site septic systems in

hydric soils with a seasonal high-water table, the very conditions that made the parcels' drainage function irreplaceable.

79. The auctions themselves are not what they purport to be. Judicial tax sales under Va. Code § 58.1-3965 *et seq*. are conducted by court-appointed special commissioners through an auctioneer selected by the Treasurer, and the price bid at public auction is treated as prima facie evidence of value when the court is asked to confirm the sale, Va. Code § 58.1-3969.

80. The bidder registrations, bid records, auctioneer's reports, and reports of sale for each Class Period auction are in the custody of the Treasurer, the auctioneer, the special commissioners, and the Circuit Court. Discovery will show which parcels were struck off to whom, at what price, and over what competing bids.

81. Virginia law gave the City every tool it needed to keep the drainage parcels in public hands, had it wished to. The City "may be a purchaser at any sale held under this article," Va. Code § 58.1-3970; where a tax-delinquent parcel is assessed at $75,000 or less ($50,000 or less before 2019) and the delinquent taxes exceed twenty-five percent of its assessed value, the City may petition the court to convey the parcel directly to the City "in lieu of the sale at public auction," for no purchase price at all, Va. Code § 58.1-3970.1; and the Open-Space Land Act, Va. Code § 10.1-1700 *et seq*., together with the City's own Agricultural Reserve Program, authorizes the City to acquire and hold such land as open space and drainage.

82. Every drainage parcel in the 2018 batch would have qualified for the in-lieu conveyance at its lawful assessed value, because a parcel carried at a nominal value of a few hundred or a few thousand dollars becomes delinquent in an amount exceeding twenty-five percent of its assessed value the moment any meaningful tax is assessed against it. Residents, including Clarkson, have repeatedly asked the Council why the City does not simply take the tax-delinquent vacant drainage parcels into its

open-space inventory rather than auction them to builders. Council members have answered that the City "would have to pay millions" for them.

83. That answer is misleading. Under Va. Code §§ 58.1-3970 and 58.1-3970.1 the City pays nothing beyond the taxes it is itself owed. The sharp increase in value happens when the City reclassifies the land.

84. The fabricated value thus serves a dual purpose: it manufactures the delinquency that forces the sale, and, by lifting the assessed value above the Va. Code § 58.1-3970.1 threshold, it disqualifies the parcel from the in-lieu conveyance that would keep it in public hands. The Council's refusal, with knowledge of these facts, to exercise the powers the General Assembly gave it, and its acquiescence in the transfer of the City's natural drainage to builders, is ratification of the scheme by the City's final policymaker for purposes of *Monell*.

85. After a drainage, open-space, or otherwise unbuildable parcel passes to a builder at auction, the parcel was "reclassified" administratively in the City's geographic information system. This reclassification converted agricultural non-buildable land parcels to residential buildable parcels. Pursuant to Va. Code §§ 15.2-2204, 15.2-2285, and 15.2-2286 and the City Zoning Ordinance, before this conversion could take place there should have been a rezoning application, a Planning Commission hearing, published notice, or recorded vote of the City Council, the exclusive means by which a parcel's zoning classification may lawfully change. None of these took place before the land was reclassified.

86. A building permit then issues, notwithstanding that the parcel does not satisfy the minimum lot-area, density, frontage, drainage, floodplain, Southern Watersheds, and Chesapeake Bay Preservation Area requirements that the City's ordinances impose, and without the wetland verification and land-disturbance review the mandatory state program requires.

87. When owners and residents have asked how a parcel that was unbuildable drainage land for fifty years became a building lot, the City's Zoning Administrator and Planning staff have answered

that there is a "right to build" on every parcel of land in the City, a "by right" entitlement said to belong to the recent purchaser and to override the lot, density, and environmental requirements of every ordinance enacted since the City's creation. No such right exists.

88. Virginia recognizes no vested right to develop a parcel in violation of the ordinances in force absent the significant affirmative governmental act, good-faith reliance, and diligent pursuit that Va. Code § 15.2-2307 requires; the City's own published guidance describes "by-right" development as development "as spelled out by [the parcel's] assigned zoning district in the City Zoning Ordinance," for which "[s]ite plans, building permits, etc., must still be reviewed and approved by City staff to ensure the project meets applicable requirements"; and a zoning administrator may modify the physical requirements applicable to a lot only upon written findings of undue hardship and after written notice to every adjoining owner, Va. Code § 15.2-2286(A)(4), none of which occurred for any parcel at issue.

89. The "right to build" is a fiction used to turn divested parcels into developable inventory and to answer the neighbors who object. When Clarkson sought the City's records of these determinations in 2021, the City responded to her requests for the zoning-map change log (F010022-041021), for the list of "by right" residential building plans issued in the agricultural district without presentation to the Planning Commission or City Council (F010011-040721), and for the Zoning Administrator's "by right" determination letters (F010010-040721) with the same three words: "No Records Exist." A City that has issued permits on a theory it cannot document has either issued them without lawful basis or failed to keep the records the law requires.

90. The scheme has not spared occupied homes. Keith's grandmother, Vernice Holley, was 97 years old and bedridden, and resided, as she had for decades, on a Holley family parcel at 3276 Indian River Road that qualified for, and for years received, the real estate tax exemption for the elderly under Va. Code §§ 58.1-3210 through 58.1-3217 and City Code ch. 35, art. II, div. 3.

91. In 2018, the City removed the exemption. When Keith, acting under a duly executed and acknowledged power of attorney, sought to reinstate it, the Treasurer's Office and the Commissioner of the Revenue, the officer the Council has designated to administer the exemption, refused to accept the application from Keith as attorney-in-fact, refused to accept the written certification of the home-health nurse who attended Mrs. Holley that she was bedridden and could not travel, and insisted that the 97-year-old applicant appear personally at the Treasurer's office before the exemption would be restored.[5]

92. Nothing in the governing statutes or ordinance permits those conditions. The exemption is claimed by "affidavit or written statement," Va. Code § 58.1-3213(A); City Code § 35-66; the statute expressly contemplates that a qualifying owner may be confined to a hospital, nursing home, or other care facility for extended periods without losing the exemption, Va. Code § 58.1-3210(B); and the Uniform Power of Attorney Act, which binds governmental units as "persons," Va. Code § 64.2-1600, required the City's officers to accept the acknowledged power of attorney or to request a certification or opinion of counsel within seven business days, and forbade them to demand an additional or different form of authority, Va. Code §§ 64.2-1617, 64.2-1618.

93. The Treasurer's office sought to compel Keith to bring her bedridden grandmother to the Treasurer's office in person to reinstate an exemption to which she had been entitled all along. On information and belief, the exemption was removed, and its reinstatement obstructed, because a builder had expressed interest in acquiring the parcel, and the conditions imposed on an elderly woman were intended to produce the delinquency that would deliver her home to the interested builder, similarly to how the Holley West Neck parcels had been delivered to Brown.

94. Plaintiffs do not challenge the City's power to levy taxes. Plaintiffs question how the City's assessment system was manipulated to manufacture liens, not lawfully owed, in order to open

---

[5] Email correspondence to City, Subject: Senior and disabled tax exemption FWD: Vernice Holley care giver letter. Attached as *Exhibit D*.

protected land for private development. This process then deprived targeted owners and heirs, including Keith, her grandmother, and the Exemption-Stripping Subclass, of property without due process and injuring downstream owners, including Clarkson, and the Property Damage Class, whose flood protection the parcels supplied.

95. Plaintiffs do not ask this Court to enjoin the assessment or collection of any tax. They challenge the falsification of public records and the disposition of land and public assets for private benefit, and the relief they seek for the Taxpayer Class is restitution to, not diversion from, the public treasury. The Tax Injunction Act, 28 U.S.C. § 1341, is therefore not implicated. *Hibbs v. Winn*, 542 U.S. 88 (2004).

96. For the Holley family, the divestiture did not end with the forced sale. Under Va. Code § 58.1-3967, the surplus proceeds of a judicial tax sale, after payment of taxes, penalties, interest, and costs, belong to the former owner and the former owner's heirs, and must be paid into court and disbursed to the persons entitled to them.

No Holley heir, including Plaintiff Keith, has ever received the surplus proceeds of the sale of the Holley parcels. On information and belief, the surplus was never properly noticed, escrowed, or disbursed, and has escheated, or is in the process of escheating, to the Commonwealth, converting even the residue of the family's equity to governmental benefit. The disposition of every dollar of surplus from every Class Period tax sale is recorded in the Treasurer's and the court's records and will be established in discovery.

97. The collections that result in an auction, continue to the present day. In August 2026, the previous calendar month, parcels encumbered by purported "tax liens" asserted by the City were exposed to public auction conducted through Virginia Auction Company online.[6] Plaintiffs will seek in discovery

---

[6] Virginia Auction Company, Inc., Aug. 19th, 2026 – Aug. 26th, 2026 – City of Virginia Beach TAX AUCTION. Lots 1, 13, 14, 15 (APZ), 17, https://www.vaauctionco.com/auctions/detail/bw147394

the RACS records, exemption-code audit trails, delinquency histories, pre-sale solicitations, and surplus-proceeds accounting for each parcel so auctioned, to establish that the scheme described in this Part remains in operation.

98. Clarkson gave the City Attorney written notice of this conduct in 2021. Defendant Stiles, whose Office had received Brown's request for the tax suit three years earlier, neither corrected nor referred it to the Commonwealth Attorney. Thereafter, after the limitations period for prosecuting the malfeasance reported in 2021 had elapsed, Defendant Duhaney rehired the same Zoning Administrator who performed the reclassifications.

99. The scheme's effects are continuing: the de-recognized parcels no longer perform their recorded drainage function; each significant rainfall event renews the invasion of downstream properties, including those of Clarkson, and the Property Damage Class; the Holley family's title and redemption rights remain divested; the "reclassified" parcels continue to be permitted and built upon; the auction pipeline continues to run; and the fabricated records remain uncorrected in the City's systems and in the land records.

100. On information and belief, database audit logs, change tickets, and user-attribution records in RACS and the City's land-records systems will identify the individuals who directed and executed each alteration. These records are within Defendants' exclusive control, are the proper subject of targeted discovery, and are specifically demanded in preservation notices served on Defendants.

## VII. THE PATTERN OF INSIDER DISPOSITIONS, 2012-2026

### A. The Cavalier transaction and the advance wire (2013).

101. On July 22, 2013, a developer consortium acquired the Cavalier Hotel parcels for approximately $35.07 million at a court-supervised receiver's sale. Three days earlier, on or about July 19, 2013, the City caused approximately $11.8 million in public funds to be wired to a title company to enable the developer's private closing comprising an $8.2 million EDIP grant (the largest in City history,

depleting approximately 80 percent of the fund), $1,224,520 for road infrastructure, and $2,370,000 for a green-space easement. The EDIP disbursement preceded any qualifying capital expenditure, in direct violation of EDIP policy requiring disbursement only after there had been a capital investment. *Exhibit E*.

102. Two sitting Authority members held undisclosed financial interests in the Cavalier project while participating in Authority deliberations on its incentive packages;[7] neither member filed the written disclosure Va. Code § 2.2-3112 requires. The developer's chief financial officer certified in writing that "no official or employee of the City of Virginia Beach" had an interest in the project, a certification false when made. A sitting Council member voted to approve the incentive package minutes after the announcement that a long-time employer of his spouse would build the project's residential component;[8] a federal grand jury later issued subpoenas concerning those votes.[9]

103. The conflicts surrounding the Cavalier transaction extended to the Council and to the Authority's own chair. By Credit Line Deed of Trust dated February 2, 2017, recorded in the City's land records, then-Councilmember James L. Wood, together with his mother, then-Authority Commissioner and later Chair Dorothy Wood, and his father, James A. Wood, jointly pledged their individually owned properties to secure a $5.6 million line of credit from TowneBank,[10] the institution then publicly known to be financing the Cavalier project.

104. Weeks later, Councilmember Wood voted to approve approximately $6.5 million in additional gap financing for the Cavalier project without disclosing the family's multimillion-dollar credit relationship with the project's lender, and neither Wood filed the written disclosure Va. Code § 2.2-

[7] SPECIAL FEATURE: Connections and Conflicts. Kerry Dougherty. October 11, 2018. ". . . commissioner Michael Levinson is a partner in COTH, LLC, which was an original investor in the Cavalier. . . VBDA member Bryan Cuffee, who has listed himself as an employee of Thompson's Gold Key/PHR." Retrieved from https://www.archive.ph/5VU3Y
[8] Virginia Beach council under the microscope. February 4, 2015. 13News Now (WVEC), Eric Kane. Retrieved from https://www.archive.ph/STtEn
[9] FBI investigating Beach councilman's vote on Cavalier project. February 2, 2015. 13News Now (WVEC), Staff. Retrieved from https://www.archive.ph/iu2AD
[10] Instrument No. 201700009727, recorded February 2, 2017.

3112 requires. Councilmember Wood also voted at least three times between 2011 and 2018 to appoint and reappoint his own mother to the Authority, where she served as Chair, upon the advice of the City Attorney's office, headed by Defendant Stiles, that he could lawfully do so. The Wood family credit line, the timing of the gap-financing vote, and the related TowneBank relationships of other officials are pleaded as part of the pattern of undisclosed conflicts through which the Enterprise operates, and the underlying loan records and communications are a proper subject of discovery.

105. On information and belief, instruments effectuating the 2013 transaction and subsequent Cavalier-related transfers were drafted or approved within the City Attorney's Office, including by Senior City Attorney Alexander W. Stiles, and the legal sufficiency of those same instruments is now certified and defended by Defendant Stiles's Office in defense of the conduct alleged herein. The Authority committed up to $24.5 million in tourism gap financing to the Cavalier project under Va. Code § 58.1-3851.1.

106. On May 12, 2026, the Authority unanimously voted to assign that subsidy to an out-of-state private-equity fund without disclosing the sale price or outstanding balance; Defendant Stiles approved the assignment's legal sufficiency.[11]

**B. The Virginia Beach fishing pier and the Authority's bid on the City owned land (2016-2018).**

107. In 2016-2018, a consortium of pier-area property owners and a favored developer proposed an approximately $245-250 million redevelopment anchored by a new city-funded pier (approximately $21-25 million of public cost). On December 19, 2017, the Authority voted on the pier project in closed session. When the City issued an invitation to bid on the lease of its own oceanfront land, one of the two bids received, at one dollar per year, for forty years, was submitted by the Authority itself, effectively bidding public land to hold it for the private consortium.

[11] Filings show Historic Cavalier Hotel, Oceanfront properties sold for over $174M. July 30, 2026. WTKR. Retrieved from https://www.archive.ph/iu2AD

108. A February 2018 motion by Councilmembers Moss and Dyer for an independent committee to review the bids, "to avoid even the appearance of favoritism"[12] was voted down. This occurred when then-Mayor Sessoms, opposed it, assuring the Council that the City Attorney had approved the process.[13] Public outcry forced a rebid; the consortium withdrew, complaining that its insider proposal had been "compromised in the process." An Authority member who had voted on the project in closed session, publicly advocated for it without disclosing his role as an authority member.[14]

**C. The Atlantic Park Project (2018-2026).**

109. Beginning in 2018, the City and the Authority pursued the 10.35-acre Dome Site ("Atlantic Park") through non-competitive selection of a preferred developer team. The process involved a conveyance of City land to the Authority, for reconveyance to the developer; issuance of revenue bonds by the Authority and a newly created community development authority; recruitment of a special purpose out-of-state 501(c)(3) with no employees or assets to issue tax-exempt bonds;[15] and settlement of construction-cost disputes for cash and additional land.

Public exposure has grown from a represented $95-96 million (2019) to more than $300 million, including approximately $153 million in capital-improvement commitments, $53,365,000 in 2023 revenue bonds, and $133.7 million in 2024 appropriation-backed Authority bonds.

110. On March 10, 2026, the Authority approved an approximately $8 million settlement with the developer of Atlantic Park; three of the Council's eleven members abstained on grounds of personal

[12] Two Virginia Beach city council members want committee to review bids of Oceanfront pier project. February 20, 2018. WTKR, Brendon Ponton. Retrieved from https://www.archive.ph/joTZF
Economic development board welcomes ideas for a new Virginia Beach pier. March 23, 2018. Virginian Pilot, Alissa Skelton. Retrieved from https://www.archive.ph/Z5p8w

[13] Sessoms had previously entered a plea resolving conflict of interest charges arising from his votes benefiting borrowers of the bank at which he was an executive. https://www.wtkr.com/2015/12/28/four-of-five-charges-against-virginia-beach-mayor-will-sessoms-dismissed

[14] Economic development board welcomes ideas for a new Virginia Beach Pier. March 23, 2018. Virginian Pilot, Alissa Skelton. "Bryan Cuffee …" Retrieved from https://www.pilotonline.com/2018/03/23/economic-development-board-welcomes-ideas-for-a-new-virginia-beach-pier/

[15] Atlantic Park Part 9: P3 Foundation and the Virginia Beach Development Authority. James C. Sherlock. Retrieved from https://www.baconsrebellion.com/atlantic-park-part-9-p3-foundation-gets-virginia-municipal-bonds/

conflicts.[16] The community development authority, composed of the same individuals who sit as City Council, has voted to cover bond debt-service shortfalls from the City's tourism-tax fund, and the City has leased public land and parking to the project's private developers for one dollar per year for one hundred years.

**D. EDIP, abnormal valuations, and City Staff (2007-2025).**

111. The Department of Economic Development staffs the Authority and administers EDIP on its behalf. The Department's director from 2007 to 2018, Warren D. Harris, resigned during a City Auditor investigation, and was indicted on November 18, 2019 on fourteen felony counts following a joint FBI, Virginia Beach Police, and Commonwealth's Attorney investigation. Harris pleaded guilty on August 4, 2021 to four counts of embezzlement by a public officer involving approximately $79,479.50 in fraudulent expenditures spanning his entire tenure, occurring during the same period as the Cavalier and EDIP conduct alleged above. Harris was sentenced on February 14, 2022.[17]

112. On March 10, 2021, a second employee of the same department, Business Development Coordinator Brian Scott Hall, was convicted of three felony counts of embezzlement arising from his use of the department's accounts between September 2016 and June 2018.[18] The department's instability has continued: a successor director resigned in July 2024 amid an auditor investigation of approximately $47,000 in travel expenses announced publicly by Defendant Duhaney; the immediate successor resigned within four months, in June 2025; and Deputy City Manager Amanda Jarratt, who personally conducted the April 2024 confidential Dragas meetings described in Part IX, has repeatedly served as interim director.

---

[16] Virginia Beach Development Authority approves multimillion-dollar surf park settlement. March 10, 2026. The Virginian Pilot, Stacy Parker. "Three Development Authority members – Mike Standing, David Weiner, and Eric Keplinger – abstained from the vote." Retrieved from https://www.baconsrebellion.com/atlantic-park-part-9-p3-foundation-gets-virginia-municipal-bonds/

[17] Former Virginia Beach economic development director to pay back nearly $80K after pleading guilty to felony embezzlement charges. February 14, 2022. 13News Now. Retrieved from https://archive.ph/NUj5v

[18] Former VB economic development employee convicted of felony embezzlement. March 10, 2021. WAVY. Retrieved from https://www.archive.ph/ntwNC

113. In January 2018, the Authority awarded a $500,000 EDIP grant to BCause LLC and its affiliate, a cryptocurrency-mining venture, which received approximately 87 percent of the grant ($436,823) before filing Chapter 11 on April 11, 2019[19] (Case No. 19-10731, Doc. 1; the sworn member list filed in that bankruptcy identifies as member number 26 "William Desteph," on information and belief the same William DeSteph who has served as a State Senator of Virginia since 2016. The Authority's award was made without disclosure of that interest.

114. The Authority's dispositions are marked by abnormal valuations that consistently favor insiders. In June 2015, the Authority sold 9.1 acres of public land in Corporate Landing for $1,358,000, approximately $149,000 per acre, to an entity controlled by Jerrold L. Miller. Miller served as a former Authority commissioner, who built and leased back the Green Flash brewery facility. Miller had participated in the Authority's 2012 Green Flash incentive negotiations ($275,000 EDIP; $484,000 VDOT roadway grant) while his own company simultaneously negotiated to build and lease the brewery, without any disclosure as to his financial interest in the project.

115. Miller was reappointed to the Authority in June 2016 while constructing his brewery facility. In July of 2016, while a sitting member of the VBDA, the VBDA approved and Miller obtained, an approximately $14,000 publicly funded fountain for the stormwater lake at his own development. The brewery failed within sixteen months of opening[20]; Miller retained the land and building. On October 4, 2023, the Authority conveyed additional public land in Corporate Landing (Parcel 6C-E, Instrument No. 202303038108, $2,080,000) to an entity managed by Miller, approved as to form by the City Attorney's Office. *Exhibit F*.

116. The same pattern of below-market or nominal pricing is recurring across the enterprise's transactions. These transactions include the Authority's one dollar-per-year bid on the City's oceanfront

[19] Virginia Beach cryptocurrency company files for reorganization bankruptcy. April 16, 2019. 13News NOW. Retrieved from https://www.archive.ph/y7351

[20] Green Flash closes Virginia Beach brewery, will stop distributing to East Coast. March 26, 2018. https://archive.ph/Q9qoQ

land; the one-dollar-per-year, one-hundred-year Atlantic Park parking lease; the City's ten-dollar conveyance of the VBN flanking parcels to the Authority in February 2018; the $921,869.40 land-purchase discount to ASC; and the proposed $18 million price, approximately $51,000 per acre, for 341.4 acres of VBN waterfront-adjacent recreational land, while interior industrial acreage in the City's own parks commands comparable or higher per-acre prices.

**E. The oversight blackout and the Authority's institutional incapacity.**

117. The Authority published no annual report for fiscal years 2018 through 2023, this five-year period included the auction of the Holley family land, the Atlantic Park escalation, the BCause grant, the Harris criminality, and the origination of the ASC land assemblage, although annual reports to Council had been routine for decades before.

The City Auditor's November 2018 audit, the first of the Authority in a decade, found the Authority had failed to follow its own EDIP policies and recommended twelve corrective changes, including written procurement policies and the broadcasting of Authority meetings.

118. The Authority's board is recurrently and presently conflicted beyond capacity for lawful function: (a) its Chair, Lisa M. Murphy, is a partner of Willcox & Savage, P.C., the firm appearing for the City Defendants in this action, and on information and belief has served beyond or in holdover of the term limitations applicable to Council appointees; Murphy's tenure as a member and chair spans the FY2018-FY2023 non-reporting period; (b) Commissioner Donald Horsley operates Land of Promise Farms Partnership, which holds a lease from the City dated March 26, 2026 on the Brown Farm parcels that are included in the VBN transaction, whose "partial termination" the Dragas Term Sheet expressly contemplates (Term Sheet § 8(f)(iv)), a personal interest in the transaction within Va. Code §§ 2.2-3101 and 2.2-3112, and on information and belief Horsley participated in Authority and Planning Commission actions advancing the VBN disposition and the ITA industrialization described in Part VIII without filing the required written disclosures or recusing himself; (c) in March 2026 more than a quarter of the board

abstained from a single Atlantic Park item for personal conflicts; and (d) the Authority's staff legal advisor is Senior City Attorney Alexander W. Stiles, a lawyer in the office of Defendant Stiles, a named defendant, and on information and belief Defendant Stiles's brother. These facts are pleaded in support of the structural relief requested in Count XXI and the Prayer, not as individual claims against Murphy or Horsley.

119. The Authority's composition is itself a product of the Enterprise's methods. The Council appoints the Authority's commissioners, and on information and belief those appointments correlate overwhelmingly with the volume of campaign contributions flowing to the appointing Council members from the appointees, their firms, their family members, and the development and banking interests they serve, including directors of TowneBank and principals and affiliates of the recipients of the public-private transactions described in this Part.

An authority whose membership is selected by reference to the private financial constituencies of the appointing officials, rather than the statutory purposes of Va. Code § 15.2-4905, cannot discharge those purposes. These allegations are pleaded in further support of the accounting, supervision, and dissolution relief requested in Count XXI, which Plaintiffs expressly preserve and do not abandon.

## VIII. THE ASC CARVEOUT AND THE INDUSTRIALIZATION OF THE AGRICULTURAL AREA BELOW THE GREEN LINE

120. Between December 2020 and June 2025, the Authority sold Acoustical Sheetmetal Company LLC ("ASC"), a manufacturer of steel and aluminum enclosures for on-site power generation serving the data-center industry, successive parcels of Authority-owned land in Innovation Park: 19.293 acres (December 18, 2020), 5.13 acres (March 24, 2023), and approximately 21.1 acres (approved June 2025), the last supported by a $1.75 million Commonwealth's Opportunity Fund grant, a $921,869.40 City land-purchase discount, and an $828,130.60 Authority cash grant.

121. Upon completion of the announced 250,000-square-foot fabrication and finishing building, ASC's campus will exceed 550,000 square feet of manufacturing space, a heavy-industrial

complex on land below the Green Line in the Southern Rivers Watershed, where industrial use of this character and intensity has never previously been permitted.

122. On information and belief, ASC operates and will expand without VPDES industrial stormwater permit coverage and without the air permits applicable to its coating, finishing, and fabrication operations. ASC does not appear on the Industrial High-Risk Runoff facility list in the City's MS4 Annual Report, and DEQ's public registries reflect no VPDES industrial stormwater coverage for the ASC campus, notwithstanding that the facility conducts outdoor metal fabrication, material staging, and vehicle operations tributary to the City's storm sewer system and the North Landing River.

The City's own Annual Report discloses that ten facilities were removed from the high-risk list, in the reporting year, while the City was simultaneously recruiting and subsidizing new industrial capacity into the very same watershed. The City's recruitment of industrial operations into and adjacent to its MS4 service area, without ensuring VPDES coverage, is a continuing violation of the City's MS4 Permit obligations to identify and control industrial discharges. This documented, continuing violation, is the specific factual predicate that the City's motion to dismiss claimed was absent from the original Complaint.

123. On September 16, 2025, on an expedited basis that its own members questioned, the City Council amended its Comprehensive Plan to remove a 21-acre parcel from the Master Transportation Plan, extinguishing a reserved public right-of-way. This amendment occurred because the bank financing ASC's expansion, objected to the reservation, a single-applicant carveout whose sole private beneficiary is ASC.

To normalize and extend the conversion, the City initiated a 2025-2026 update to the ITA and Vicinity Master Plan contemplating area-wide industrial expansion of as much as 375 additional acres of city-owned land, with the Authority's own planning documents projecting Phase 2 (approximately 68 acres) and Phase 3 (approximately 298 acres) expansions of Innovation Park. Despite the fact that the

Transition Area/ITA Citizens Advisory Committee voted in April 2025 that industrial uses in the ITA or below the Green Line conflict with the Comprehensive Plan and despite the 2017 Master Plan's commitment that utilities are not intended south of Indian River Road. City officials have publicly acknowledged that the expansion would require $5 million to $25 million in public road infrastructure.

The ASC carveout is not unique. Since at least 2023 the City has pursued the recruitment of additional industrial users onto agricultural land below the Green Line without the permits their location would require, including the 2023 "Project Wayne" proposal to rezone farmland in southern Virginia Beach from agricultural to light industrial for a textile medical manufacturing campus, advanced through code-named briefings before the affected public knew the user's identity, and the recruitment of data-center-serving and other industrial users into the Southern Rivers Watershed.

124. On information and belief, discovery of the Department of Economic Development's recruitment files will identify additional industrial prospects sited or proposed below the Green Line without VPDES industrial stormwater coverage, air permitting, or water-quality impact assessment.

125. The area being industrialized overlies an active military jet-fuel pipeline system with documented integrity failures: on March 4, 2025, two same-day pipeline releases occurred, one spilling approximately 4,200 gallons of jet fuel that reached the Upper North Landing River, and one at 4001 Dam Neck Road adjacent to the first industrial allowance, both documented in the City's own MS4 Annual Report, Appendix D. No water-quality impact assessment under 9VAC25-830-140 has been prepared for any development of this intensity in the ITA.-The Virginia Court of Appeals has recently confirmed, in litigation arising from a materially identical conversion of rural agricultural land to intensive industrial use, that local land-use approvals adopted without strict compliance with statutory notice requirements are void ab initio, that the statutory safe harbor does not protect a locality whose own errors caused the defect, and that neighboring owners' proximity and particularized harms confer standing to obtain that relief. *Bd. of Cnty. Supervisors of Prince William Cnty. v. Oak Valley Homeowners*

*Ass'n*, 2026 WL 873963 (Va. Ct. App. Mar. 31, 2026) (consolidated with American Battlefield Trust appeal) (voiding the Prince William "Digital Gateway" data-center rezonings). The September 16, 2025 carveout, the ITA Master Plan amendment, and the August 11, 2026 Disposition Ordinance are subject to the same infirmities.

## IX. THE VIRGINIA BEACH NATIONAL/DRAGAS TRANSACTION

126. VBN is a publicly owned, approximately 350-acre golf and recreation complex at 2500 Tournament Drive, comprising the golf course parcel (GPIN 1494-34-4919) and adjoining parcels (GPINs 1494-03-5237, 1494-13-7202, 1494-41-2582, and 1494-52-3434). The City owns the golf course parcel; the Authority leases the golf-course grounds under the October 8, 1997 Ground Lease, dedicated to public recreation through October 7, 2037, and holds title to the flanking parcels conveyed to it for ten dollars in February 2018; and a private operator manages the course under a management agreement expiring December 31, 2026.

127. The course has operated continuously as a public golf facility since 1999, hosts a First Tee youth facility under a lease through 2030, and has produced annual net income of approximately $740,000. On October 13, 2023, the City Auditor issued a formal audit finding the Authority lacked written procedures governing VBN finances and capital maintenance and had no process to track capital needs running into millions of dollars.

128. Two of the flanking parcels (GPINs 1494-03-5237 and 1494-13-7202) were purchased in 2011 with Commonwealth Military Strategic Response Fund grant money for the express purpose of removing development potential beneath the NAS Oceana-NALF Fentress flight corridor; the Commonwealth holds a recorded lien for fifty percent of the sales price upon any disposition of those parcels; and by recorded Grant of Easement EI-11534 (September 2012), the United States holds a perpetual restrictive easement, acquired for $3,760,000 under 10 U.S.C. § 2684a, providing that the

burdened land "may not be used for residential use," conditioning any stormwater impoundment on prior written federal approval, and requiring ninety days' certified-mail notice before any new use or construction, the omission of which "shall be deemed a breach."

129. The 2025 solicitation was not Dragas's first approach to this ground. In 2020, Dragas was identified at or near the same location with applications and proposals for residential development on City-owned land within the ITA, land assembled and held for the express purpose of preventing residential encroachment between NAS Oceana and NALF Fentress, as noted in the original Complaint. See Compl., ECF No. 1, at n. 2.

The 2024-2026 transaction thus renewed a years-long objective, previously rebuffed, of converting City-owned encroachment-control land below the Green Line into private residential inventory, and the change in outcome between 2020 and 2026 is attributable not to any change in the law or the land but to the concealed access described in this Part.

130. On April 18, 2024, Deputy City Manager Jarratt requested aerial imagery of the Property for a meeting with Helen Dragas. On April 22, 2024, Jarratt and a colleague met Dragas and her attorney in person. On April 23, 2024, staff recorded that Dragas was "interested in building a for-sale home and condo community on the land adjacent to VB National." On April 24, 2024, Jarratt offered to send Dragas the not-yet-final internal audit before its finalization or publication. Staff forwarded the draft to City Attorney Stiles, writing that Dragas "is eager to" proceed (Compl. Exs. F-G).

131. In July 2024, Dragas proposed an exclusivity arrangement, and staff wrote to the City Attorney that Dragas "is eager to reconvene on how her company might be able to develop some additional residential unconstrained by AICUZ, but wants to keep their discussions confidential with a period of exclusivity," and that "this is a really interesting project that might check down several boxes for us if we play our cards right."

On August 7, 2024, the City and Dragas executed a Mutual Non-Disclosure Agreement (hereinafter referred to as "the NDA"), negotiated and approved by the City Attorney's Office, that barred disclosure of the dealings to "any third party, including any member or members of any appointed committees or commissions of the city," thereby excluding the Authority board, the Planning Commission, the Wetlands Board, the Chesapeake Bay Preservation Area Board, and the Transition Area/ITA Citizens Advisory Committee, the very bodies charged with reviewing the Property.

132. On August 8, 2024, the day after the NDA was executed, staff identified the "unconstrained" residential footprint outside the ITA overlay as "about 42 acres." On August 29, 2024, a Deputy City Attorney provided Dragas the boundary survey, title report, and easement information, describing the recorded drainage easements serving adjacent properties as a "placeholder in the event the property is conveyed to a private party."

133. On September 6, 2024, Defendant Duhaney personally attended a meeting with a second developer group pursuing the same Property, which recorded that it had been told "a major challenge for this property will be the requirement to obtain a Council supermajority vote."

134. Over September 23-24, 2024, Defendant Dyer exchanged text messages with Dragas arranging a private meeting structured to remain below the three-member threshold that triggers Virginia's open-meeting requirements. On October 25, 2024, Defendant Stiles produced records concerning the dealings to a sitting Council member while advising him to "refrain from publicizing" them.

135. On October 12, 2025, seventeen months after the exclusive engagement began, the City issued RFP #ED-25-04 for the sale of approximately 350 acres. Every respondent was required to execute an Anti-collusion Form certifying that "no arrangement in restraint of free competitive bidding" existed and that "no person acting for, or employed by, the City of Virginia Beach has an interest in, or is concerned with, this proposal." Comp. Ex. Q.

136. Nine parties responded, including Dragas. Dragas executed the certification; it was false when made, and the City accepted it, knowing it was false. In November 2025, Defendant Wilson told the press that the City's interest arose from a developer approach received "in September," false by more than a year. Staff briefed the Council in closed session on January 6, 2026; a review committee interviewed short-listed respondents and briefed the Council in closed session on February 24, 2026; and the Council directed staff to negotiate a term sheet with Dragas.

137. On June 16, 2026, City staff presented the Dragas Term Sheet ("Princess Anne Landing"): approximately 659 residential units on roughly 42 acres (approximately fifteen units per acre against a one-unit-per-fifteen-acres baseline), a purchase price of approximately $18 million, City-funded course-redesign cost reimbursement up to $3.6 million, an approximately $1.82 million Authority contribution, and obligations to terminate or modify the recorded encumbrances, including the 1997 Ground Lease, the management agreement, and the March 26, 2026 lease to Land of Promise Farms Partnership on the Brown Farm parcels ("partial termination contemplated"). Staff represented that a "public input session" had been conducted; on information and belief it was limited to prospective respondents and excluded the general public.

138. The Council held a public hearing on July 7, 2026 and scheduled its vote for July 14, 2026. The vote did not occur on July 14, 2026, because the City admitted in a sworn declaration filed in this Court that "[t]he Notice for the July 7 public hearing incorrectly listed the acreage of the property proposed for sale and as a result the vote scheduled for July 14 did not go forward."

139. On August 11, 2026, following a re-advertised hearing at which seventy members of the public spoke, the Council adopted the Disposition Ordinance by a recorded vote of 9 to 2. The Clerk's summary of council actions records that the Council adopted an "ALTERNATE VERSION" of the ordinance, a version materially different from the advertised item, presented and adopted the same day. *Exhibit G.*

140. The re-advertised notice again described approximately 341.4 acres, although the City's own recorded plat describes the golf course parcel alone as 352.451 acres and the transaction reaches five separate GPINs, and the notice did not disclose the ground-lease termination, the federal easement, or the Commonwealth's lien. The City has sworn that as of August 5, 2026, no purchase and development agreement had been drafted and that the definitive agreements are "yet to be drafted"; the Council thus took final legislative action on the disposition before its terms existed and delegated the settlement of those terms to the City Manager.

141. The transaction as proposed cannot lawfully be performed: the perpetual federal easement categorically prohibits residential use on two of the five parcels; the Commonwealth holds a recorded lien against those parcels; the Ground Lease dedicates the Property to public recreation through October 7, 2037; the Property contains two active bald eagle nests confirmed on the public record on July 7, 2026, and no Defendant holds or has sought authorization under the Bald and Golden Eagle Protection Act that must precede the tree removal, grading, and site mobilization the Term Sheet contemplates; the residential density proposed is irreconcilable with the ITA Overlay and Green Line density restrictions absent rezonings that would themselves issue under the unlawful 2018 regime described in Part V; and, as pleaded in Part X, the development cannot lawfully proceed until the City surveys and brings into compliance the downstream receiving drainage that lies outside its MS4 service area.

142. The disposition also breaks a specific promise the City made to its voters. In September 2021, to secure passage of the flood protection bond referendum, the Council unanimously adopted a resolution committing that, if the voters approved the borrowing, the Council would amend the Comprehensive Plan to require the Planning Department to recommend denial of any new development generating a net increase in stormwater discharge demand over the capacity of the receiving drainage system, a zero-impact development standard.

143. On November 2, 2021, 72.72 percent of the voters approved the $567.5 million referendum and the accompanying real estate tax increase. *Exhibit H*. The Council then reneged.[21] On November 10, 2021, the Planning Commission, whose members have extensive ties to the development community, voted 11 to 0 to recommend denial of the very amendment the Council had promised. Council then deferred the amendment at least four times and referred it to a "process improvement committee," and Council has never adopted it.

144. However, the taxpayers are paying the referendum tax today. Meanwhile the promised zero-impact standard, under which the VBN project and the ASC expansion would have to be recommended for denial, was withheld for the benefit of the developer interests that opposed it, including Defendant Dragas. The broken referendum commitment is further evidence that the City's land-use powers are administered for private benefit and that the challenged approvals are arbitrary, capricious, in violation of law, and against public policy.

145. The City is simultaneously soliciting the expansion of the very military overlay under which it proposes to authorize Dragas to build high density housing. By unanimous resolution, the Council has petitioned the Navy to home-base the next-generation F-35 strike fighter at NAS Oceana. The Navy has initiated an environmental impact statement evaluating the replacement of seven F/A-18 squadrons with approximately seventy F-35C aircraft at Oceana.

146. The F-35 is significantly louder than the F/A-18 on departure, and any basing decision will require a new AICUZ study and, on information and belief, expanded noise contours and accident potential zones over and adjacent to the Property and the ITA. The City is proposing to place approximately 659 residential units within and against an overlay it knows may expand. While at the same time, actively courting that expansion, a course irreconcilable with City Zoning Ordinance Article

[21] Virginia Beach promised changes for developers if flooding referendum passed. Why have they delayed a vote. January 6, 2022. WAVY, Brett Hall. Retrieved from https://archive.ph/kJzfb
Virginia Beach City Council again delays vote to fulfill flooding referendum promise. February 1, 2022. WAVY, Brett Hall. Retrieved from https://archive.ph/AnupA

18, with Va. Code § 15.2-2283.1, with the 2005 BRAC commitments on which the retention of NAS Oceana depended, and with the recorded encroachment-control instruments burdening the very parcels in the transaction.

147. The site cannot support the stormwater system that the project requires. The recorded federal easement conditions any stormwater impoundment on the burdened parcels upon the prior written approval of the United States, which has not been sought or obtained, and prohibits residential use of those parcels outright; the Term Sheet nonetheless assumes the construction of additional stormwater ponds.

148. Groundwater on the VBN site lies at less than five feet below the surface. Ponds excavated into that water table do not detain or treat runoff as the stormwater regulations assume; they intercept the groundwater itself and convey pollutants directly into the shallow aquifer system from which the surrounding community draws its drinking water through private wells. The development cannot occur until the City re-surveys the receiving drainage downstream of and outside its MS4 service area, as pleaded in Part X.

149. Virginia law forbids the City from rezoning or approving intensified development on this ground without first identifying and mapping the downstream and surrounding wells. Va. Code § 15.2-2283 commands that zoning ordinances and their administration give reasonable consideration to the protection of surface water and ground water as defined in Va. Code § 62.1255.

The entirety of the City lies within the Eastern Virginia Groundwater Management Area, 9VAC25-600-20, within which the Ground Water Management Act of 1992, Va. Code § 62.1254 *et seq*., requires the registration and annual reporting of wells precisely so that they can be located and protected, and Va. Code § 62.1-262.2 now expressly protects residential wells located within five miles of commercial or industrial withdrawals.

150. The Private Well Construction Act, Va. Code § 32.1-176.1 *et seq*., and the Private Well Regulations, 12VAC5630, impose mandatory separation distances between wells and sources of contamination that cannot be applied or verified unless the existing wells are first identified and mapped, and the VSMP regulation, 9VAC25-870-66, requires analysis of the receiving system downstream of any land-disturbing activity.

The City has never surveyed or mapped the private wells downstream of VBN or of the ASC campus. It therefore cannot lawfully make the findings these provisions require before rezoning land below the Green Line to industrial or intensified residential use, and every such rezoning and approval, including the ASC rezonings and any rezoning of the Property, is for that additional reason contrary to law.

151. Plaintiffs will identify by amendment any additional local ordinance or Comprehensive Plan provision requiring a downstream well survey as a condition of rezoning below the Green Line and Plaintiffs will establish the absence of any such survey through discovery.

152. The City's fiscal justification, approximately $3.4 million in projected annual tax revenue, repeats the error of Ashville Park. The City approved residential development, Ashville Park, on land that the City knew or should have known, would flood. The homes flooded and the taxpayers, not the developer, have since borne tens of millions of dollars in drainage capital projects to protect development that the City should never have approved.

A project placed on hydric soils with groundwater at less than five feet, discharging into an unsurveyed receiving system outside the MS4, will not produce net tax revenue; it will produce the next Ashville Park, and just as with Ashville Park, the liability will be passed on to the taxpayers and the profit privatized to Dragas.

153. On information and belief, no independent appraisal was disclosed to the public, and no traffic, fiscal-impact, school-capacity, drainage, or groundwater study was performed before the Council

acted. The Term Sheet further channels to a Dragas-affiliated company, without competitive bidding, a construction contract that is equal to ten percent of the contemplated improvement work, an uncompeted private set-aside of public value, that is contrary to the policies of the Virginia Public Procurement Act, Va. Code § 2.2-4300 *et seq*. *Exhibit I.*

## X. THE CITY'S ONGOING CLEAN WATER ACT VIOLATIONS

154. The City's MS4 Permit is a permit issued under 33 U.S.C. § 1342, and each of its conditions is an "effluent standard or limitation" enforceable by citizen suit. 33 U.S.C. § 1365(a)(1), (f)(7). The violations pleaded below are continuing conditions of noncompliance, or violations that are intermittent yet reasonably likely to recur because the programmatic failures producing them, remain uncorrected. *Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd*., 844 F.2d 170 (4th Cir. 1988). Each violation existed at the commencement of this action and continues as of this amendment:

155. The City's MS4 Permit is a permit issued under 33 U.S.C. § 1342, and each of its conditions is an "effluent standard or limitation" enforceable by citizen suit, because 33 U.S.C. § 1365(f)(7) expressly defines that term to include "a permit or condition of a permit issued under section 1342."

The City's suggestion that citizen suits reach only numeric discharge limits misreads the statute: programmatic, monitoring, inspection, reporting, and legal-authority conditions of an MS4 permit are conditions of a section 1342 permit and are enforceable as such. The violations pleaded below are continuing conditions of noncompliance, or violations that are intermittent yet reasonably likely to recur because the programmatic failures producing them remain uncorrected, within the meaning of *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 64 (1987), and *Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171-72 (4th Cir. 1988) (good-faith allegation of ongoing or reasonably-likely to recur violation sustains jurisdiction).

156. Each violation existed at the commencement of this action and continues as of this amendment:

(a) Failure to maintain adequate legal authority. MS4 Permit Part I.A.3 requires the City to maintain legal authority adequate to control discharges to and from the MS4. The City's stormwater program south of the Green Line rests on the 1992 Appendix G ordinance, never substantively amended, lacking the 2,500-square-foot Bay Act land-disturbance threshold, the water-quality criteria, and the wetland-verification checkpoint that state law mandates, administered under the unlawful 2018 internal policy described in Part V. This is a standing, present, programmatic failure renewed every day the 2018 "right to build" policy remains in force; it is not a past, remediated spill.

(b) Under-designation of the Chesapeake Bay Preservation Area. Va. Code § 62.1-44.15:74(A) and 9VAC25-830-80 require designation by physical criteria across the City's jurisdiction; since 2018 the City has excluded the southern two-thirds of its territory. The under-designation is a continuing condition.

(c) TMDL action-plan and load-reduction failures. For the North Landing River watershed, the City has designated its mandatory phosphorus load-reduction calculations "TBD" and has not achieved or reported required reductions, a present reporting and implementation failure under the Permit's TMDL special conditions. This failure is renewed in each of the City's annual reports. The City's own motion to dismiss concedes that this claim is sufficiently pleaded and is not subject to dismissal on the pleadings.

(d) Failure to inspect private stormwater management facilities. The Permit requires inspection of privately maintained SWM facilities no less than once per five years; by the City's own Annual Report, approximately 191 such facilities with maintenance agreements remain uninspected

within the five-year window, and 139 privately maintained facilities lack maintenance agreements altogether, a continuing violation of an express permit condition, not a past event.

(e) The facilitation of unpermitted industrial discharges. The Permit obligates the City to identify and control industrial dischargers to its MS4. As pleaded in Part VIII, the City has located, subsidized, and expanded a 550,000-square-foot manufacturing campus (ASC) tributary to its MS4 and the North Landing River without identified VPDES industrial stormwater coverage or air permits, has removed facilities from its Industrial High-Risk Runoff list while adding industrial capacity, and has adopted land-use actions expanding industrial use in the same drainage without the water-quality impact assessment 9VAC25-830-140 requires. This condition is ongoing and will be aggravated by each approval.

(g) Illicit discharge detection and elimination program failures. The City's own Annual Report documents recurrent sanitary sewer discharges to impaired waters, no fewer than twelve discharge events in the reporting year, including a force-main failure releasing approximately 20,000 gallons to London Bridge Creek and jet-fuel releases reaching the Upper North Landing River. Plaintiffs do not plead these spills as isolated past events; Plaintiffs plead that the recurrence of materially identical failures year over year, across aging force mains and an unremediated pipeline corridor, demonstrates a systemic infrastructure and program failure that makes recurrence reasonably certain, and recurrence has in fact continued. Under *Gwaltney*, intermittent violations reasonably likely to recur are ongoing violations.

(h) Systematic failure to recognize wetlands and enforce the Wetlands Zoning Ordinance and Preservation Area requirements, including acceptance of site plans depicting jurisdictional wetlands and drainage as buildable area, a continuing program-administration failure.

(i) Failure to apply to the City's own capital projects the wetland-delineation, permitting, and erosion-and-sediment controls the Permit and state law require, continuing with each active City project in the Southern Rivers Watershed.

(j) Failure to survey and control the receiving drainage outside the MS4 service area. The Southern Rivers Watershed drainage into which VBN and the West Neck parcels discharge lies outside the City's MS4 service area and has never been surveyed, mapped, or assessed by the City for capacity, condition, or compliance, even as the City has de-recognized the natural drainage parcels that served it and has approved, and now proposes, intensive development tributary to it. The City cannot lawfully authorize new discharges and land-disturbing activity into receiving drainage whose capacity and condition it has never established. The VBN development cannot lawfully occur until the City resurveys the downstream drainage outside the MS4 and brings its program into compliance.

157. Additional industrial and illicit discharges within the City are occurring without required VPDES permit coverage or in violation of such coverage,[22] including industrial stormwater discharges from the ASC campus described in Part VIII; discharges from facilities identified in the City's own MS4 annual reports as uninspected or unverified, including the approximately 191 privately maintained stormwater facilities the City has failed to inspect; and unpermitted discharges to the receiving drainage outside the MS4 service area.

158. Plaintiffs will supplement with each additional facility and outfall identified through DEQ registration and enforcement records, the City's MS4 annual reports, and discovery. Each unpermitted or uncontrolled discharge independently violates 33 U.S.C. § 1311(a) or the Permit, and each underscores

[22] IMS Gear, 408 Progress Lane, PReP 320862, reported by Clarkson 10/03/2025 – "This site was unpermitted at the time of complaint and inspection."
Acoustical Sheetmetal Company, 2009 Hudome Way, PReP 3199417, reported by Clarkson 06/14/2025 – "Unpermitted at time of complaint. Referred to ombudsman office to assist the facility in obtaining required permits."

that any permit or approval the City issues for the VBN project will issue from, and into, a program in systemic violation of the Clean Water Act and is for that reason contrary to state and federal law.

159. Because of the approvals the Dragas project requires, rezoning, subdivision, site plan, stormwater, and land-disturbance approvals, would issue under the same unlawful regime and into the same unsurveyed, noncompliant receiving system, any permit or approval the City issues for the project will be contrary to state and federal law, and the project cannot lawfully proceed until the City's program is brought into compliance and the downstream drainage is resurveyed.

## XI. THE ENTERPRISE AND THE PATTERN OF RACKETEERING ACTIVITY

160. The Enterprise. At all relevant times, Defendants Dyer, Wilson, Duhaney, Stiles, and Henderson, together with Dragas, the John Doe financial institution, the John Doe developers (including Brown), title and auction participants, conflicted members of the Authority's board, and other John Does (collectively, the "Enterprise Participants"), constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4): an ongoing organization, formal and informal, with relationships among its participants, a common purpose of converting public assets, subsidies, and regulatory forbearance to private gain under the guise of public and municipal authority, and longevity sufficient to pursue that purpose continuously from at least 2012 to the present. The City and the Authority are not named as RICO defendants; they are the instrumentalities through which the Enterprise operated and, with the Plaintiffs and the Classes, among its victims. The Enterprise is distinct from each Defendant, and each RICO Defendant conducted or participated in the conduct of the Enterprise's affairs, not merely his, her, or its own.

161. Common purpose and methods. The Enterprise's methods are consistent across transactions: (a) concealed pre-commitment to a favored private counterparty before any public process; (b) use of the Authority as pass-through owner, lessee, bidder, grant-maker, or bond issuer; (c) suppression of oversight through closed sessions, NDAs, non-reporting, and discouragement of

councilmember disclosure; (d) false certifications and misrepresentations to tribunals, boards, the press, and the public; (e) non-enforcement of conflict-of-interest requirements; (f) abnormal valuations in purchases and sales of public property that transfer the difference to private participants; (g) retaliatory or extractive use of the tax and land-records systems against disfavored owners; (h) the administrative "reclassification" of divested parcels and the issuance of permits on the "right to build" fiction; and (i) the refusal to exercise the City's statutory power to take tax-delinquent drainage land into public ownership, so that the land flows instead to the Enterprise's builders.

162. Pattern. The predicate acts pleaded below are related, involving the same participants, methods, victims, and beneficiary class, and continuous, spanning 2013 to 2026 with ongoing and threatened repetition (closed-ended continuity over more than a decade, and open-ended continuity given the pending VBN conveyance, the ITA industrialization, and the Authority's continuing operations).

163. Predicate acts. The Enterprise's pattern of racketeering activity includes, without limitation: (1) Wire fraud (18 U.S.C. § 1343), Cavalier advance: on or about July 19, 2013, transmission by interstate wire of approximately $11.8 million in public funds to a title company to enable a private closing, in furtherance of a scheme in which material conflicts and policy violations were concealed from the public and the Authority's processes were used under false certifications that no City official held an interest. (2) Mail fraud (18 U.S.C. § 1341), tax-lien scheme: on dates reflected in Treasurer mailing records within Defendants' exclusive control, including the 2018 billing cycle commencing with the June 6, 2018 batch run, mailings of tax bills, delinquency notices, and lien notices premised on fabricated "buildable" assessments of drainage and open-space parcels, including the Holley parcels and the parcel adjacent to Clarkson's property, in furtherance of a scheme to deprive owners and heirs, including Keith, of property and to convey the parcels to developer-purchasers, including the March 2019 refusal of redemption by installment and the auction at which the Holley family's bids were disregarded in favor of Brown, the builder who had solicited the tax suit, and the 2018 removal of the

elderly exemption from the homestead of Keith's grandmother and the mailing of bills premised on that removal. (3) Wire fraud, audit disclosure: on or about April 24, 2024, electronic transmission by Jarratt offering and, on information and belief, delivering a not-yet-final internal City audit to Dragas, a material non-public disclosure in furtherance of the scheme to predetermine the VBN disposition. (4) Wire fraud, concealment texts: on or about September 23-24, 2024, interstate-carrier text messages between Dyer and Dragas structuring a meeting to evade open-meeting requirements, in furtherance of the same scheme. (5) Wire fraud, false anti-collusion certification: on or about November 21, 2025, electronic submission by Dragas of an Anti-collusion Form falsely certifying the absence of arrangements in restraint of free competitive bidding and the absence of any interested City person, a material false statement submitted to obtain property (the RFP award) and accepted by City officials who knew it to be false. (6) Wire fraud, public misstatements in furtherance: November 2025 statements by Wilson to the press, transmitted by wire, misrepresenting the transaction's origin by more than a year, in furtherance of the scheme's concealment. (7) Honest-services fraud (18 U.S.C. §§ 1343, 1346), on a bribery or kickback theory consistent with *Skilling v. United States*, 561 U.S. 358 (2010): Duhaney's receipt of real property by deed from a builder engaged in development on unlawfully reclassified land (Compl. Ex. B); and upon information and belief, a deed from Doe regional bank to a then female friend of Dyer, which influences his votes[23]; a thing of value received in connection with official acts benefiting the grantor and the Enterprise. (8) Wire fraud, EDIP and grant disbursements contrary to policy and without disclosure of insider interests, including the January 2018 BCause disbursements (approximately $436,823) and the ASC grant and discount disbursements, each transmitted by wire. (9) Wire fraud, May 12, 2026 assignment of the Cavalier tourism-financing subsidy to an out-of-state fund without disclosure of price or balance, approved as legally sufficient by Stiles, in furtherance of the Enterprise's continuing extraction of public value. (10) Additional predicates: Plaintiffs anticipate that discovery of

[23] Instrument Nos. 202000043444 and 202000043445, recorded 05/20/2020.

Treasurer, RACS, information-technology, closed-session, and communications records will support additional predicate acts, including further mail and wire transmissions in the tax-sale proceedings and obstruction-related conduct, and will seek leave to supplement. The communications and dealings evidencing the Enterprise, including the NDA-shielded correspondence, the closed-session materials, the RACS audit tables, and the text-message records, are within Defendants' exclusive possession, custody, and control, and Rule 9(b) does not require Plaintiffs to plead facts exclusively within Defendants' control with greater particularity before discovery.

164. RICO injuries and proximate cause. Each Plaintiff was a direct target of identified predicate acts: Keith of the tax-lien mailings, the fabricated assessments, the denial of redemption, the rigged auction, and the retention and escheat of the surplus proceeds of the forced sale (predicate 2), suffering the loss of her family's land, her heir's interest, the costs of attempting redemption, and the monies to which she remains entitled, and, as attorney-in-fact for her grandmother, the costs of restoring an exemption unlawfully removed; Clarkson, to the extent the parcels upstream of their properties passed through the tax-sale and reclassification pipeline described in Part VI, which discovery will confirm, of the same predicate mailings and record falsifications, suffering remediation costs, well-water treatment and replacement costs, and property-value loss; Clarkson of the tax-lien mailings and record falsifications affecting the drainage parcel adjacent to her property (predicate 2), suffering out-of-pocket costs, remediation costs, and property-value loss from the recurring flooding the de-recognition causes; and SFF of the concealment scheme, suffering quantifiable diversion of organizational resources. These injuries to business and property flow directly from the predicate acts, not derivatively through harm to others.

## <u>XII. MUNICIPAL POLICY, CUSTOM, AND RATIFICATION</u>

165. The constitutional violations alleged herein were caused by official policies and customs of the City and of the Authority, each fairly attributable to final policymakers: (a) the 2018 internal

citywide policy substituting Appendix G for the mandatory Bay Act program and under-designating the CBPA, a uniform, citywide policy applied continuously since 2018 and never authorized by the governing body; (b) the persistent, widespread, and well-documented custom of off-process disposition of public assets to favored private parties (Parts VI through IX), known to and ratified by the City Council, which appoints every Authority member, voted down independent bid review in 2018, and approved each transaction; (b) the Authority's own policies and customs, adopted by its board as its final policymaking authority, including closed-session dispositions, non-enforcement of conflict rules, non-reporting, the submission of its own bid on City land for a private consortium, discounted sales to insiders, and its approval of and financial participation in the VBN Term Sheet, each an act of the Authority itself and not merely of the City; (d) ratification by final policymakers, including the Council's adoption of the Disposition Ordinance with knowledge of the concealed dealings after they were publicly exposed and the City Attorney's legal-sufficiency approvals; (e) the Council's knowing refusal, when asked in public session, to exercise the City's statutory authority under Va. Code §§ 58.1-3970 and 58.1-3970.1 to take tax-delinquent drainage parcels into public ownership, and its acquiescence in their auction to builders; and (f) the Zoning Administrator's and Planning Department's practice of "reclassifying" auctioned parcels as buildable and issuing permits on the "right to build" rationale, a citywide practice applied to every divested parcel. The violations were the coordinated product of multiple departments, planning, zoning, information technology, the Treasurer's Office, the City Attorney's Office, and economic development, not the isolated acts of any single employee.

## XIII. TIMELINESS, CONTINUING VIOLATIONS, AND TOLLING

166. All claims are timely. The flooding and drainage invasions are continuing torts and continuing takings, accruing anew with each inundation. The 2018 "right to build" policy and CBPA under-designation are present, continuing conditions enforced today. The MS4 violations are ongoing within the meaning of *Gwaltney*.

167. The RICO pattern includes predicate acts within the last four years, and RICO injuries are governed by the separate-accrual rule. As to all earlier conduct, Defendants fraudulently concealed the facts, through unnoticed database edits, the NDA, closed sessions, non-reporting, false public statements, and instructions to a sitting Council member to "refrain from publicizing" records, such that Plaintiffs neither knew nor reasonably could have known the facts giving rise to their claims: Keith could not have known that the delinquency divesting her family was manufactured by concealed RACS edits, or that Brown had solicited the City to institute the tax suit, until the batch-run and solicitation records described in Part VI came to light when SFF filed the Complaint; Keith did not receive, and could not have discovered the disposition of, the surplus proceeds of the sale, and did not learn that those monies had never been paid to the family and, on information and belief, had escheated to the Commonwealth, until asked by Plaintiff Clarkson after filing of the Complaint; Clarkson, although she reported visible symptoms to officials beginning in 2021, could not have known of the concealed citywide policy, the batch operation, or the enterprise coordination until the VFOIA productions and sworn filings of 2024-2026; and, who experienced the inundation of their properties as a natural event, could not have known that the upstream fill had been permitted on de-recognized drainage land under a regime never lawfully adopted. Equitable tolling and estoppel apply; Va. Code § 8.01-229(D) tolls the state-law claims for the period of obstruction; and a defendant whose own concealment prevented discovery of the claim may not invoke limitations, because no limitations defense rewards the success of the concealment it protects.

## <u>XIV. CLAIMS FOR RELIEF</u>

### <u>COUNT I</u>
**Conduct of Enterprise Affairs Through a Pattern of Racketeering Activity**
**(18 U.S.C. § 1962(c); 18 U.S.C. § 1964(c))**
*(Against Dyer, Wilson, Duhaney, Stiles, and Henderson, each individually; Dragas; and Does)*

168. Plaintiffs incorporate by reference each preceding paragraph.

169. Each RICO Defendant is a "person" under 18 U.S.C. § 1961(3), employed by or associated with the association-in-fact Enterprise described in Part XI, which is engaged in and whose activities affect interstate commerce (interstate wires, interstate financing, out-of-state funds and issuers, federal grants, and interstate construction and real-estate markets).

170. Each RICO Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, including the predicate acts identified in Part XI attributable to each: Dyer (predicates 4 and 5 acceptance, concealment acts); Wilson (predicates 5 and 6); Duhaney (predicates 2, 5, 7 and 8); Stiles (predicates 1, 2 approvals, 5, and 9); Dragas (predicates 3-5); and the Doe participants as identified.

171. By reason of these violations, Plaintiffs Clarkson, Keith, and SFF suffered direct injury to business and property as pleaded in Part XI, in amounts to be proven, trebled under 18 U.S.C. § 1964(c), with costs and reasonable attorneys' fees.

**COUNT II**
**RICO Conspiracy**
**(18 U.S.C. § 1962(d))**
*(Against Dyer, Wilson, Duhaney, Stiles, and Henderson, each individually; Dragas; and Does)*

172. Plaintiffs incorporate each preceding paragraph.

173. Each RICO Defendant knowingly agreed to facilitate a scheme that, if completed, would include the operation or management of the Enterprise through a pattern of racketeering activity, and adopted the goal of furthering that endeavor, as evidenced by the coordinated, mutually reinforcing acts pleaded above: the NDA, the audit disclosure, the structured meetings, the false certification and its knowing acceptance, and the concealment campaign. Each is liable for the reasonably foreseeable predicate acts of co-conspirators. Plaintiffs were injured thereby as pleaded, entitling them to treble damages, costs, and fees.

**COUNT III**
**Procedural Due Process**
**(42 U.S.C. § 1983; U.S. Const. amend. XIV)**
*(Against the City, the Authority, and Dyer, Wilson, Duhaney, Stiles, and Henderson)*

174. Plaintiffs incorporate each preceding paragraph.

175. Plaintiffs and the Classes hold constitutionally protected property interests in:

(a) recorded drainage and open-space servitudes and the drainage function appurtenant to their parcels;

(b) tax classifications and exemptions lawfully fixed and relied upon for decades, including the statutory rights of redemption attendant to judicial tax sales;

(c) fee and heirship interests in land, including Keith's interest in the Holley parcels, and the exemption and homestead of Keith's grandmother; (c-1) the statutory rights of an heir who gives notice of a succession claim to be joined in the tax-sale proceeding and to redeem by installment under Va. Code § 58.1-3965(C), and of a bidder at a judicial sale to have the property struck off to the highest bidder;

(d) the statutory procedural predicates, notice, hearing, and ordinance, that Virginia law mandates before the City may change land classifications, dispose of public land (Va. Code § 15.2-1800(B)), or amend its regulatory ordinances.

176. Defendants deprived Plaintiffs of these interests without notice or opportunity to be heard: the 2018 regime was adopted by internal directive with no process at all; the tax-exemption removals, fabricated assessments, and record alterations were effected without notice or hearing; the Holley heirs' statutory redemption and installment rights were denied and their bids at auction disregarded; the elderly exemption of Keith's grandmother was removed and its reinstatement conditioned on demands the law does not permit; divested parcels were "reclassified" and permitted without the notice and hearing that any change in zoning classification requires; and the VBN disposition was predetermined behind an NDA that withheld the dealings from the public bodies whose review constitutes the process due, then

consummated by an "alternate version" ordinance adopted on defective notice. The deprivations were effected under color of state law pursuant to the policies and customs pleaded in Part XII. These claims are timely for the reasons pleaded in Part XIII.

177. Plaintiffs and the Classes suffered and will suffer injury, entitling them to damages, declaratory relief, and an injunction .

**COUNT IV**
**Substantive Due Process**
**(42 U.S.C. § 1983; U.S. Const. amend. XIV)**
*(Against the City, the Authority, Dyer, Wilson, Duhaney, Stiles, and Henderson)*

178. Plaintiffs incorporate each preceding paragraph.

179. Defendants' conduct, the deliberate falsification of public land and tax records to manufacture delinquencies against targeted parcels, including land held by an elderly woman whose heirs were then denied redemption and passed over at auction in favor of the builder who had solicited the tax suit, and the homestead of a bedridden elderly woman whose exemption was removed and held hostage to her personal appearance; the knowing acceptance of a false anti-collusion certification; and the use of governmental power to transfer public assets to predetermined private beneficiaries under color of sham process, is arbitrary, conscience-shocking conduct unjustifiable by any legitimate governmental interest, literally incapable of being cured by any process because the process itself was the instrument of the deprivation, and it deprived Plaintiffs of property in violation of the Fourteenth Amendment.

**COUNT V**
**Equal Protection**
**(42 U.S.C. § 1983; U.S. Const. amend. XIV)**
*(Against the City, the Authority, and Dyer, Wilson, Duhaney, Stiles, and Henderson)*

180. Plaintiffs incorporate each preceding paragraph.

181. Defendants intentionally treated Plaintiffs and the Classes differently from similarly situated favored parties without rational basis: ordinary owners, including Clarkson, Keith, and the

Holley family, are held to wetlands, density, drainage, and CBPA requirements and are subjected to fabricated assessments, forced sales, and denials of redemption.

Meanwhile the builders who acquire their land at auction, receive permits on a "right to build" theory that has never been extended to the owners from whom the land was. While favored insiders (Dragas, ASC, the Cavalier and Atlantic Park developers, and Authority insiders) receive off-process access, single-applicant carveouts, advance disbursements that are contrary to policy, below-market land, and non-enforcement. The disparate treatment was intentional, irrational, and motivated by the illegitimate purpose of private enrichment.

**COUNT VI**
**Takings and Damaging of Property**
**(42 U.S.C. § 1983; U.S. Const. amends. V, XIV)**
*(Against the City and the Authority)*

182. Plaintiffs incorporate each preceding paragraph.

183. By de-recognizing and conveying the drainage infrastructure serving Plaintiffs' and Class members' parcels, and by approving development, including the filling of the drainage parcels upstream of the properties of Clarkson, that redirects stormwater onto their lands, Defendants have caused and authorized recurring physical invasions of private property, government-induced flooding that is the direct, natural, and probable consequence of their deliberate official actions.

These actions, constitute takings, without just compensation. Each inundation event renews the taking, so the claim is timely as to every invasion within the limitations period regardless of when the first occurred. The flooding is attributable to public action, the City's own de-recognition, conveyance, and permitting decisions, respecting the drainage system on which the affected catchments depend, and not to the conduct of strangers. The failure to exclude wetlands, water bodies, and drainage from

minimum-lot-area and density calculations further takes the affected owners' property by regulatory distortion. Plaintiffs seek just compensation, damages, and injunctive relief.

**COUNT VII**
**Clean Water Act Citizen Suit – Ongoing Violations of Permit Conditions**
**(33 U.S.C. §§ 1365(a)(1), (f)(7); 33 U.S.C. § 1342)**
*(Against the City)*

184. Plaintiffs incorporate each preceding paragraph, including Part X.

185. The City is a "person" in violation of "an effluent standard or limitation," defined to include "a permit or condition of a permit issued under section 1342." 33 U.S.C. § 1365(f)(7). Each condition of MS4 Permit No. VA0088676 is independently enforceable.

186. The City is in continuing violation of the Permit conditions identified in Part X, subparagraphs (a) through (i), each of which existed at the commencement of this action and continues, or is intermittent, yet reasonably likely to recur because its programmatic cause remains uncorrected. Plaintiffs make these allegations in good faith based on the City's own permit, annual reports, DEQ registries, and public records.

187. Plaintiffs and their members are persons "having an interest which is or may be adversely affected," 33 U.S.C. § 1365(g): they own property on, draw drinking water beneath, and use and enjoy the receiving waters of the Southern Rivers Watershed, and Clarkson and Keith, each draw their household drinking water from private wells downstream of the de-recognized and filled drainage.

188. Plaintiffs seek declaratory relief; an injunction requiring compliance, including lawful CBPA designation, ordinance amendment, TMDL implementation, completion of the inspection backlog, control of unpermitted industrial discharges including the ASC campus, and a survey and assessment of the receiving drainage outside the MS4 service area; an injunction against City approval of new discharges and land-disturbing approvals in the Southern Rivers Watershed, including the VBN project, until compliance is achieved and the downstream drainage is resurveyed; civil penalties payable

to the United States Treasury under 33 U.S.C. §§ 1365(a) and 1319(d); and costs and fees under 33 U.S.C. § 1365(d).

**COUNT VIII**
**Endangered Species Act Citizen Suit**
**(16 U.S.C. §§ 1538(a)(1)(B), 1540(g))**
*(Against the City, the Authority, and Dragas)*

189. Plaintiffs incorporate each preceding paragraph. The sixty-day notice served July 13, 2026 has matured; this Count is asserted to the extent federally listed species are confirmed on the Property by the surveys.

190. On information and belief, the Property and its waters provide habitat for federally listed species, including the northern long-eared bat (endangered) and the tricolored bat (if and when listed), whose presence qualified surveys will confirm or exclude. The site mobilization, tree clearing, and hydrologic alteration the Term Sheet contemplates would "take" listed species within the meaning of 16 U.S.C. § 1538 and 50 C.F.R. § 17.3 (harm by significant habitat modification). Plaintiffs seek declaratory and injunctive relief prohibiting any such take absent incidental-take authorization.

**COUNT IX**
**Declaratory Judgment: No Lawful Site Disturbance Absent Federal Eagle Authorization**
**(28 U.S.C. §§ 2201–2202; Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668–668d (as the governing legal standard)**
*(Against the City, the Authority, and Dragas)*

191. Plaintiffs incorporate by reference each preceding paragraph.

192. Plaintiffs do not assert a private right of action under the Bald and Golden Eagle Protection Act or the Migratory Bird Treaty Act. Rather, an actual controversy exists between the parties as to whether the conveyance, approvals, and construction schedule the Term Sheet mandates can lawfully be performed: the Property contains two active bald eagle nests; federal law prohibits disturbance of those nests, 16 U.S.C. § 668; 50 C.F.R. Part 22, absent a permit no Defendant holds or

has sought; and the Term Sheet's deadlines (approvals by June 30, 2027 and prompt site mobilization) cannot be met lawfully.

193. Plaintiffs seek a declaration that no Defendant may authorize, commence, or permit tree removal, grading, or land-disturbing activity within 660 feet of either nest absent the required federal authorization, and that municipal approvals purporting to authorize such activity are void, together with a conforming injunction in aid of that declaration.

**COUNT X**
**Inverse Condemnation**
**(Va. Const. art. I, § 11 (supplemental))**
*(Against the City and the Authority)*

194. Plaintiffs incorporate each preceding paragraph.

195. Article I, § 11 of the Constitution of Virginia encompasses property "damaged" as well as taken. Defendants' de-recognition and conveyance of the drainage infrastructure on which Plaintiffs' catchments depend, and their approval of upstream development, including the filling of the drainage parcels above the property of Clarkson, discharging into that impaired system, are public uses of the government's land-management and stormwater powers that have directly damaged and taken Plaintiffs' and Class members' private property. These invasions issue from the failure and redirection of a drainage function the City itself recognized, recorded, and then destroyed, not from purely private conduct. Each flood event renews the claim, and the claim is timely as to each invasion within the limitations period. Plaintiffs seek just compensation, damages, and interest.

**COUNT XI**
**Conspiracy to Obstruct Justice in State Court Proceedings**
**(42 U.S.C. § 1985(2); 42 U.S.C. § 1985(3)**
*(Against Henderson, Dyer, Wilson, Duhaney, Stiles, and Does)*

196. Plaintiffs incorporate each preceding paragraph.

197. Defendants and Doe participants, including the captive auctioneer, the special commissioners, and the developer-purchaser Brown, conspired for the purpose of impeding, hindering,

obstructing, and defeating the due course of justice in the Commonwealth of Virginia in identified Virginia Beach Circuit Court judicial tax-sale proceedings.

These proceedings became possible through fabricated assessments, manufactured delinquencies as the predicate for judicial sales, concealing the conflicts of the court officers who conducting them, serving process at addresses known to be out of date, obtaining relief against absent heirs, denying qualifying heirs the statutory rights of joinder, installment redemption, redemption, and conducting auctions whose outcomes were arranged in advance in favor of pre-selected builders over competing bidders, including the Holley family.

198. The conspiracy was motivated, at least in part, by invidious class-based animus: on information and belief, the parcels and owners targeted by the exemption-stripping operation were disproportionately the heirs' property of elderly, disabled, and Black landholding families, including the Holley family, whose generational land in the rural southern portion of the City was the raw material the scheme converted. Plaintiff Keith and the Exemption-Stripping Subclass were injured in their persons and property thereby, and are entitled to damages.

**COUNT XII**
**Neglect to Prevent**
**(42 U.S.C. § 1986)**
*(Against Stiles and Does with knowledge and power to prevent)*

199. Plaintiffs incorporate each preceding paragraph.

200. Defendant Stiles and Doe supervisors, having knowledge of the § 1985 conspiracy, including by Clarkson's 2021 written notice, and power to prevent or aid in preventing it, neglected and refused to do so, and are liable for the resulting injuries. Because the conspiracy and its concealment continued into the limitations period, and because the underlying wrongs were fraudulently concealed as pleaded in Part XIII, this claim is timely.

**COUNT XIII**
**Virginia Statutory Business Conspiracy**
**(Va. Code §§ 18.2-499, 18.2-500 (supplemental))**
*(Against Dragas; Dyer, Wilson, Duhaney, and Stiles in their individual capacities; and Does)*

201. Plaintiffs incorporate each preceding paragraph.

202. Dragas combined, associated, and agreed with two or more persons, including the individual Defendants acting outside the legitimate scope of their offices, for personal and political benefit.

203. Legal malice is pleaded with particularity: the conspirators acted intentionally, purposefully, and without lawful justification when they conducted seventeen months of concealed dealings, extracted non-public information, executed and accepted an anti-collusion certification known to be false, and thereby purposefully deprived competing respondents of the fair competition the solicitation promised. Injury to competitors was the intended and necessary means of the scheme, not an incident of legitimate competition.

**COUNT XIV**
**Virginia Antitrust Act – Conspiracy in Restraint of Trade**
**(Va. Code §§ 59.1-9.5, 59.1-9.12 (supplemental))**
*(Against Dragas and Does)*

204. Plaintiffs incorporate each preceding paragraph.

205. The relevant market is the market for the acquisition and redevelopment of the Property as solicited by RFP #ED-25-04, and more broadly the market for disposition of City-owned development land in Virginia Beach. Dragas and its co-conspirators rigged that market: pre-arranged access and information asymmetry, a sham solicitation, and a false anti-collusion certification constitute a contract,

combination, or conspiracy in restraint of trade, per se unlawful as bid rigging.

206. No Virginia statute clearly articulates a policy authorizing bid rigging in municipal land dispositions; no state-action immunity attaches. Plaintiffs seek treble damages, costs, and fees under Va. Code § 59.1-9.12, and injunctive relief.

**COUNT XV**

**Virginia Computer Crimes Act**
**(Va. Code §§ 18.2-152.3, 18.2-152.12 (supplemental))**
*(Against Henderson and Does; the City for respondeat superior as applicable)*

207. Plaintiffs incorporate each preceding paragraph.

208. Defendant Henderson and Doe Defendants used computers and computer networks without authority or in excess of authority, with intent to defraud, to alter assessment classifications, tax-exemption status, and land-record designations of the parcels identified in Part VI, including the Holley parcels and the homestead of Keith's grandmother, and to alter the zoning and buildability designations of auctioned parcels in the City's GIS and permitting systems, causing injury to Keith, Clarkson, the Exemption-Stripping Subclass, and the Property Damage Class, who seek damages, costs, and fees under Va. Code § 18.2-152.12.

**COUNT XVI**
**Declaratory Judgment – Disqualification of the Commonwealth's Attorney**
**(28 U.S.C. §§ 2201-2202)**
*(Against Doe Commonwealth's Attorney, official capacity only)*

209. Plaintiffs incorporate each preceding paragraph.

210. An actual controversy exists as to whether the Commonwealth's Attorney for the City, who has acknowledged in writing to the Virginia State Bar a disqualifying conflict concerning the John Doe financial institution, and who has initiated no prosecution under the Conflict of Interests Act or the Governmental Frauds Act against any sitting City elected official since 2013, is disqualified from investigating or declining to investigate the conduct alleged herein. Plaintiffs seek a declaration of

disqualification and such further relief as supports referral of the record to the Attorney General of Virginia and the United States Attorney. No damages are sought against this official.

**COUNT XVII**
**Declaratory Judgment – ITA Master Plan Amendment and Single-Applicant Carveout Inconsistent with State Law AICUZ Obligations**
**(28 U.S.C. §§ 2201-2202; 2006 Va. Acts of Assembly; Va. Code §§ 15.2-2223 et seq.)**
*(Against the City)*

211. Plaintiffs incorporate each preceding paragraph.

212. The 2025-2026 ITA Master Plan amendment and the September 16, 2025 single-applicant carveout conflict with the City's obligations under the 2006 Acts of Assembly and its AICUZ ordinance adopted pursuant to the 2005 BRAC commitments, with Va. Code § 15.2-2283.1 (discouraging incompatible encroachment upon military installations), with the mandatory comprehensive-plan criteria of Va. Code §§ 15.2-2223 through 15.2-2224 (including groundwater sustainability and water-quality analysis), and with the Comprehensive Plan as the City's own advisory bodies found in April 2025.

213. This is not a request for an advisory opinion about hypothetical acts: the carveout was adopted on September 16, 2025; the Master Plan update is presently pending on a defined record; the ASC expansion it serves is funded, announced, and under way; and the industrialization directly injures Plaintiffs' adjacent and downstream interests now. Plaintiffs seek a declaration of invalidity and an injunction against approvals premised on the amendment.

**COUNT XVIII**
**Declaratory Judgment – Non-Disclosure Agreement Ultra Vires and Void**
**(28 U.S.C. §§ 2201–2202; Dillon Rule)**
*(Against the City and Dragas)*

214. Plaintiffs incorporate each preceding paragraph.

215. No statute, charter provision, or ordinance authorizes the City to contract away disclosure to its own boards and commissions or to conceal the disposition of public land from the bodies charged with its oversight, and no ordinance of the Council authorized or ratified the NDA.

216. The FOIA exemptions the City invokes, Va. Code §§ 2.2-3711(A)(5) and 2.2-3705.6(3), protect economic-development recruitment of prospective or expanding businesses where no previous announcement of the business's interest has been made, narrowly construed under § 2.2-3700(B); they are permissive shields against mandatory disclosure, not grants of municipal power, and they do not reach the sale of public land to an established local developer whose identity and interest were known to the officials who would vote on it.

217. The August 7, 2024, NDA, is ultra vires and void ab initio. All actions taken in reliance upon the NDA are voidable. Plaintiffs seek a conforming declaration.

**COUNT XIX**

**Declaratory Judgment – The 2018 Regime and the VBN Disposition Process Are Void for Want of Statutory and Constitutional Predicates**

**(28 U.S.C. §§ 2201-2202; Va. Const. art. VII, § 9;Va. Code §§ 15.2-1800(B), 15.2-1813, 15.2-2100, 62.1-44.15:74; Dillon Rule)**

*(Against the City and the Authority)*

218. Plaintiffs incorporate each preceding paragraph.

219. The 2018 internal citywide policy substituting Appendix G for the mandatory Bay Act program, and the corresponding under-designation of the CBPA, were never adopted by ordinance after notice and hearing, were never presented to or voted upon by the Council, exceed the City's delegated powers, violate the City's own existing ordinances, and are void ab initio; every approval issued in reliance on that regime, on every parcel below the Green Line, is voidable.

220. The VBN disposition, including the August 11, 2026 Disposition Ordinance, proceeded without the statutory and constitutional predicates Virginia law requires for the disposition of public land dedicated to public use: the notice published for the July 7, 2026 hearing was defective by the City's own sworn admission. The re-advertised notice repeated the acreage misdescription and omitted the interests actually being disposed of. The ordinance adopted was an "alternate version" that was not advertised. The recorded vote was taken on terms that did not exist; and the ordinance delegates the settlement of those terms to the City Manager without further hearing or recorded supermajority vote.

221. Under controlling Virginia law, local legislative action taken on statutorily deficient notice is void ab initio. *Glazebrook v. Bd. of Supervisors*, 266 Va. 550 (2003); *City Council of Alexandria v. Potomac Greens Assocs. P'ship*, 245 Va. 371 (1993); *Bd. of Cnty. Supervisors of Prince William Cnty. v. Oak Valley Homeowners Ass'n* (Va. Ct. App. Mar. 31, 2026).

222. The administrative "reclassification" of auctioned drainage, open-space, and otherwise unbuildable parcels as buildable, and the issuance of permits on them on the theory that every recorded parcel carries a "right to build" irrespective of the lot-area, density, drainage, and environmental requirements of the City's ordinances, is a de facto rezoning effected without the notice, hearing, and recorded vote that Va. Code §§ 15.2-2204 and 15.2-2285 require, is void ab initio, and every permit so issued is void; Plaintiffs seek a declaration that no such "right to build" exists independent of compliance with the ordinances in force and the mandatory state program, and that no permit may issue on any parcel below the Green Line that does not satisfy them.

223. Plaintiffs seek declarations of invalidity and an injunction against conveyance, encumbrance, or land-disturbing activity pending lawful process. These issues of Virginia law are also presented to the Circuit Court of the City of Virginia Beach in the parallel state action; this Court may, as appropriate, stay or abstain as to this Count in deference to that proceeding while retaining the federal claims.

## COUNT XX

**Fraudulent Concealment and Fraud on Land Records; Constructive Trust**
**(Virginia Common Law (supplemental))**
*(Against the City, Does, Henderson, Does, and developer-purchaser Does)*

224. Plaintiffs incorporate each preceding paragraph.

225. Defendants knowingly falsified and concealed material facts in the public land and tax records, representations of record on which Plaintiffs, the Classes, and all purchasers are entitled to rely,

with intent to mislead; the concealment was active, not constructive, consisting of unnoticed database edits, suppressed audit trails, and records withheld under an ultra vires NDA.

Plaintiffs reasonably relied, to their detriment, in the maintenance, purchase, improvement, and attempted redemption of their properties. Keith's family relied on the recorded exemption, the redemption process, and the integrity of the public auction. Keith's grandmother's relied on the elderly exemption lawfully granted to her.

Sovereign immunity does not bar claims arising from the intentional falsification of records for private benefit, which is not a governmental function, and the limitations defense is answered by the concealment itself as pleaded in Part XIII. Plaintiffs seek damages; correction of the records; and imposition of a constructive trust upon parcels and proceeds traceable to the scheme, including the Holley parcels and other parcels conveyed to developer-purchasers with notice of the fraud.

**COUNT XXI**
**Declaratory and Injunctive Relief – The Authority Has Exceeded and Abused Its Powers**
**Accounting, Supervision, and Referral for Dissolution**
**(28 U.S.C. §§ 2201–2202; Va. Code §§ 15.2-4900 et seq., 15.2-4914; Va. Code § 8.01-635 et seq.)**
*(in the alternative)*
*(Against the Authority and the City)*

226. Plaintiffs incorporate each preceding paragraph, including Parts VII and VIII.

227. An actual controversy exists as to whether the Authority is operating within its statutory powers and purposes. The Authority was created in 1964 to finance and induce industrial and commercial development. It has long since outlived and abandoned that purpose, and the record establishes persistent abuse and institutional incapacity.

The Authority has gone five consecutive fiscal years, without the annual reporting its governance contemplates; administration of EDIP in violation of its own policies, including advance disbursement and grants to conflicted and failed ventures; the submission of its own one-dollar bid on the City's land to hold it for a private consortium; discounted and abnormal-valuation dispositions to its own present and former members; recurrent participation by members holding undisclosed personal interests in the

transactions before them, including the 2013 Cavalier deliberations, the Green Flash transactions, and, presently, a member whose farming partnership holds the very lease the pending VBN transaction would partially terminate; a chair whose law firm represents the Authority's co-defendants in this action and whose appointments, on information and belief, exceed or outlast applicable term limitations; a staff legal advisor who is the brother of the City Attorney defending this action; and a staffing department where two of the departments employees, including its long-time director, were convicted of embezzling public funds across the same years.

228. Plaintiffs seek: (a) a declaration that the Authority has exceeded and abused its powers, no longer serves its statutory purpose, and is presently incapable of lawfully exercising its acquisition, disposition, grant-making, and financing functions; (b) an injunction prohibiting the Authority from acquiring, conveying, leasing, encumbering, or granting public assets, including any action in furtherance of the VBN transaction, pending compliance with the accounting and governance conditions the Court orders; (c) a court-supervised accounting of all real property, EDIP and tourism-financing commitments, and bond obligations, with appointment of a special master or receiver over the Authority's land inventory as equity requires; (d) referral of the record to the Attorney General of Virginia, the United States Attorney for the Eastern District of Virginia, and the Virginia State Police; and (e) a declaration that, upon defeasance of outstanding obligations, dissolution under Va. Code § 15.2-4914 is the appropriate remedy, directing the City and the Authority to take the steps that statute prescribes, together with leave, if and as required, to proceed in the nature of quo warranto under Va. Code § 8.01-635 *et seq*.

229. Plaintiffs acknowledge that the statutory act of dissolution belongs to the locality upon the conditions Va. Code § 15.2-4914 prescribes; the relief sought here establishes the factual and legal predicate for that dissolution, enjoins the abuse in the interim, and compels the accounting without which

dissolution cannot responsibly occur. This claim enforces the Authority's own enabling statute; it does not interfere with any unified state regulatory scheme, and abstention is not warranted.

**COUNT XXII**
**Declaratory Judgment – Individual Liability for Defense Costs**
**(28 U.S.C. §§ 2201-2202; Va. Code § 15.2-1521)**
*(Against Dyer, Wilson, Duhaney, Stiles, and Henderson individually)*

230. Plaintiffs incorporate each preceding paragraph.

231. Because the individual Defendants' acts alleged herein were willful, outside the scope of lawfully conferred duties, and undertaken for personal and private benefit, an actual controversy exists as to whether public funds may lawfully be used for their individual defense or indemnification.

Va. Code § 15.2-1520 authorizes a locality to provide civil defense costs only for actions arising out of the performance of official duties; acts of the kind alleged, the falsification of records, the acceptance of certifications known to be false, and participation in a private-benefit enterprise, are not the performance of official duties. Plaintiffs seek a declaration that defense costs and any judgment on the individual-capacity claims are the personal obligations of those Defendants.

**COUNT XXIII**
**Taxpayer Action on Behalf of Taxpayer Class – Unlawful Expenditure and Disposition of Public Funds and Assets; Restitution, Accounting, and Constructive Trust**
**(Virginia Common Law (supplemental); Va. Const. art. VII, § 9; Va. Code §§ 15.2-1800(B), 15.2-2100, 15.2-4901 et seq.; 28 U.S.C §§ 2201-22022)**
*(Against the City and the Authority; Dyer, Wilson, Duhaney, Stiles, and Henderson, individually and officially; and Dragas and Does as recipients)*

232. Plaintiffs incorporate each preceding paragraph.

233. Plaintiffs Clarkson and Keith are resident taxpayers of the City and bring this Count on behalf of the Taxpayer Class. Virginia recognizes the right of a resident taxpayer to sue in equity to restrain the unlawful expenditure of public funds and the unlawful disposition of public property, and to compel restitution to the public treasury of funds and property unlawfully diverted. *Goldman v. Landsidle*, 262 Va. 364, 373 (2001). The interest of a municipal taxpayer in the application of municipal

funds is "direct and immediate," and suffices for standing in this Court. *Frothingham v. Mellon*, 262 U.S. 447, 486-87 (1923); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349 (2006).

234. Defendants have expended, committed, and disposed of public funds and assets of the City and the Authority for the private benefit of the Enterprise Participants and in violation of law, including: (a) the approximately $11.8 million advance wire of public funds in July 2013 to enable a private closing, in violation of EDIP policy; (b) EDIP and other grant disbursements made contrary to policy and without disclosure of insider interests, including the BCause and ASC disbursements and discounts; (c) the conveyance and lease of public land for nominal consideration, including the ten-dollar conveyance of the VBN flanking parcels, the one-dollar-per-year, one-hundred-year Atlantic Park parking lease, and the Authority's one-dollar bid on the City's own oceanfront land; (d) the discounted and below-market dispositions of Authority land to present and former Authority insiders; (e) the Atlantic Park commitments and bond obligations and the use of tourism-tax funds to cover private debt service; (f) the commitment of up to $3.6 million in course-redesign reimbursement and approximately $1.82 million in Authority funds to the below-market disposition to Dragas of a public facility producing approximately $740,000 in annual net income; (g) the public cost of the drainage capital projects, including at Ashville Park, made necessary by the City's approval of development on land it knew would flood, and the public cost of the flooding caused by the de-recognition, auction, and filling of drainage parcels; (h) the forgone revenues and the surplus-proceeds liabilities generated by the tax-lien scheme; and (i) the use of public funds to defend the individual Defendants for acts outside the scope of their duties. Each such expenditure and disposition was made without lawful authority, for private rather than public purposes, and in breach of the duties the individual Defendants owe the public.

235. Every member of the Taxpayer Class has been injured in the same way: each has paid, and continues to pay, the taxes that fund the expenditures and replace the public assets and revenues Defendants have diverted, including the real estate tax increase approved with the 2021 flood protection

referendum, while the zero-impact development standard promised in exchange for that increase was withheld for the benefit of the development interests the Enterprise serves.

236. Plaintiffs and the Taxpayer Class seek: (a) a declaration that the expenditures and dispositions identified above were unlawful; (b) an injunction against further expenditures, commitments, and dispositions of public funds and assets in furtherance of the VBN transaction and the other conduct alleged herein, pending compliance with law; (c) an accounting; (d) restitution and disgorgement to the treasuries of the City and the Authority of all public funds, and the value of all public property, unlawfully diverted, from the individual Defendants and from the private recipients thereof, including Dragas and the Doe participants, with the imposition of a constructive trust on public assets and their proceeds in private hands; (e) to the extent Virginia law permits, damages against the individual Defendants for the public funds lost through their willful misconduct, to be paid into the public treasury for the benefit of the Taxpayer Class; and (f) reasonable attorneys' fees and costs from any common fund recovered or as otherwise permitted by law.

237. This Count does not challenge the assessment, levy, or collection of any tax; it seeks to restore, not to restrain, the public revenues. The Tax Injunction Act, 28 U.S.C. § 1341, and principles of comity are not implicated

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes and the Subclasses, respectfully request that the Court:

A. CERTIFY the Property Damage Class, the Exemption-Stripping Subclass, and the Surplus Proceeds Subclass under Rule 23(b)(3), and the Injunctive Class and the Taxpayer Class under Rule 23(b)(2) (and the Taxpayer Class, in the alternative, under Rule 23(b)(3)), or in the alternative certify issues under Rule 23(c)(4); appoint Plaintiffs

Clarkson and Keith, as class representatives; and appoint class counsel under Rule 23(g) as proposed at certification;

B. ENTER judgment for Plaintiffs on Counts I and II and award treble damages, costs, and attorneys' fees under 18 U.S.C. § 1964(c);

C. ENTER judgment on Counts III through VI and X through XII, awarding compensatory damages, just compensation, and, against the individual Defendants, punitive damages, with attorneys' fees under 42 U.S.C. § 1988;

D. On Count VII, DECLARE the City in continuing violation of its MS4 Permit; enjoin the violations and require a compliance program including lawful CBPA designation, ordinance amendment, TMDL implementation, completion of the inspection backlog, control of unpermitted industrial discharges, and a survey and assessment of the receiving drainage downstream of the MS4 service area; enjoin City approval of new land-disturbing activity and discharges in the Southern Rivers Watershed, including the VBN project, pending compliance and completion of the downstream drainage resurvey; assess civil penalties payable to the United States Treasury; and award costs and fees under 33 U.S.C. § 1365(d);

E. On Counts VIII and IX, DECLARE and ENJOIN as requested therein, including prohibition of any conveyance, tree removal, grading, or land-disturbing activity on the Property, including within 660 feet of either bald eagle nest, absent all required federal authorizations;

F. On Counts XIII through XV, AWARD treble damages, costs, and attorneys' fees under Va. Code §§ 18.2-500 and 59.1-9.12 and damages under § 18.2-152.12;

G. On Counts XVI through XIX, ENTER the declarations requested; DECLARE the August 7, 2024 NDA, the 2018 regulatory substitution, the September 16, 2025 carveout, and the

August 11, 2026 Disposition Ordinance and the VBN disposition process void or voidable; declare that no "right to build" exists independent of compliance with the City's ordinances and the mandatory state program, and that the administrative "reclassification" of auctioned drainage and open-space parcels as buildable, and the permits issued thereon, are void; and enjoin the conveyance, lease, or encumbrance of the Property and the adjacent parcels pending lawful process;

H. On Count XX, AWARD damages, order correction of the land and tax records, restore the unlawfully stripped exemptions and classifications, including the retroactive restoration of the elderly exemption of Keith's grandmother and the refund of all amounts paid by reason of its removal, and impose a constructive trust on parcels and proceeds traceable to the scheme, including the Holley parcels; and order an accounting of all surplus proceeds of the Class Period tax sales under Va. Code § 58.1-3967 and restitution to Keith and the Surplus Proceeds Subclass of all amounts unpaid, retained, or escheated;

I. On Count XXI, DECLARE the Authority's abuse of its powers and that it no longer serves its statutory purpose; enjoin further acquisitions, dispositions, grants, and encumbrances pending compliance; order a court-supervised accounting and appoint a special master or receiver over the Authority's land inventory; refer the record to the Attorney General of Virginia, the United States Attorney, and the Virginia State Police; and declare that dissolution under Va. Code § 15.2-4914 is appropriate upon defeasance of obligations, with leave to proceed in the nature of quo warranto as required;

J. On Count XXII, DECLARE the individual Defendants personally responsible for their defense costs and any individual-capacity judgment;

K. On Count XXIII, ENTER the declarations requested; enjoin further unlawful expenditures, commitments, and dispositions of public funds and assets; order an

accounting; and order restitution and disgorgement to the public treasury, with a constructive trust on diverted public assets and their proceeds, for the benefit of the Taxpayer Class;

L. ORDER an audit of all City building permits, site plans, and land-disturbance approvals issued in the Southern Rivers Watershed since 2018, parcel by parcel, identifying on every parcel each approval issued in violation of the City's ordinances and the mandatory state program, together with an audit of every parcel sold at judicial tax sale in the City since January 1, 2016, identifying for each its pre-sale classification and exemption history, its assessed-value history, the bidders and bids at auction, the purchaser, the disposition of surplus proceeds, and every subsequent reclassification and permit; and require the City to produce the underlying permit files, inspection records, RACS and GIS data, and sale records in discovery;

M. ORDER preservation of all documents, communications, devices, RACS audit tables, change tickets, closed-session recordings and materials, text messages, and audit logs relevant to the conduct alleged, and authorize expedited discovery of the communications and dealings among the Enterprise Participants;

N. AWARD pre- and post-judgment interest; and

O. GRANT such other and further relief as the Court deems just and proper.

## XVI. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 22, 2026

Respectfully submitted,

/s/

Suzanne Seidel Richmond (VSB No. 75888)
Law Office of Suzanne Seidel Richmond
3808 North Landing Road
Virginia Beach, Virginia 23456
Telephone: 757-301-8822
Email: suzanneseidel@gmail.com
*Counsel for Plaintiffs and the Putative Class*